**E-FILED**
Thursday, 30 August, 2007  03:13:26 PM
Clerk, U.S. District Court, ILCD

## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS, PEORIA DIVISION

DAYS INNS WORLDWIDE, INC.,

        Plaintiff,

    v.

GROWTH PROPERTY INVESTMENT
GROUP, INC., a California corporation, and
CARLOS E. CARDONA and FRANK TICAS,
individuals,

        Defendants.

Case No.  06-CV-01171-MMM-BGC

Hon. Michael M. Mihm

Magistrate Judge Byron G. Cudmore

## PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Pursuant to Federal Rule of Civil Procedure 56, Plaintiff Days Inns Worldwide, Inc. ("DIW" or "Plaintiff"), respectfully moves for summary judgment against defendants Carlos E. Cardona ("Cardona") and Frank Ticas ("Ticas") on Count Ten of Plaintiff's Verified Complaint ("Complaint").  In support of this Motion, Plaintiff states:

## I.    INTRODUCTION

Plaintiff Days Inns Worldwide, Inc. ("DIW" or "Plaintiff") brought this action to redress trademark infringement and to recover monies owed by defendants Growth Property Investment Group, Inc. ("GPIG"), Carlos E. Cardona ("Cardona") and Frank Ticas ("Ticas") (collectively referred to as "Defendants") pursuant to a June 30, 2004 License Agreement between DIW and GPIG for the operation of a Days Inn® facility in Galesburg, Illinois, and a guaranty of that agreement by Cardona and Ticas ("Guaranty").  This Court entered a default judgment against GPIG in the amount of $294,823.29 for GPIG's breaches of the License Agreement and trademark infringement.  (12/13/06 Order & Judgment, Doc. No. 16, hereinafter "GPIG Judgment".)  Cardona and Ticas, the guarantors of GPIG's obligations, each appeared and filed an answer *pro se* and are the two remaining defendants in the case.

1

Because Cardona and Ticas guaranteed the obligations of GPIG under the License Agreement in their Guaranty agreement, and because judgment already has been entered against GPIG for breaching the License Agreement and causing $294,823.29 in damages to DIW, Cardona and Ticas are liable to DIW for those damages as well.

It is undisputed that the Guaranty is a valid and enforceable contract, under which Cardona and Ticas, jointly and severally, promised to "immediately make each payment and perform or cause [GPIG] to perform" all obligations of GPIG under the License Agreement. As set forth in the GPIG Judgment, GPIG breached the License Agreement by failing to pay DIW (1) past-due recurring fees, (2) liquidated damages for the premature termination of the facility resulting from GPIG's unauthorized transfer of the hotel facility in breach of the parties' contract, (3) damages caused by GPIG's failure to ensure that the facility was de-identified with no further use of the Days Inn Marks, and (4) attorneys' fees, costs and accrued interest. GPIG has not paid any of those amounts to date, nor has Cardona or Ticas, its guarantors. Accordingly,   DIW is entitled to judgment as a matter of law against Cardona and Ticas on its Complaint.

## II.    <u>MATERIAL UNDISPUTED FACTS</u>

1.    On June 30, 2004, DIW entered into a valid and binding License Agreement with GPIG for the operation of a 118-room Days Inn guest lodging facility, located at 3282 N. Henderson St., Galesburg, IL 61401, Site No. 797 (the "Facility"). Cardona signed the License Agreement on behalf of GPIG. (Ex. B hereto, Cardona Requests to Admit, ¶¶ 1-2 [hereinafter, "Cardona R.A."; Ex. C hereto, Ticas Requests to Admit, ¶¶ 1-2 [hereinafter "Ticas R.A."][1]; *see*

---

[1] On May 3, 2007, DIW timely served Cardona and Ticas with Requests for Admission, Interrogatories and Document Requests. On June 26, 2007, DIW re-served Ticas with Requests for Admission, Interrogatories and Document Requests upon learning that he had moved to a new address. In addition, Cardona has been barred from introducing into evidence any

*also* License Agreement, attached as Ex. E hereto [hereinafter "License Agreement"]; Ex. D hereto, Affidavit of Valerie Workman, ¶ 3.)

2.    Effective as of the date of the License Agreement, Cardona and Ticas, jointly and severally, and irrevocably and unconditionally, provided DIW with a Guaranty of GPIG's obligations under the License Agreement (the "Guaranty"). (Ex. A hereto, the Guaranty; Ex. B, Cardona R.A., ¶¶ 3-4; Ex. C, Ticas R.A., ¶¶ 3-4; *see also* Ex. D, Workman Aff., ¶ 16.)

3.    The Guaranty is a valid and binding obligation between Ticas and Cardona, on the one hand, and DIW. (Ex. A, Guaranty; Ex. B, Cardona R.A. ¶¶ 1, 3; Ex. C, Ticas R.A. ¶¶ 1, 4.)

4.    Pursuant to the terms of the Guaranty, Cardona and Ticas each agreed, among other things, that upon default under the License Agreement, they would immediately make all payments and/or perform all obligations required under the License Agreement. (Ex. A, Guaranty.)

5.    Pursuant to the terms of the Guaranty, which expressly acknowledges that section 17 of the License Agreement applies to the Guaranty, Cardona and Ticas each agreed to pay the costs, including reasonable attorneys' fees, incurred by DIW in enforcing its rights or remedies under the Guaranty or the License Agreement. (Ex. A, Guaranty.)

6.    On December 13, 2006, the Court entered judgment in favor of DIW and against GPIG for GPIG's breaches of the License Agreement, in the amount of $294,823.29, which remains outstanding. (Doc. No. 16, GPIG Judgment.)

7.    Those breaches of the License Agreement are GPIG's failures (1) to pay all

---

information he failed to produce in response to DIW's discovery requests. (Text Order entered July 18, 2007.) Because neither he nor Ticas has produced any documents or interrogatory answers in response to DIW's discovery requests or motions to compel, neither defendant may rely on any such information in an attempt to defeat summary judgment.

Recurring Fees due under the License Agreement; (2) to pay Liquidated Damages due under the License Agreement for the premature termination of the Agreement resulting from GPIG's unauthorized transfer of the Facility fourteen years before the expiration of the Agreement's term; (3) to de-identify the Facility as required by Section 13 of the License Agreement and the federal and state trademark laws; and (4) to pay attorneys' fees and costs, along with accrued interest on the outstanding Recurring Fees and Liquidated Damages.  (Doc. No. 16, GPIG Judgment; Ex. D, Workman Aff.)

8.      By way of background, pursuant to Sections 1 and 5 of the License Agreement, GPIG was obligated to operate the Facility for a 15-year term, during which time GPIG was permitted to use the Days Inn trademarks, services marks, trade name and logos ("Days Inn Marks") in association with the operation and use of the Facility as part of DIW's franchise system.  (Ex. D, Workman Aff. ¶ 4; License Agreement, §§ 1 & 5.)

9.      On or about November 12, 2004, the Defendants sold the Facility to Marcia Miller ("Miller"), without seeking or obtaining DIW's prior consent as required by the License Agreement, thereby immediately and unilaterally terminating the License Agreement in further violation of its terms.  (Ex. D, Workman Aff. ¶ 18; Ex. B, Cardona R. A., ¶¶ 5-6; Ex. C, Ticas R. A., ¶¶ 5-6; License Agreement, §§ 9.1, 9.3, 9.5-9.6.)

10.     Pursuant to the License Agreement and Guaranty, the Defendants were required to discontinue immediately any further use of the Days Inn Marks, and to de-identify the Facility by removing all items bearing the Days Inn Marks, but failed to fulfill those obligations before conveying title and relinquishing control of the premises to Miller.  (Ex. D, Workman Aff., ¶¶ 14, 20; License Agreement, § 13.)

11.    Because Cardona and Ticas guaranteed GPIG's obligations pursuant to the Guaranty, they are liable to DIW for the $294,823.29 damages that the Court has ruled were caused by GPIG's breaches of the License Agreement.  (Ex. A, Guaranty; Doc. No. 16, GPIG Judgment.)

12.    In addition, Cardona and Ticas owe DIW interest accruing after the date of entry of the GPIG Judgment.  (Ex. A, Guaranty; License Agreement, § 7.3; Ex. D, Workman Aff., ¶ 38.)  The amount of accrued interest through the date of this Motion is $37,656.60.  This is calculated by taking the judgment amount of $294,823.29 multiplied by the 1.5% monthly interest rate under Section 7.3 of the License Agreement from the December 13, 2006 GPIG Judgment to the date of this Motion.  (*Id.*)

13.    Cardona and Ticas also owe DIW additional attorneys' fees, costs and expenses incurred in connection with the claims against them, pursuant to the terms of the Guaranty.  (Ex. A, Guaranty; Doc. No. 16, Default Judgment Order against GPIG; License Agreement, §17.4.)

**III.    ARGUMENT**

**DIW IS ENTITLED TO SUMMARY JUDGMENT AGAINST CARDONA AND TICAS ON COUNT TEN OF ITS COMPLAINT**

Summary judgment should be granted when "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  In this case, even with all inferences drawn in the light most favorable to Cardona and Ticas, *Holland v. Jefferson Nat'l Life Ins. Co.*, 883 F.2d 1307, 1312 (7th Cir. 1989), the record demonstrates that no genuine issue of material fact exists, and that no reasonable fact finder could return a verdict in favor of them.  *See, e.g., Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-249 (1986).

Pursuant to the Guaranty, Ticas and Cardona, as guarantors of GPIG's obligations, are liable to DIW for $294,823.29, the amount the Court has ruled in the GPIG Judgment constitutes DIW's damages for GPIG's breaches of the License Agreement,[2] along with additional accrued interest and attorneys' fees and costs since that time. As set forth above, Cardona and Ticas' obligations under the Guaranty are undisputed. Accordingly, DIW is entitled to summary judgment against Cardona and Ticas, jointly and severally, on Count X for breach of guaranty for $294,823.29, plus additional accrued interest of $9,100.35, as of August 30, 2007, and attorneys' fees and costs.

## <u>CONCLUSION</u>

DIW respectfully asks the Court to grant summary judgment jointly and severally against defendants Carlos E. Cardona and Frank Ticas for $303,923.64, plus additional attorneys' fees and costs. DIW will submit a petition for the additional attorney's fees and costs (which do not duplicate the fees and costs included in the GPIG Judgment) in accordance with the Local Rules.

---

[2] Of that amount, $93,442.56 represents DIW's damages for the Defendants' violation of their contractual duties to de-identify the Facility. Although DIW claimed these damages against GPIG under both breach of contract and Lanham Act theories, because the infringement was a breach of the License Agreement, Cardona and Ticas are liable for them under the Guaranty (Count Ten). Even if that were not so, however, Cardona and Ticas, as principals of GPIG, are liable as individual contributory infringers (Counts One – Six). *See* Statement of Facts, ¶10; Ticas R.A. ¶¶ 5-8, Cardona R.A. ¶¶ 5-8; *See Platinum Home Mortgage Corp. v. Platinum Fin. Group, Inc.*, 149 F.3d 722, 726-27 (7th Cir. 1998) (likelihood of confusion where same marks used at previously licensed location); *Sparks Tune-Up Centers, Inc. v. Strong*, No. 92 C 5902, 1995 WL 153277, at *2, 6 (N.D. Ill. April 6, 1995) (citing *Gorenstein Enter., Inc. v. Quality Care-USA, Inc.*, 874 F.2d 431, 435 (7th Cir. 1989) (defendant's conduct was deliberate where he was "put on notice of the wrongfulness of his conduct" and did not discontinue infringing conduct; trebling therefore appropriate); *Trans Union LLC v. Credit Research, Inc.*, 142 F. Supp. 2d 1029, 1038 (N.D. Ill. 2001) (state law analysis for common law trademark infringement and unfair competition, and claims under the Illinois Consumer Fraud and Deceptive Business Practices Act, is the same as federal infringement analysis).

Dated: August 30, 2007

Respectfully submitted,

DAYS INNS WORLDWIDE, INC.

s/Mark E. Ashton
Counsel for Plaintiff
Mark E. Ashton Bar Number: 6287992

Clay A. Tillack
Fiona A. Burke
Mark E. Ashton
Schiff Hardin LLP
6600 Sears Tower, 233 South Wacker Drive
Chicago, IL  60606-6473
Telephone: (312) 258-5500
Facsimile: (312) 258-5600
ctillack@schiffhardin.com
fburke@schiffhardin.com
mashton@schiffhardin.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 30 2007, I electronically filed the foregoing **Motion for Summary Judgment** and **Memorandum of Law** with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all counsel of record, and I hereby certify that I have mailed by United States Postal Service the documents to the following non CM/ECF participants:

Frank Ticas, individually
and as President of Growth Property Investment Group, Inc.
12058 Foster Rd.
Norwalk, CA 90658

Carlos Cardona, individually
and as Vice President of Growth Property Investment Group, Inc.
P.O. Box 2145
Mission Viejo, CA 92690-0145

s/Mark E. Ashton
Mark E. Ashton Bar Number: 6287992
One of the Attorneys for Plaintiff
Schiff Hardin LLP
6600 Sears Tower
Chicago, IL 60606
(312) 258-5500
(312) 258-5600 (facsimile)
mashton@schiffhardin.com

CH1\ 5182535.1

**E-FILED**
Thursday, 30 August, 2007  03:13:46 PM
Clerk, U.S. District Court, ILCD

# EXHIBIT A

## GUARANTY

To induce Days Inns Worldwide, Inc., its successors and assigns ("you") to sign the License Agreement (the "Agreement") with the party named as the "Licensee," to which this Guaranty is attached, the undersigned, jointly and severally ("we," "our" or "us"), irrevocably and unconditionally (i) warrant to you that Licensee's representations and warranties in the Agreement are true and correct as stated, and (ii) guaranty that Licensee's obligations under the Agreement, including any amendments, will be punctually paid and performed.

Upon default by Licensee and notice from you we will immediately make each payment and perform or cause Licensee to perform, each unpaid or unperformed obligation of Licensee under the Agreement. Without affecting our obligations under this Guaranty, you may without notice to us extend, modify or release any indebtedness or obligation of Licensee, or settle, adjust or compromise any claims against Licensee. We waive notice of amendment of the Agreement. We acknowledge that Section 17 of the Agreement, including Remedies, Venue and Dispute Resolution, and WAIVER OF JURY TRIAL, applies to this Guaranty.

Upon the death of an individual guarantor, the estate of the guarantor will be bound by this Guaranty for obligations of Licensee to you existing at the time of death, and the obligations of all other guarantors will continue in full force and effect.

IN WITNESS WHEREOF, each of us has signed this Guaranty effective as of the date of the Agreement.

**WITNESSES:**                                   **GUARANTORS:**

_____                 _____ (Seal)
                                                            Carlos E. Cardona

_____                 _____ (Seal)
                                                            Frank Ticas

36

E-FILED
Thursday, 30 August, 2007  03:14:09 PM
Clerk, U.S. District Court, ILCD

# EXHIBIT B



# IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS, PEORIA DIVISION

DAYS INNS WORLDWIDE, INC.,

        Plaintiff,

    v.

GROWTH PROPERTY INVESTMENT
GROUP, INC., a California corporation, and
CARLOS E. CARDONA and FRANK TICAS,
individuals,

        Defendants.

Case No.  06-CV-01171-MMM-BGC

Hon. Michael M. Mihm

Magistrate Judge Byron G. Cudmore

## PLAINTIFF'S FIRST SET OF REQUESTS FOR ADMISSION
## DIRECTED TO CARLOS E. CARDONA

**PLEASE TAKE NOTICE** that plaintiff Days Inns Worldwide, Inc. ("DIW"), by and through its undersigned counsel and pursuant to Rule 36 of the Federal Rules of Civil Procedure, hereby requests that defendant Carlos E. Cardona admit each of the following Requests by providing responses to counsel for the plaintiff within 30 days:

## DEFINITIONS AND INSTRUCTIONS

    A.    "GPIG" refers to defendant Growth Property Investment Group, Inc., and any of its employees, former employees, agents, former agents, partners, former partners, shareholders, former shareholders, assignees, owners, successors of the owner, officers, former officers, directors, former directors, representatives and former representatives.

    B.    "Guarantors" refers to defendants  Carlos E. Cardona ("Cardona") and Frank Ticas ("Ticas").

    C.    "You" or "your" refers to Carlos E. Cardona, to whom these requests are directed.

    D.    "DIW" refers to plaintiff Days Inns Worldwide, Inc.

    E.    The "License Agreement" refers to refers to the June 30, 2004 License Agreement between DIW and GPIG for the operation of a 118-room guest lodging facility located in Galesburg, Illinois for a 15-year term, a copy of which is attached to DIW's Verified Complaint as Exhibit B.

F.      The "Guaranty" refers to a Guaranty of GPIG's obligations under the License Agreement provided to DIW by Cardona and Ticas, a copy of which is attached to DIW's Verified Complaint as Exhibit C.

G.      The "Facility" refers to the guest lodging facility located at 3282 N. Henderson St., Galesburg, IL 61401, designated as Days Inn Site No. 797.

H.      "Miller" refers to Marcia Miller, the individual to whom you sold the Facility on or around November 12, 2004.

I.      "Recurring Fees" refers to fees due to DIW under the License Agreement for royalties, service assessments, taxes, interest, reservation system user fees, annual conference fees, and other fees.

J.      The "Days Inn Marks" has the same meaning as in DIW's Verified Complaint, and refers to the various trade names and service marks and logos, and derivations thereof, which DIW has the exclusive right to sublicense, including without limitation the trade name and service mark "Days Inn."

K.      If you object to any request, state with specificity the reason for such objection. The answer must specifically deny the matter or state with particularity why you cannot truthfully admit or deny the matter.

L.      If a denial is made, your denial must fairly meet the substance of the request for admission.

M.      When good faith requires that you qualify your answer or deny only a part of the matter of which an admission is requested, you shall specify which part is true and qualify or deny the remainder.

N.      You may not give lack of information or knowledge as a response unless you can state that you have made a reasonable inquiry, and that the information known or readily obtainable by you is insufficient to enable you to admit or deny.

## REQUESTS

Please admit each of the following statements as true:

1.      The License Agreement and its Addenda attached to DIW's Verified Complaint as Exhibit B is a valid and binding contract between GPIG and DIW.

2.      The signature that appears on the License Agreement and its Amendment is that of Cardona, who signed the License Agreement and its Addenda on behalf of GPIG.

3.      The signature that appears on the Guaranty above the name "Carlos E. Cardona" is that of Cardona.



4.      The signature that appears on the Guaranty above the name "Frank Ticas" is that of Ticas.

5.      On or around November 12, 2004, GPIG sold the Facility to Miller.

6.      GPIG did not obtain DIW's prior written consent before transferring the Facility to Miller.

7.      Cardona knew that Miller intended to use the Days Inn Marks after she purchased the Facility.

8.      Miller continued to use the Days Inn Marks after she purchased the Facility.

9.      The License Agreement was terminated effective December 31, 2004.

10.     As of December 31, 2004, Cardona had not paid all Recurring Fees and other amounts due and owing to DIW under the License Agreement.

11.     Cardona never paid DIW $1,000.00 in exchange for a release of his obligations under the License Agreement and Guaranty.

12.     Cardona never discussed a release of release of his obligations under the License Agreement and Guaranty with Albertina Cunha.

13.     Cardona never discussed a release of release of his obligations under the License Agreement and Guaranty with Joe Maida.

14.     Cardona never discussed a release of release of his obligations under the License Agreement and Guaranty with anyone representing DIW.

15.     The May 9, 2005 letter attached as Exhibit 1 hereto was not executed by DIW.

16.     Cardona prepared the document that purports to be a letter from Albertina Cunha and that is attached as Exhibit 1 hereto.

17.     Cardona never received a release of his obligations under the License Agreement and Guaranty from DIW.

18.     Cardona has not paid any of the Recurring Fees, as that term is defined in the License Agreement, demanded of him in the letter dated April 29, 2005, attached as Exhibit D to the Verified Complaint and attached hereto as Exhibit 2.

19.     Cardona has not paid any of the liquidated damages, as that term is defined in the License Agreement, demanded of him in the letter dated April 29, 2005, attached as Exhibit D to the Verified Complaint and attached hereto as Exhibit 2.

20.     Cardona has not paid any of the damages assessed against GPIG in the judgment of the Court dated December 13, 2006.



Dated: May 3, 2007                    DAYS INNS WORLDWIDE, INC.

By: _____
                    Counsel for Plaintiff

Clay A. Tillack
Fiona A. Burke
Mark E. Ashton
SCHIFF HARDIN LLP
6600 Sears Tower
Chicago, IL 60606-6473
Telephone:  (312) 258-5500
Facsimile:  (312) 258-5600

4



Days Inns Worldwide, Inc.
1 Sylvan Way
Parsippany, New Jersey 07054

RICHARD M. SALTZMAN
VICE PRESIDENT
FRANCHISE SALES & DEVELOPMENT

Tel (973) 496-5257
Fax (973) 496-5360
rich.saltzman@cendant.com

May 9, 2005

Mr. Carlos Cardona
Growth Property Investment Group, Inc.
11752 Garden Grove Blvd.
#115
Garden Grove, CA 92843

Re: Settlement of License agreement Days® System Unit #797-82054-5 located in Galesburg, IL

Dear Mr. Cardona:

Days Inn Worldwide has been informed that you have or intend to transfer the property located at 3282 North Henderson Street Galesburg IL 61401, Unit 797-82054-5. We have received an application from Marcia Miller and are glad to advise you that we have approved her as a licensee as a Days Inn Partner.

This also confirms that we have agreed to release you from the agreement signed on June 30, 2004. In consideration for said release we are willing to accept $1,000.00 as full satisfaction of liquidated damages.

Please contact me or Joe Maida at your earliest opportunity at (866) 582-9104, option 6.

Sincerely,

Albertina Cunha
Director
Compliance
Franchise Administration.

cc:    Frank Ticas (Guarantor)





Days Inns Worldwide, Inc.
1 Sylvan Way
Parsippany, New Jersey 07054-0278

Tel 1-866-582-9104
Fax (973) 496-5345

FRANCHISE ADMINISTRATION

April 29, 2005

**VIA OVERNIGHT COURIER**

Mr. Carlos Cardona
Growth Property Investment Group, Inc.
11752 Garden Grove Blvd.
#115
Garden Grove, CA 92843

Re:    **NOTICE OF TERMINATION** of License for Days® System Unit #797-82054-5 located in Galesburg, IL ("Facility")

Dear Mr. Cardona:

Days Inns Worldwide, Inc. ("we", "our" or "us") understands that Growth Property Investment Group, Inc. ("you" or "your") relinquished control of the Facility to Marcia Miller, causing the automatic termination of the License Agreement dated June 30, 2004 (the "Agreement"). Accordingly, your license to operate the Facility in the Days System terminated on December 31, 2004 (the "Termination Date").

While we have been working in good faith with Marcia Miller in an effort to secure a long-term agreement to continue the Facility's affiliation with the Days Chain, our efforts have not been successful. We regret that the Facility will no longer operate as a Days facility and must now require you to fulfill the post-termination obligations set forth in the Agreement, including the payment of liquidated damages.

As a result of your premature termination of the Agreement, you are required to pay to us liquidated damages in the amount of $118,000 as provided in Section 18.5 of the Agreement. You must also pay Damages of $1,000.00 for early termination of the Addendum to the Agreement for Satellite Connectivity Services (the "Addendum"). The Addendum will also terminate on the Termination Date.   You are also responsible to pay us all outstanding Recurring Fees and other charges within 10 days. We estimate that, as of April 18, 2005, you owe us $31,894.27 in Recurring Fees.  We have enclosed an itemized statement detailing the Recurring Fees and other charges.  In addition, you apparently failed to de-identify the Facility before conveying title and relinquishing control of the Facility to Marcia Miller.  If we are constrained to file suit to force Marcia Miller to de-identify the Facility, we reserve the right to include a claim in that action against you for contributory infringement and dilution under the applicable federal trademark statutes.

We hope, of course, to resolve this matter amicably and welcome the opportunity to do business with you in the future.  If you have any questions concerning the contents of this letter, please feel free to contact Joe Maida, Manager of Settlements, at (866) 582-9104, option 6.

Sincerely,

Albertina Cunha
Director
Compliance
Franchise Administration

Enclosure

cc:    Mr. Frank Ticas (Guarantor)
       Joseph R. Kane, Jr.
       Joe Maida

02/01/2006 14:36 FAX  19734985915        CENDANT LEGAL DEPT                    ☑003/010

ITEMIZED STATEMENT                               PAGE 1        
FOR DAYS INN #797-82054 - Galesburg-N. Henderson St., IL
AS OF 2005-04-18

| MONTH | RELATION NBR | ITEM DATE | DESC | AMOUNT DUE | |
|-------|--------------|-----------|------|------------|---|
| 8 | IN1350514-02 | 2004-08-18 | JLY-DIRECWAY | 53.23 | |
|   | IN1366224-01 | 2004-08-27 | AUG-EQUIP SALES TAX | 9.38 | |
|   | IN1366224-02 | 2004-08-27 | AUG-DIRECWAY | 150.00 | |
|   | MV0862083-01 | 2004-08-31 | ROYALTY FEE | 835.64 | |
|   | MV0862083-02 | 2004-08-31 | MARKETING FEE | 313.36 | |
|   | MV0862083-03 | 2004-08-31 | RESERVATION FEE | 480.00 | |
|   |   |   |   | 1,841.61 | |
| 9 | IN1374826-01 | 2004-09-16 | PROCS CHG William Co | 25.00 | |
|   | 07970409A-01 | 2004-09-30 | ROYALTY ACCRUAL | 3,000.00 | ACR |
|   | 07970409A-03 | 2004-09-30 | MKTG FEE ACCRUAL B | 1,100.00 | ACR |
|   | 07970409A-06 | 2004-09-30 | RESERVATION FEE ACCR | 1,700.00 | ACR |
|   | IN1385683-01 | 2004-09-30 | G/S Debra Drago | 60.00 | |
|   | IN1385683-02 | 2004-09-30 | TRIPREWARDS 5%CHRGBK | 28.41 | |
|   | IN1385683-03 | 2004-09-30 | SEP-EQUIP SALES TAX | 9.38 | |
|   | IN1385683-04 | 2004-09-30 | SEP-DIRECWAY | 150.00 | |
|   | TA2995399-01 | 2004-09-30 | T/A COMMISSIONS | 54.66 | |
|   | TP3995399-01 | 2004-09-30 | GDS & INTERNET BKGS | 24.00 | |
|   |   |   |   | 6,151.45 | |
| 10 | IN1391745-01 | 2004-10-07 | PROCS CHG Gina Atwel | 25.00 | |
|   | IN1395531-01 | 2004-10-21 | OCT-MSI SOFTWARE MAI | 249.10 | |
|   | IN1401016-01 | 2004-10-28 | PROCS CHG Ronald Eva | 25.00 | |
|   | IN1401016-02 | 2004-10-28 | TRIPREWARDS 5%CHRGBK | 75.50 | |
|   | IN1401016-03 | 2004-10-28 | OCT-EQUIP SALES TAX | 9.38 | |
|   | IN1401016-04 | 2004-10-28 | OCT-DIRECWAY | 150.00 | |
|   | IN1401016-05 | 2004-10-28 | 2005 CONFERENCE | 799.00 | |
|   | IN1401016-06 | 2004-10-28 | 2005 ALLIANCE FEES | 1,062.00 | |
|   | TA2998923-01 | 2004-10-28 | T/A COMMISSIONS | 173.18 | |
|   | TP3998923-01 | 2004-10-28 | GDS & INTERNET BKGS | 43.50 | |
|   | 07970410A-01 | 2004-10-31 | ROYALTY ACCRUAL | 3,400.00 | ACR |
|   | 07970410A-03 | 2004-10-31 | MKTG FEE ACCRUAL B | 1,300.00 | ACR |
|   | 07970410A-06 | 2004-10-31 | RESERVATION FEE ACCR | 1,900.00 | ACR |
|   | FC0292471-01 | 2004-10-31 | FINANCE CHARGE | 20.11 | |
|   |   |   |   | 9,231.77 | |
| 11 | IN1410759-01 | 2004-11-11 | PROCS CHG Fred House | 25.00 | |
|   | IN1413681-01 | 2004-11-22 | G/S Fred Housel | 59.83 | |
|   | IN1413681-02 | 2004-11-22 | TRANS CHG Fred House | 75.00 | |
|   | IN1413681-03 | 2004-11-22 | PROCS CHG Erin Woods | 25.00 | |
|   | TA3007843-01 | 2004-11-24 | T/A COMMISSIONS | 227.46 | |
|   | TP4007843-01 | 2004-11-24 | GDS & INTERNET BKGS | 51.00 | |
|   | IN1418379-01 | 2004-11-29 | PROCS CHG Sally Wood | 25.00 | |
|   | IN1418379-02 | 2004-11-29 | PROCS CHG Christophe | 25.00 | |
|   | IN1418379-03 | 2004-11-29 | NOV-MSI SOFTWARE MAI | 249.10 | |
|   | IN1418379-04 | 2004-11-29 | TRIPREWARDS 5%CHRGBK | 45.86 | |
|   | FC0295515-01 | 2004-11-30 | FINANCE CHARGE | 32.46 | |

ITEMIZED STATEMENT                              PAGE 2
FOR DAYS INN #797-82054 - Galesburg-N. Henderson St., IL
AS OF 2005-04-18



| MONTH | RELATION NBR | ITEM DATE | DESC | AMOUNT DUE | |
|-------|--------------|-----------|------|-----------|---|
| 11 | IN1423359-01 | 2004-11-30 | NOV-EQUIP SALES TAX | 9.38 | |
| | IN1423359-02 | 2004-11-30 | NOV-DIRECWAY | 150.00 | |
| | MV0909959-01 | 2004-11-30 | ROYALTY FEE | 743.84 | |
| | MV0909959-02 | 2004-11-30 | MARKETING FEE | 278.94 | |
| | MV0909959-03 | 2004-11-30 | RESERVATION FEE | 427.71 | |
| | | | | 2,450.58 | |
| 12 | IN1432758-01 | 2004-12-27 | PROCS CHG Dusty Medi | 25.00 | |
| | IN1432758-02 | 2004-12-27 | DEC-MSI SOFTWARE MAI | 249.10 | |
| | IN1432758-03 | 2004-12-27 | TRIPREWARDS 5%CHRGBK | 103.22 | |
| | IN1439289-01 | 2004-12-30 | DEC-EQUIP SALES TAX | 9.38 | |
| | IN1439289-02 | 2004-12-30 | DEC-DIRECWAY | 150.00 | |
| | FC0298593-01 | 2004-12-31 | FINANCE CHARGE | 57.21 | |
| | MV0891082-01 | 2004-12-31 | ROYALTY FEE | 618.91 | |
| | MV0891082-02 | 2004-12-31 | MARKETING FEE | 232.09 | |
| | MV0891082-03 | 2004-12-31 | RESERVATION FEE | 356.00 | |
| | | | | 1,800.91 | |
| 1 | IN1449149-01 | 2005-01-27 | JAN-MSI SOFTWARE MAI | 249.10 | |
| | IN1449149-02 | 2005-01-27 | TRIPREWARDS 5%CHRGBK | 87.80 | |
| | FC0301845-01 | 2005-01-31 | FINANCE CHARGE | 71.99 | |
| | IN1455257-01 | 2005-01-31 | JAN-EQUIP SALES TAX | 9.38 | |
| | IN1455257-02 | 2005-01-31 | JAN-DIRECWAY | 150.00 | |
| | MV0909960-01 | 2005-01-31 | ROYALTY FEE | 460.76 | |
| | MV0909960-02 | 2005-01-31 | MARKETING FEE | 172.78 | |
| | MV0909960-03 | 2005-01-31 | RESERVATION FEE | 264.93 | |
| | | | | 1,466.74 | |
| 2 | IN1462366-01 | 2005-02-24 | FEB-MSI SOFTWARE MAI | 249.10 | |
| | IN1462366-02 | 2005-02-24 | TRIPREWARDS 5%CHRGBK | 129.24 | |
| | 07970502A-01 | 2005-02-28 | ROYALTY ACCRUAL | 1,600.00 | ACR |
| | 07970502A-03 | 2005-02-28 | MKTG FEE ACCRUAL B | 600.00 | ACR |
| | 07970502A-06 | 2005-02-28 | RESERVATION FEE ACCR | 900.00 | ACR |
| | FC0305285-01 | 2005-02-28 | FINANCE CHARGE | 83.80 | |
| | IN1467675-01 | 2005-02-28 | FEB-EQUIP SALES TAX | 9.38 | |
| | IN1467675-02 | 2005-02-28 | FEB-DIRECWAY | 150.00 | |
| | | | | 3,721.52 | |
| 3 | IN1477797-01 | 2005-03-24 | G/S Julia Nelms | 30.00 | |
| | IN1477797-02 | 2005-03-24 | TRANS CHG Julia Nelm | 75.00 | |
| | IN1477797-03 | 2005-03-24 | MAR-MSI SOFTWARE MAI | 249.10 | |
| | 07970503A-01 | 2005-03-31 | ROYALTY ACCRUAL | 2,300.00 | ACR |
| | 07970503A-03 | 2005-03-31 | MKTG FEE ACCRUAL B | 900.00 | ACR |
| | 07970503A-06 | 2005-03-31 | RESERVATION FEE ACCR | 1,300.00 | ACR |
| | FC0308651-01 | 2005-03-31 | FINANCE CHARGE | 103.79 | |
| | IN1484339-01 | 2005-03-31 | TRIPREWARDS 5%CHRGBK | 112.42 | |

ITEMIZED STATEMENT                                        PAGE 3
FOR DAYS INN #797-82054 - Galesburg-N. Henderson St., IL
AS OF 2005-04-18

| MONTH | RELATION NBR | ITEM DATE | DESC | AMOUNT DUE | |
|-------|--------------|-----------|------|-----------:|---|
| 3 | IN1484339-02 | 2005-03-31 | MAR-EQUIP SALES TAX | 9.38 | |
|   | IN1484339-03 | 2005-03-31 | MAR-DIRECWAY | 150.00 | |
|   |              |            |              | 5,229.69 | |
|   |              |            |              | 31,894.27 | |

## <u>CERTIFICATE OF SERVICE</u>

I, Fiona A. Burke, an attorney, hereby certify that on May 3, 2007, I caused a copy of the foregoing **Plaintiff's First Set of Requests for Admission Directed to Carlos E. Cardona** to be mailed via Federal Express before the hour of 5:00 p.m. to the following individuals who have appeared pro se:

Frank Ticas, individually
and as President of Growth Property Investment Group, Inc.
11752 Garden Grove Blvd
Suite 114
Garden Grove, CA 92843

Carlos Cardona, individually
and as Vice President of Growth Property Investment Group, Inc.
5 Wegeford Circle
Ladera Ranch, CA 92694

By: _Fiona A. Burke_____
Counsel for Plaintiff
Fiona A. Burke
SCHIFF HARDIN LLP
6600 Sears Tower
Chicago, Illinois 60606
Telephone: (312) 258-5500
Fax: (312) 258-5700
E-mail: fburke@schiffhardin.com

E-FILED
Thursday, 30 August, 2007  03:14:31 PM
Clerk, U.S. District Court, ILCD

# EXHIBIT C

**IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS, PEORIA DIVISION**

DAYS INNS WORLDWIDE, INC.,

        Plaintiff,

    v.

GROWTH PROPERTY INVESTMENT
GROUP, INC., a California corporation, and
CARLOS E. CARDONA and FRANK TICAS,
individuals,

        Defendants.

Case No.  06-CV-01171-MMM-BGC

Hon. Michael M. Mihm

Magistrate Judge Byron G. Cudmore

**PLAINTIFF'S FIRST SET OF REQUESTS FOR ADMISSION
DIRECTED TO FRANK TICAS**

    **PLEASE TAKE NOTICE** that plaintiff Days Inns Worldwide, Inc. ("DIW"), by and through its undersigned counsel and pursuant to Rule 36 of the Federal Rules of Civil Procedure, hereby requests that defendant Frank Ticas admit each of the following Requests by providing responses to counsel for the plaintiff within 30 days:

### DEFINITIONS AND INSTRUCTIONS

    A.    "GPIG" refers to defendant Growth Property Investment Group, Inc., and any of its employees, former employees, agents, former agents, partners, former partners, shareholders, former shareholders, assignees, owners, successors of the owner, officers, former officers, directors, former directors, representatives and former representatives.

    B.    "Guarantors" refers to defendants  Carlos E. Cardona ("Cardona") and Frank Ticas ("Ticas").

    C.    "You" or "your" refers to Frank Ticas, to whom these requests are directed.

    D.    "DIW" refers to plaintiff Days Inns Worldwide, Inc.

    E.    The "License Agreement" refers to refers to the June 30, 2004 License Agreement between DIW and GPIG for the operation of a 118-room guest lodging facility located in Galesburg, Illinois for a 15-year term, a copy of which is attached to DIW's Verified Complaint as Exhibit B.

F.      The "Guaranty" refers to a Guaranty of GPIG's obligations under the License Agreement provided to DIW by Cardona and Ticas, a copy of which is attached to DIW's Verified Complaint as Exhibit C.

G.      The "Facility" refers to the guest lodging facility located at 3282 N. Henderson St., Galesburg, IL 61401, designated as Days Inn Site No. 797.

H.      "Miller" refers to Marcia Miller, the individual to whom you sold the Facility on or around November 12, 2004.

I.      "Recurring Fees" refers to fees due to DIW under the License Agreement for royalties, service assessments, taxes, interest, reservation system user fees, annual conference fees, and other fees.

J.      The "Days Inn Marks" has the same meaning as in DIW's Verified Complaint, and refers to the various trade names and service marks and logos, and derivations thereof, which DIW has the exclusive right to sublicense, including without limitation the trade name and service mark "Days Inn."

K.      If you object to any request, state with specificity the reason for such objection. The answer must specifically deny the matter or state with particularity why you cannot truthfully admit or deny the matter.

L.      If a denial is made, your denial must fairly meet the substance of the request for admission.

M.      When good faith requires that you qualify your answer or deny only a part of the matter of which an admission is requested, you shall specify which part is true and qualify or deny the remainder.

N.      You may not give lack of information or knowledge as a response unless you can state that you have made a reasonable inquiry, and that the information known or readily obtainable by you is insufficient to enable you to admit or deny.

## **REQUESTS**

Please admit each of the following statements as true:

1.      The License Agreement and its Addenda attached to DIW's Verified Complaint as Exhibit B is a valid and binding contract between GPIG and DIW.

2.      The signature that appears on the License Agreement and its Amendment is that of Cardona, who signed the License Agreement and its Addenda on behalf of GPIG.

3.      The signature that appears on the Guaranty above the name "Carlos E. Cardona" is that of Cardona.

4.      The signature that appears on the Guaranty above the name "Frank Ticas" is that of Ticas.

5.      On or around November 12, 2004, GPIG sold the Facility to Miller.

6.      GPIG did not obtain DIW's prior written consent before transferring the Facility to Miller.

7.      Ticas knew that Miller intended to use the Days Inn Marks after she purchased the Facility.

8.      Miller continued to use the Days Inn Marks after she purchased the Facility.

9.      The License Agreement was terminated effective December 31, 2004.

10.      As of December 31, 2004, Ticas had not paid all Recurring Fees and other amounts due and owing to DIW under the License Agreement.

11.      Ticas never paid DIW $1,000.00 in exchange for a release of his obligations under the License Agreement and Guaranty.

12.      Ticas never discussed a release of release of his obligations under the License Agreement and Guaranty with Albertina Cunha.

13.      Ticas never discussed a release of release of his obligations under the License Agreement and Guaranty with Joe Maida.

14.      Ticas never discussed a release of release of his obligations under the License Agreement and Guaranty with anyone representing DIW.

15.      The May 9, 2005 letter attached as Exhibit 1 hereto was not executed by DIW.

16.      Cardona prepared the document that purports to be a letter from Albertina Cunha and that is attached as Exhibit 1 hereto.

17.      Ticas never received a release of his obligations under the License Agreement and Guaranty from DIW.

18.      Ticas has not paid any of the Recurring Fees, as that term is defined in the License Agreement, demanded of him in the letter dated April 29, 2005, attached as Exhibit D to the Verified Complaint and attached hereto as Exhibit 2.

19.      Ticas has not paid any of the liquidated damages, as that term is defined in the License Agreement, demanded of him in the letter dated April 29, 2005, attached as Exhibit D to the Verified Complaint and attached hereto as Exhibit 2.

20.      Ticas has not paid any of the damages assessed against GPIG in the judgment of the Court dated December 13, 2006.

Dated: June 26, 2007                    DAYS INNS WORLDWIDE, INC.


By: _____
              Counsel for Plaintiff

Clay A. Tillack
Fiona A. Burke
Mark E. Ashton
SCHIFF HARDIN LLP
6600 Sears Tower
Chicago, IL 60606-6473
Telephone:  (312) 258-5500
Facsimile:  (312) 258-5600

## CERTIFICATE OF SERVICE

I, Mark E. Ashton, an attorney, hereby certify that on June 26, 2007, I caused a copy of the foregoing **Plaintiff's First Set of Requests for Admission Directed to Frank Ticas** to be served via Federal Express overnight delivery, and via facsimile where indicated, upon the following individuals who have appeared pro se:

Frank Ticas, individually
and as President of Growth Property Investment Group, Inc.
12058 Foster Rd.
Norwalk, CA 90658
Facsimile: (562) 246-0976

By: _____
Counsel for Plaintiff
Mark E. Ashton
SCHIFF HARDIN LLP
6600 Sears Tower
Chicago, Illinois 60606
Telephone: (312) 258-5500
Fax: (312) 258-5600
E-mail: mashton@schiffhardin.com

CH1\ 5069375.1



6600 Sears Tower, Chicago, Illinois 60606-6473 · 312.258.5500
Facsimile 312.258.5600

| | |
|---|---|
| ATT ORNEY NO.: | 2437 |
| CLIENT/MATTER NO.: | 33993-0019 |
| DATE: | June 26, 2007 |

## FACSIMILE TRANSMITTAL SHEET

### TO THE FOLLOWING:

| Name | Company | Fax Number | Phone Number |
|---|---|---|---|
| Frank Ticas | Growth Property Investment | (562) 246-0976 | |

FROM:    Mark E. Ashton                    DIRECT DIAL NO.:    312-258-5645

Transmission consists of cover sheet plus _____ page(s).

If there are any problems with this transmission, please call Sue Edwards at (312) 258-4951.

COMMENTS:  *DAYS INN WORLDWIDE, INC. V. GROWTH PROPERTY INVESTMENT GROUP, INC., ET AL.*

CASE NO. 06-CV-01171-MMM-BGC, U.S. DISTRICT COURT

IMPORTANT - THIS MESSAGE IS INTENDED ONLY FOR THE USE OF THE INDIVIDUAL OR ENTITY TO WHICH IT IS ADDRESSED, AND MAY CONTAIN INFORMATION THAT IS PRIVILEGED, CONFIDENTIAL AND EXEMPT FROM DISCLOSURE UNDER APPLICABLE LAW. IF THE READER OF THIS MESSAGE IS NOT THE INTENDED RECIPIENT, OR THE EMPLOYEE OR AGENT RESPONSIBLE TO DELIVER IT TO THE INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT READING, DISSEMINATING, DISTRIBUTING OR COPYING THIS COMMUNICATION IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS COMMUNICATION IN ERROR, PLEASE IMMEDIATELY NOTIFY US BY TELEPHONE, AND RETURN THE ORIGINAL MESSAGE TO US AT THE ABOVE ADDRESS VIA THE U.S. POSTAL SERVICE. THANK YOU

*(For Internal Use Only)* PLEASE RETURN THIS DOCUMENT TO:

Transmittal Problems:

Time

Name:    Sue Edwards

☐ Constant Busy

SENT OUT:

☐ Constant Ringing

Date:

Time:

A.M./P.M.

☐ Bad Line

By:

☐ Equipment Problem

CH1\ 5069552.1

**E-FILED**
Thursday, 30 August, 2007  03:15:30 PM
Clerk, U.S. District Court, ILCD

# EXHIBIT D

| | | |
|---|---|---|
| DAYS INNS WORLDWIDE, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 06-CV-01171-MMM-BGC |
| v. | ) | |
| | ) | Hon. Michael M. Mihm |
| | ) | |
| GROWTH PROPERTY INVESTMENT | ) | Magistrate Judge Byron G. Cudmore |
| GROUP, INC., a California Corporation, | ) | |
| CARLOS E. CARDONA, and FRANK | ) | |
| TICAS, individuals, | ) | |
| | ) | |
| Defendants. | ) | |

## AFFIDAVIT OF VALERIE CAPERS WORKMAN

Valerie Capers Workman being duly sworn, according to law, upon her oath, deposes and says:

1.     I am the Vice President of Franchise Administration for plaintiff Days Inn Worldwide, Inc. ("DIW").

2.     This affidavit is made in support of DIW's Motion for Entry of Default Judgment against defendant Growth Property Investment Group, Inc. ("GPIG") pursuant to Federal Rule of Civil Procedure 55(b).  I make this affidavit on behalf of DIW based on my personal knowledge, the records of DIW, or information available through employees of DIW and am prepared to testify to the following facts if called as a witness.

### The Agreements Between The Parties

3.     On June 30, 2004, DIW entered into a License Agreement with GPIG for the operation of a 118-room Days Inn guest lodging facility, located at 3282 N. Henderson St.,

Galesburg, IL 61401, Site No. 797 (the "Facility") for a 15-year term. A true copy of the License Agreement is attached to DIW's Complaint as Exhibit B.

4. Pursuant to sections 1 and 5 of the License Agreement, GPIG was obligated to operate the Facility as a Days Inn® guest lodging facility for the remainder of the 15-year term, during which time GPIG was permitted to use the Days Inn® trade names and service marks ("Days Inn Marks") in association with the operation and use of the Facility as part of DIW's franchise system.

5. Pursuant to sections 7 and 18 and Schedule C of the License Agreement, GPIG was required to make certain periodic payments to DIW for royalties, service assessments, taxes, interest, reservation system user fees, annual conference fees, and other fees (collectively, "Recurring Fees").

6. Pursuant to section 7.3 GPIG was required to pay interest on any past due amounts "at the rate of 1.5% per month or the maximum rate permitted by applicable law, whichever is less, accruing from the due date until the amount is paid."

7. Pursuant to section 9.1 of the License Agreement, if GPIG transferred the property without also transferring the License Agreement in accordance with sections 9.3 and 9.6, and without obtaining DIW's prior written consent, the License Agreement would be void as between DIW and GPIG and the License Agreement would be subject to termination.

8. Pursuant to Appendix A, Definitions, to the License Agreement, "Transfer" was defined to include, among other things, an "assign[ment], pledge, transfer, delegat[ion] or grant [of] a security interest in all or any of [GPIG's] rights, benefits and obligations under [the License] Agreement, or a "sale, conveyance, transfer, or donation of [GPIG's] right, title and interest in and to the Facility."

9.     Pursuant to section 9.1, "[t]he License [Agreement was] not transferable to [GPIG's] transferee, who has no right or authorization to use the [Days Inn] System and the [Days Inn] Marks when [GPIG] transfer[s] ownership or possession of the Facility.  The transferee may not operate the Facility under the [Days Inn] System, and [GPIG is] responsible for performing the post-termination obligations in Section 13."

10.     Pursuant to section 11.2 of the License Agreement, DIW could terminate the License Agreement, with written notice to GPIG, for various reasons, including GPIG's violation of the transfer provisions of section 9.

11.     In light of the difficulty of calculating the precise amount of injury to DIW if GPIG breached and/or impermissibly terminated the License Agreement, sections 12.1 and 18.5 contained a provision for liquidated damages.  Under the terms of section 12.1, GPIG agreed that, in the event of a termination of the License Agreement pursuant to section 11.2, it would pay liquidated damages to DIW within 30 days, in accordance with the formula specified in the License Agreement. GPIG agreed that DIW's "right to receive other amounts due under [the License] Agreement is not affected" by Defendants' obligation to pay liquidated damages.

12.     Pursuant to section 18.5, the parties reached an agreed compromise that set Liquidated Damages for the Facility upon termination occurring before the last two years of the License Agreement at $1,000.00 for each guest room of the Facility.  There were 118 authorized guest rooms in this Facility at the time of termination.

13.     In addition, pursuant to section 13 of the Satellite Connectivity Services Addendum to the License Agreement, GPIG agreed that, in the event of a termination of the Addendum pursuant to section 11.2 of the License Agreement, it would pay liquidated damages

in the amount of $1,000.00 to DIW ("Addendum Liquidated Damages") within ten (10) days of termination.

14.     Section 13 of the License Agreement specified GPIG's obligations in the event of a termination of the License Agreement, including its obligation to cease immediately all use of the Days Inn Marks.

15.     Pursuant to section 17.4 of the License Agreement, GPIG agreed that the non-prevailing party would "pay all costs and expenses, including reasonable attorneys' fees, incurred by the prevailing party to enforce this [License] Agreement or collect amounts owed under this [License] Agreement."

16.     Effective as of the date of the License Agreement, Cardona and Ticas provided DIW with a Guaranty of GPIG's obligations under the License Agreement. A true copy of the Guaranty is attached to DIW's Complaint as Exhibit C.

17.     Pursuant to the terms of the Guaranty, Cardona and Ticas each agreed, among other things, that upon default under the License Agreement, they would immediately make all payments and/or perform all obligations required under the License Agreement.

### The Defendants' Defaults and Termination

18.     On or around November 12, 2004, GPIG sold the facility, without seeking or obtaining DIW's prior consent, to Marcia Miller ("Miller"). DIW did not learn of the transfer until approximately November 17, 2004. DIW attempted in good faith to enter into a License Agreement with Miller. However, Miller refused to execute a License Agreement for the Facility.

19.     After learning of the transfer, DIW advised Defendants by letter dated April 29, 2005, that the License Agreement, including the Satellite Connectivity Services Addendum to

- 4 -

the License Agreement, was automatically terminated effective December 31, 2004. DIW further advised Defendants that they must fulfill the post-termination obligations set forth in the License Agreement, including the payment of $118,000.00 in Liquidated Damages for the premature termination of the License Agreement, $1,000.00 in Addendum Liquidated Damages for early termination of the Addendum to the Agreement for Satellite Connectivity Services, in addition to all outstanding Recurring Fees at that time in the amount of $31,894.27. A true and correct copy of the Notice of Termination is attached to the Complaint as Exhibit D.

20.     The termination of the License Agreement required Defendants to discontinue immediately any further use of the Days Inn Marks, and to de-identify the Facility by removing all items bearing the Days Inn Marks. Defendants failed to fulfill those obligations before conveying title and relinquishing control of the premises to Miller.

21.     As of November 8, 2006, the amount of Recurring Fees due and owing by Defendants was $23,307.67.

22.     Despite DIW's repeated demands, Defendants have failed to pay any of the amounts due and owing to DIW under the License Agreement and Guaranty.

### Damages

### Infringement Damages

23.     GPIG not only violated the federal and state trademark laws, but it also failed to comply with section 13 of the License Agreement. Specifically GPIG failed to immediately cease all use of the Days Inn Marks in and around the Facility and to completely de-identify the Facility from its former appearance as a Days Inn facility before engaging in the unauthorized transfer to a third party, Marcia Miller ("Miller") which resulted in termination of the License Agreement on December 31, 2004.

- 5 -

24.     GPIG knew or should have known that Miller was likely to continue using the Days Inn Marks at the Facility. GPIG's failure to de-identify the facility before its unauthorized transfer enabled Miller to use of the Days Inn Marks without license from DIW, and has therefore willfully allowed and contributed to the ongoing infringement of the Days Inn Marks by Miller.

25.     As late as August 10, 2006, Miller had not ceased her use of the Days Inn Marks at the Facility. Inspections conducted by DIW personnel on August 31, 2005, January 31, 2006, May 2, 2006 and August 10, 2006, revealed that Miller has continued to use the Days Inn Marks without authorization at the Facility. Attached as Group Exhibit A to this Affidavit are copies of photographs taken during the August 31, 2005, January 31, 2006, May 2, 2006 and August 10, 2006 inspections. These photographs were taken in the ordinary course of those inspections, and were prepared and maintained in the ordinary course of business of DIW by DIW quality assurance personnel. Each of these photographs fairly and accurately represents the subject matter as it appeared on the dates on which the photograph was taken.

26.     Since the termination of the License Agreement, Miller has continued to display the Days Inn Marks without authorization through, among other things, failure to remove Days Inn signage which bears the Days Inn trade name from the exterior of the Facility. For example, the inspections conducted on August 31, 2005, January 31, 2006, May 2, 2006 and August 10, 2006, revealed that Miller continued to display the Days Inn name and Days Inn Marks on signage on the exterior of the Facility, including large signs in front of the Facility. (Photographs attached as Group Exhibit A.) GPIG has willfully contributed to Miller's infringement of the Days Inn Marks.

27. DIW seeks $31,147.52 in damages for GPIG's unauthorized, willful contribution to GCI's post-termination use of the Days Inn Marks, trebled to total $93,442.56.

28. DIW's infringement damages were calculated as follows. DIW multiplied the average monthly Recurring Fees paid pursuant to the License Agreement, $1,611.98, by the number of months that the post-termination infringement of the Days Inn Marks continued (December 31, 2004 through August 10, 2006), to arrive at its $30,627.62 calculation of infringement damages.

29. GPIG has not paid DIW any compensation for its contributory infringement of the Days Inn Marks.

### Liquidated Damages

30. Pursuant to sections 12.1 and 18.5 of the License Agreement, DIW is also seeking $118,000.00 in Liquidated Damages that became due as a result of the premature termination of the License Agreement. Pursuant to section 7.3 of the License Agreement, DIW is also entitled to interest on these amounts calculated at the legal rate of interest of 1.5% per month in the amount of $37,701.00 from January, 31 2005 (30 days after the date of termination) through November 8, 2006 (the date of filing of this Motion for Default Judgment).

31. DIW also seeks $1000 in Addendum Liquidated Damages that became due as a result of the premature termination of the Satellite Connectivity Services Addendum to the License Agreement pursuant to section 13 of the Satellite Connectivity Services Addendum to the License Agreement. Pursuant to section 7.3 of the License Agreement, DIW is also entitled to interest on these amounts calculated at the legal rate of interest of 1.5% per month in the amount of $330 from January, 31 2005 (30 days after the date of termination) through November 8, 2006 (the date of filing of this Motion for Default Judgment).

32.     Defendants have not paid any of the Liquidated Damages for premature termination of the License Agreement set forth in the preceding paragraphs.

33.     DIW has attempted to replace this site since the premature termination of the License Agreement on December 31, 2005. However, DIW has been unable to replace this site to date.

## Recurring Fees

34.     As of November 8, 2006, and pursuant to section 7 and 18 and Schedule C of the License Agreement, the amount of Recurring Fees due and owing by Defendants under the License Agreement and Guaranty was $23,307.67.

35.     The amounts of past due Recurring Fees due from GPIG, as set forth in the preceding paragraph, was calculated using an itemized statement for the Facility dated November 8, 2006 covering Recurring Fees owed by GPIG from August 2004 to the present. The Itemized Statement was compiled and printed by DIW's Finance Department. DIW's Finance Department has regular responsibility for maintaining such records in the ordinary course of our business. A true and correct copy of the November 8, 2006 Itemized Statement is attached hereto as Exhibit B.

36.     The Itemized Statement includes accrued interest. Pursuant to section 7.3 of the License Agreement, DIW is entitled to interest on past due amounts calculated at the legal rate of interest of 1.5% per month. Interest is calculated at the rate of 1.5% monthly, per days in the month, on items that are over thirty days past due. Interest is not calculated on finance charges or accruals.

37.     To date, Defendants have failed to pay any of the Recurring Fees that are due to DIW.

## Other Damages

38.     In addition to the amounts described above, DIW is entitled to interest accruing after the date of entry of DIW's Motion for Default Judgment until the judgment is paid in full.

39.     DIW also has incurred attorneys' fees, costs and expenses, for which it is owed reimbursement from the Defendants pursuant to Section 17.4 of the License Agreement and the Guaranty, and respectfully seeks a fees and costs award as well, as set forth in its accompanying motion.

Further affiant sayeth not.

DATED: November 8, 2006

Valerie Capers Workman

SUBSCRIBED and SWORN to before me this
8th day of November, 2006 in Parsippany,
New Jersey.

My commission expires: _Feb. 5, 2009_

Linda M. Rublano
Notary Public
State of New Jersey
My Commission expires 2-5-09

- 9 -

# GROUP EXHIBIT A

 *legal*


CENDANT

# POST TERMINATION OBLIGATIONS CHECKLIST

BRAND: DAYS INN        UNIT: 00797        DATE: 08/31/2005

ADDRESS: 3282 NORTH HENDERSON STREET

CITY: GALESBURG        STATE: IL

| | YES | NO |
|---|---|---|
| Primary signage removed/replaced/properly covered: | | X |
| All additional exterior signage removed: | | X |
| Signage removed from interior public areas: | | X |
| Billboards changed to remove name: | X | |
| Stop answering phone: Days, HJ, Knights, Ramada, Super 8, Travelodge, Villager, Wingate | | X |
| Domain name removed from brochures & advertising: (www.motelname.com) | | |
| Returned confidential operations manuals & reservation equipment: | | |
| Howard Johnson Gatelodge orange roof painted: | X | |
| Howard Johnson Gatelodge cupola removed: | X | |

Has the logo and name been removed from the following items?

| | YES | NO | | YES | NO |
|---|---|---|---|---|---|
| Stationery/Pads/Pens | X | | Soap/Shampoo | | X |
| Directories/Brochures | X | | Key Tags | X | |
| Business Cards | X | | Credit Card Imprinter | X | |
| Folios/Reg. Cards | X | | Laundry Bags | X | |
| Do-Not-Disturb Cards | | X | Name Tags/Uniforms | X | |
| Comment Cards | X | | Ice Buckets/Trays | X | |
| Telephone Plates | | X | Ashtray/Matches | X | |
| Telephone Dialing Instructions | | X | Plaques | X | |
| TV Channel ID plates | X | | Guest Checks/Receipts | X | |
| Rate/Law Cards | X | | Menus | X | |
| Door Signage | X | | | | |

Comments: _____

_____

_____

_____

_____

_____

QA Representative: *Steve B Blankenship*

Print Name:   SHANE BLANKENSHIP

Produced using ACI software, 800.234.8727 www.aciweb.com

PTOC0628002

Quality Assurance



**Primary Sign**



**Primary Sign**



SIGNAGE ON PORTE COCHERE



DAYS INN LOGOED SUPPLIES BEING USED





00797 013106 DEID



 CENDANT

# POST TERMINATION OBLIGATIONS CHECKLIST

BRAND: DAYS INN     UNIT: 00797     DATE: 01/31/2006
ADDRESS: 3282 N. HENDERSON STREET
CITY: GALESBURG     STATE: IL

| | YES | NO |
|---|---|---|
| Primary signage removed/replaced/properly covered: | | X |
| All additional exterior signage removed: | | X |
| Signage removed from interior public areas: | | X |
| Billboards changed to remove name: | | X |
| Stop answering phone: Days, HJ, Knights, Ramada, Super 8, Travelodge, Villager, Wingate | X | |
| Domain name removed from brochures & advertising: (www.motelname.com) | X | |
| Returned confidential operations manuals & reservation equipment: | | X |
| Howard Johnson Gatelodge orange roof painted: | | X |
| Howard Johnson Gatelodge cupola removed: | | X |

Has the logo and name been removed from the following items?

| | YES | NO | | YES | NO |
|---|---|---|---|---|---|
| Stationery/Pads/Pens | | X | Soap/Shampoo | | X |
| Directories/Brochures | | X | Key Tags | | X |
| Business Cards | | X | Credit Card Imprinter | | X |
| Folios/Reg. Cards | | X | Laundry Bags | | X |
| Do-Not-Disturb Cards | | X | Name Tags/Uniforms | | X |
| Comment Cards | | X | Ice Buckets/Trays | | X |
| Telephone Plates | | X | Ashtray/Matches | | X |
| Telephone Dialing Instructions | | X | Plaques | | X |
| TV Channel ID plates | | X | Guest Checks/Receipts | | X |
| Rate/Law Cards | | X | Menus | | X |
| Door Signage | | X | | | X |

Comments: PROPERTY APPEARS ABANDONED. HANDWRITTEN CLOSED SIGN ON FRONT DOOR. ONE WINDOW TO INTERIOR VIEWED BROKEN. ALL SIGNAGE REMAINS IN VIEW

QA Representative: _Krista Kraynick_
Print Name: KRISTA KRAYNICK



**Primary Sign**



**Primary Sign**



)NE OF TWO BUILDING SIGNS SA SHOWN IN ABOVE PHOT(



ONE OF THREE ENTRANCE SIGNS



HIRISE SIGN



legal



 CENDANT

# POST TERMINATION OBLIGATIONS CHECKLIST

BRAND: DAYS INN          UNIT: 00797          DATE: 05/02/2006

ADDRESS: 3282 NORTH HENDERSON STREET

CITY: GALESBURG          STATE: IL

|  | YES | NO |
|---|---|---|
| Primary signage removed/replaced/properly covered: |  | X |
| All additional exterior signage removed: |  | X |
| Signage removed from interior public areas: |  |  |
| Billboards changed to remove name: | X |  |
| Stop answering phone: Days, HJ, Knights, Ramada, Super 8, Travelodge, Villager, Wingate | X |  |
| Domain name removed from brochures & advertising: (www.motelname.com) |  |  |
| Returned confidential operations manuals & reservation equipment: |  |  |
| Howard Johnson Gatelodge orange roof painted: |  |  |
| Howard Johnson Gatelodge cupola removed: |  |  |

Has the logo and name been removed from the following items?

| | YES | NO | | YES | NO |
|---|---|---|---|---|---|
| Stationery/Pads/Pens |  |  | Soap/Shampoo |  |  |
| Directories/Brochures |  |  | Key Tags |  |  |
| Business Cards |  |  | Credit Card Imprinter |  |  |
| Folios/Reg. Cards |  |  | Laundry Bags |  |  |
| Do-Not-Disturb Cards |  |  | Name Tags/Uniforms |  |  |
| Comment Cards |  |  | Ice Buckets/Trays |  |  |
| Telephone Plates |  |  | Ashtray/Matches |  |  |
| Telephone Dialing Instructions |  |  | Plaques |  |  |
| TV Channel ID plates |  |  | Guest Checks/Receipts |  |  |
| Rate/Law Cards |  |  | Menus |  |  |
| Door Signage |  |  | |  |  |

Comments: CLOSED SIGN POSTED ON WINDOWS, DOORS CHIANED LOCK

QA Representative: _Darryl Davis_

Print Name:     DARRYL DAVIS

Produced using ACI software, 800.234.8727 www.aciweb.com

Quality Assurance

PTOC0628002



**Primary Sign**



**Primary Sign**









 CENDANT

# POST TERMINATION OBLIGATIONS CHECKLIST

BRAND: DAYS INN     UNIT: 00797     DATE: 08/10/2006

ADDRESS: 3282 NORTH HENDERSON STREET

CITY: GALESBURG     STATE: IL

| | YES | NO |
|---|---|---|
| Primary signage removed/replaced/properly covered: | | X |
| All additional exterior signage removed: | | X |
| Signage removed from interior public areas: | | |
| Billboards changed to remove name: | X | |
| Stop answering phone: Days, HJ, Knights, Ramada, Super 8, Travelodge, Villager, Wingate | X | |
| Domain name removed from brochures & advertising: (www.motelname.com) | | |
| Returned confidential operations manuals & reservation equipment: | | |
| Howard Johnson Gatelodge orange roof painted: | X | |
| Howard Johnson Gatelodge cupola removed: | X | |

Has the logo and name been removed from the following items?

| | YES | NO | | YES | NO |
|---|---|---|---|---|---|
| Stationery/Pads/Pens | | | Soap/Shampoo | | |
| Directories/Brochures | | | Key Tags | | |
| Business Cards | | | Credit Card Imprinter | | |
| Folios/Reg. Cards | | | Laundry Bags | | |
| Do-Not-Disturb Cards | | | Name Tags/Uniforms | | |
| Comment Cards | | | Ice Buckets/Trays | | |
| Telephone Plates | | | Ashtray/Matches | | |
| Telephone Dialing Instructions | | | Plaques | | |
| TV Channel ID plates | | | Guest Checks/Receipts | | |
| Rate/Law Cards | | | Menus | | |
| Door Signage | | | | | |

Comments: PROPERTY IS CLOSED

QA Representative: _(signature)_

Print Name:     SHANE BLANKENSHIP



**Primary Sign**



**Primary Sign**



PRIMARY SIGN



PROPERTY IS CLOSED

# EXHIBIT B

@ 001/008

@YHDHAM HOSPITALITY

11/08/2006 15:04 FAX

ITEMIZED STATEMENT
-------------------

As of Date (DD-MON-YYYY) : 08-NOV-2006
Customer No :              00757-82054-05-DAY
Category Set :
Category Group :
Group No :
Bankruptcy :              No Bankruptcy Sites
Disputed :                No

Page 1 of 8

Ⓐ 002/008

ITEMIZED STATEMENT
-------------------

Customer No : 80797-82054-95-DAY
Address : 3382 N. KENNEDALE ST., GALESBURG, IL, 61401, US
As of Date: 08-NOV-2006

| Mon-Year | Invoice No | Invoice Date | Description | Accrued | Billing | Amount Tax | FinanceCharges | Total |
|----------|-----------|--------------|-------------|---------|---------|-----|---------------|-------|
| AUG-2004 | IN1350514-002 | 18-AUG-04 | JLT-DIRECWAY | | 53.23 | 0.00 | 0.00 | 53.23 |
| | IN1366224-001 | 27-AUG-04 | AUG-EQUIP SALES | | 9.38 | 0.00 | 0.00 | 9.38 |
| | IN1366224-002 | 27-AUG-04 | AUG-DIRECWAY | | 150.00 | 0.00 | 0.00 | 150.00 |
| | INV0062083-002 | 31-AUG-04 | MARKETING FEE | | 313.36 | 0.00 | 0.00 | 313.36 |
| | INV0062083-003 | 31-AUG-04 | RESERVATIONS FEE | | 480.00 | 0.00 | 0.00 | 480.00 |
| | INV0062083-001 | 31-AUG-04 | ROYALTY FEE | | 835.64 | 0.00 | 0.00 | 835.64 |
| | | | | Sub Total | 1841.61 | 0.00 | 0.00 | 1841.61 |
| SEP-2004 | IN1374926-001 | 16-SEP-04 | PROCS CHG Willi | | 25.00 | 0.00 | 0.00 | 25.00 |
| | 07970403A-001 | 30-SEP-04 | ROYALTY ACCRUAL | * | 3000.00 | 0.00 | 0.00 | 3000.00 |
| | TP3995395-001 | 30-SEP-04 | GDS & INTEREST | | 24.00 | 0.00 | 0.00 | 24.00 |
| | IN1385603-002 | 30-SEP-04 | TRIPREWARDS SVC | | 29.41 | 0.00 | 0.00 | 29.41 |
| | IN1385603-001 | 30-SEP-04 | G/S Debra Drago | | 60.00 | 0.00 | 0.00 | 60.00 |
| | IN1385603-004 | 30-SEP-04 | SEP-DIRECWAY | | 150.00 | 0.00 | 0.00 | 150.00 |
| | IN1385603-003 | 30-SEP-04 | SEP-EQUIP SALES | | 9.38 | 0.00 | 0.00 | 9.38 |
| | 07970409A-006 | 30-SEP-04 | RESERVATION FEE | * | 1700.00 | 0.00 | 0.00 | 1700.00 |
| | TP3995395-001 | 30-SEP-04 | T/A COMMISSIONW | | 54.66 | 0.00 | 0.00 | 54.66 |
| | 07970409A-003 | 30-SEP-04 | MKTG FEE ACCRUA | * | 1100.00 | 0.00 | 0.00 | 1100.00 |
| | | | | Sub Total | 6151.45 | 0.00 | 0.00 | 6151.45 |
| OCT-2004 | IN1391745-001 | 07-OCT-04 | PROCS CHG Gina | | 25.00 | 0.00 | 0.00 | 25.00 |
| | IN1399531-001 | 21-OCT-04 | OCT-KEY SOFTWAR | | 249.10 | 0.00 | 0.00 | 249.10 |
| | IN1401016-003 | 28-OCT-04 | OCT-EQUIP SALES | | 9.38 | 0.00 | 0.00 | 9.38 |
| | IN1401016-002 | 28-OCT-04 | TRIPREWARDS SVC | | 75.50 | 0.00 | 0.00 | 75.50 |
| | TP3998923-001 | 28-OCT-04 | T/A COMMISSIONW | | 173.18 | 0.00 | 0.00 | 173.18 |
| | TP3998923-001 | 28-OCT-04 | GDS & INTERNET | | 43.50 | 0.00 | 0.00 | 43.50 |
| | IN1401016-001 | 28-OCT-04 | PROCS CHG Rosal | | 25.00 | 0.00 | 0.00 | 25.00 |
| | IN1401816-004 | 28-OCT-04 | OCT-DIRECWAY | | 150.00 | 0.00 | 0.00 | 150.00 |
| | FC0292471-001 | 31-OCT-04 | FINANCE CHARGE | | 20.11 | 0.00 | 0.00 | 20.11 |
| | 07970411A-001 | 31-OCT-04 | ROYALTY ACCRUAL | * | 3400.00 | 0.00 | 0.00 | 3400.00 |
| | 07970411A-006 | 31-OCT-04 | RESERVATION FEE | * | 1900.00 | 0.00 | 0.00 | 1900.00 |
| | 07970411A-003 | 31-OCT-04 | MKTG FEE ACCRUA | * | 1300.00 | 0.00 | 0.00 | 1300.00 |

Page 2 of 6

WYNDHAM HOSPITALITY

ITEMIZED STATEMENT
--------------------

Customer No :   00797-H2054-05-DAY
Address :       3292 N. HENDERSON ST.,GALESBURG,IL,61401,US
As of Date:     08-NOV-2006

| Mon-Year | Invoice No | Invoice Date | Description | Accrued | Billing | Amount Tax | FinanceCharges | Total |
|----------|-----------|--------------|-------------|---------|---------|-----|----------------|-------|
| | | | | **Sub Total** | 7370.77 | 0.00 | 0.00 | 7370.77 |
| | | | | | | | | |
| NOV-2004 | IN1410759-001 | 11-NOV-04 | PROCS CMG Fred | | 25.00 | 0.00 | 0.00 | 25.00 |
| | IN1413681-001 | 22-NOV-04 | O/S Fred Nousel | | 59.83 | 0.00 | 0.00 | 59.83 |
| | IN1413681-002 | 22-NOV-04 | TRANS CMG Fred | | 75.00 | 0.00 | 0.00 | 75.00 |
| | IN1413681-003 | 22-NOV-04 | PROCS CMG Erin | | 25.00 | 0.00 | 0.00 | 25.00 |
| | TR3007843-001 | 24-NOV-04 | T/A COMMISSIONS | | 227.66 | 0.00 | 0.00 | 227.66 |
| | TP4507843-001 | 24-NOV-04 | SMS & INTEREST | | 51.00 | 0.00 | 0.00 | 51.00 |
| | IN1418379-003 | 29-NOV-04 | NOV-NET SOFTWAR | | 249.10 | 0.00 | 0.00 | 249.10 |
| | IN1418379-002 | 29-NOV-04 | PROCS CMG Chris | | 25.00 | 0.00 | 0.00 | 25.00 |
| | IN1418379-001 | 29-NOV-04 | PROCS CMG Sally | | 25.00 | 0.00 | 0.00 | 25.00 |
| | IN1418379-004 | 29-NOV-04 | TRIPREWARDS SVC | | 45.86 | 0.00 | 0.00 | 45.86 |
| | FC0295818-001 | 30-NOV-04 | FINANCE CHARGE | | 32.46 | 0.00 | 0.00 | 32.46 |
| | MV0909959-003 | 30-NOV-04 | RESERVATION FEE | | 437.71 | 0.00 | 0.00 | 437.71 |
| | MV0909959-001 | 30-NOV-04 | ROYALTY FEE | | 743.94 | 0.00 | 0.00 | 743.94 |
| | MV0909959-002 | 30-NOV-04 | MARKETING FEE | | 278.94 | 0.00 | 0.00 | 278.94 |
| | IN1423359-001 | 30-NOV-04 | NOV-EQUIP SALES | | 9.38 | 0.00 | 0.00 | 9.38 |
| | IN1423359-002 | 30-NOV-04 | NOV-DIRECWAY | | 150.00 | 0.00 | 0.00 | 150.00 |
| | | | | **Sub Total** | 2450.58 | 0.00 | 0.00 | 2450.58 |
| | | | | | | | | |
| DEC-2004 | IN1433758-002 | 27-DEC-04 | DEC-NET SOFTWAR | | 249.10 | 0.00 | 0.00 | 249.10 |
| | IN1433758-001 | 27-DEC-04 | PROCS CMG Dusty | | 25.00 | 0.00 | 0.00 | 25.00 |
| | IN1433758-003 | 27-DEC-04 | TRIPREWARDS SVC | | 103.22 | 0.00 | 0.00 | 103.22 |
| | IN1435289-002 | 30-DEC-04 | DEC-EQUIP SALES | | 9.38 | 0.00 | 0.00 | 9.38 |
| | IN1435289-003 | 30-DEC-04 | DEC-DIRECWAY | | 150.00 | 0.00 | 0.00 | 150.00 |
| | FC0298593-001 | 31-DEC-04 | FINANCE CHARGE | | 57.21 | 0.00 | 0.00 | 57.21 |
| | MV0891882-003 | 31-DEC-04 | RESERVATION FEE | | 356.00 | 0.00 | 0.00 | 356.00 |
| | MV0891882-001 | 31-DEC-04 | ROYALTY FEE | | 618.91 | 0.00 | 0.00 | 618.91 |
| | MV0891882-002 | 31-DEC-04 | MARKETING FEE | | 232.09 | 0.00 | 0.00 | 232.09 |

@ 004/008

ITEMIZED STATEMENT
--------------------

Customer No :  00797-92054-05-DAY
Address :  3283 W. HENDERSON ST.,GALESBURG,IL,61401,UN
As of Date:  08-NOV-2006

| Mon-Year | Invoice No | Invoice Date | Description | Accrued | Billing | Amount Tax | Finance Charges | Total |
|----------|-----------|--------------|-------------|---------|---------|------------|-----------------|-------|
| | | | | Sub Total | 1800.91 | 0.00 | 0.00 | 1800.91 |
| JAN-2005 | IN1449149-003 | 27-JAN-05 | TRIFREWARDS INC | | 87.80 | 0.00 | 0.00 | 87.80 |
| | FC0301845-001 | 31-JAN-05 | FINANCE CHARGE | | 71.99 | 0.00 | 0.00 | 71.99 |
| | | | | Sub Total | 159.79 | 0.00 | 0.00 | 159.79 |
| FEB-2005 | IN1462366-003 | 24-FEB-05 | TRIFREWARDS INC | | 129.36 | 0.00 | 0.00 | 129.36 |
| | FC0305265-001 | 28-FEB-05 | FINANCE CHARGE | | 83.80 | 0.00 | 0.00 | 83.80 |
| | | | | Sub Total | 213.04 | 0.00 | 0.00 | 213.04 |
| MAR-2005 | IN1477797-001 | 24-MAR-05 | O/S Julia Nelms | | 30.80 | 0.00 | 0.00 | 30.80 |
| | IN1477797-002 | 24-MAR-05 | TRANS CHG Julia | | 75.00 | 0.00 | 0.00 | 75.00 |
| | FC0308651-001 | 31-MAR-05 | FINANCE CHARGE | | 103.79 | 0.00 | 0.00 | 103.79 |
| | IN1484339-001 | 31-MAR-05 | TRIFREWARDS INC | | 112.42 | 0.00 | 0.00 | 112.42 |
| | | | | Sub Total | 321.21 | 0.00 | 0.00 | 321.21 |
| APR-2005 | IN1498533-001 | 28-APR-05 | PROCS CHG Tares | | 25.00 | 0.00 | 0.00 | 25.00 |
| | IN1498533-002 | 28-APR-05 | TRIFREBACCN INC | | 149.70 | 0.00 | 0.00 | 149.70 |
| | FC0311788-001 | 30-APR-05 | FINANCE CHARGE | | 168.04 | 0.00 | 0.00 | 168.04 |
| | | | | Sub Total | 342.74 | 0.00 | 0.00 | 342.74 |
| MAY-2005 | IN1511738-001 | 26-MAY-05 | TRIFREWARDS INC | | 36.65 | 0.00 | 0.00 | 36.65 |
| | FC0315207-001 | 31-MAY-05 | FINANCE CHARGE | | 115.36 | 0.00 | 0.00 | 115.36 |

Page 4 of 9

WYNDHAM HOSPITALITY

11/08/2006  15:04 FAX

ITEMIZED STATEMENT
-------------------

Customer No : 00797-02054-05-DAY
Address : 3282 N. HENDERSON ST.,GALESBURG,IL,61401,US
As of Date: 09-NOV-2006

| Mon-Year | Invoice No | Invoice Date | Description | Accrued | Billing | Amount Tax | FinanceCharges | Total |
|---|---|---|---|---|---|---|---|---|
| | | | Sub Total | | 151.89 | 0.00 | 0.00 | 151.89 |
| JUN-2006 | FC0315948-001 | 30-JUN-06 | FINANCE CHARGE | | 114.18 | 0.00 | 0.00 | 114.18 |
| | IN1536718-601 | 30-JUN-06 | TRIFFEROARDS SVC | | 36.75 | 0.00 | 0.00 | 36.75 |
| | | | Sub Total | | 150.93 | 0.00 | 0.00 | 150.93 |
| JUL-2005 | FC0322474-001 | 31-JUL-05 | FINANCE CHARGE | | 118.47 | 0.00 | 0.00 | 118.47 |
| | | | Sub Total | | 118.47 | 0.00 | 0.00 | 118.47 |
| AUG-2005 | FC0326047-001 | 31-AUG-05 | FINANCE CHARGE | | 119.03 | 0.00 | 0.00 | 119.03 |
| | IN1559769-001 | 31-AUG-05 | TRIFFENANDS SVC | | 6.22 | 0.00 | 0.00 | 6.22 |
| | | | Sub Total | | 125.25 | 0.00 | 0.00 | 125.25 |
| SEP-2005 | IN1575371-001 | 28-SEP-05 | PROCS CHG John | | 25.00 | 0.00 | 0.00 | 25.00 |
| | FC0329540-001 | 30-SEP-05 | FINANCE CHARGE | | 115.26 | 0.00 | 0.00 | 115.26 |
| | | | Sub Total | | 140.26 | 0.00 | 0.00 | 140.26 |
| OCT-2005 | FC0333214-001 | 11-OCT-05 | FINANCE CHARGE | | 119.13 | 0.00 | 0.00 | 119.13 |
| | | | Sub Total | | 119.13 | 0.00 | 0.00 | 119.13 |
| NOV-2005 | IN0580863-001 | 29-NOV-05 | PROCS CHG Sandr | | 25.00 | 0.00 | 0.00 | 25.00 |

②006/008

:

WYNDHAM HOSPITALITY

:

:

:

|

.

FAX

04

15

11/08/2006

Report Date : 08-NOV-06

ITEMIZED STATEMENT
--------------------

Customer No :   00757-82054-05-DAY
Address :       3202 N. HENDERSON ST., GALESBURG, IL, 61401, US
As of Date:     08-NOV-2006

| Mon-Year | Invoice No | Invoice Date | Description | Accrued | Billing | Amount Tax | FinanceCharges | Total |
|----------|-----------|--------------|-------------|---------|---------|-----|----------------|-------|
|          | FC0337155-001 | 30-NOV-05 | FINANCE CHARGE |  | 115.72 | 0.00 | 0.00 | 115.72 |
|          |           |           |  | Sub Total | 140.72 | 0.00 | 0.00 | 140.72 |
| DEC-2005 | FC0341094-001 | 31-DEC-05 | FINANCE CHARGE |  | 119.51 | 0.00 | 0.00 | 119.51 |
|          |           |           |  | Sub Total | 119.51 | 0.00 | 0.00 | 119.51 |
| JAN-2006 | FC0345062-001 | 31-JAN-06 | FINANCE CHARGE |  | 133.89 | 0.00 | 0.00 | 133.89 |
|          |           |           |  | Sub Total | 115.89 | 0.00 | 0.00 | 115.89 |
| FEB-2006 | FC0348741-001 | 28-FEB-06 | FINANCE CHARGE |  | 108.39 | 0.00 | 0.00 | 108.39 |
|          |           |           |  | Sub Total | 108.39 | 0.03 | 0.00 | 108.39 |
| MAR-2006 | FC0352190-001 | 31-MAR-06 | FINANCE CHARGE |  | 119.89 | 8.00 | 0.00 | 119.95 |
|          |           |           |  | Sub Total | 119.89 | 0.00 | 0.00 | 119.89 |
| APR-2006 | FC0355772-001 | 30-APR-06 | FINANCE CHARGE |  | 116.03 | 0.00 | 0.00 | 116.03 |
|          |           |           |  | Sub Total | 116.03 | 0.00 | 0.00 | 116.03 |
| MAY-2006 | FC0359309-001 | 31-MAY-06 | FINANCE CHARGE |  | 119.89 | 0.00 | 0.00 | 119.89 |

Report Date : 08-NOV-06

ITEMIZED STATEMENT
--------------------

Customer No : 00797-02054-05-IRY
Address : 3287 N. HENDERSON ST., GALESBURG, IL, 61401,US
As of Date: 08-NOV-2006

| Mon-Year | Invoice No | Invoice Date | Description | Accrued | Billing | Amount Tax | FinanceCharges | Total |
|----------|-----------|-------------|-------------|---------|---------|------------|----------------|-------|
| | | | Sub Total | | 119.89 | 0.00 | 0.00 | 119.89 |
| JUN-2006 | FC0367718-001 | 30-JUN-06 | FINANCE CHARGE | | 116.09 | 0.00 | 0.00 | 116.09 |
| | | | Sub Total | | 116.09 | 0.00 | 0.00 | 116.09 |
| JUL-2006 | FC0365594-001 | 31-JUL-06 | FINANCE CHARGE | | 119.89 | 0.00 | 0.00 | 119.89 |
| | | | Sub Total | | 119.89 | 0.00 | 0.00 | 119.89 |
| SEP-2006 | 10003894 | 15-SEP-06 | FINANCE CHARGE | | 465.62 | 0.00 | 0.00 | 465.62 |
| | | | Sub Total | | 465.62 | 0.00 | 0.00 | 465.62 |
| OCT-2006 | 30018395 | 15-OCT-06 | FINANCE CHARGE | | 303.66 | 0.00 | 0.00 | 303.66 |
| | | | Sub Total | | 303.66 | 0.00 | 0.00 | 303.66 |
| | | | Grand Total | | 23307.87 | 0.00 | 0.00 | 23307.87 |

Requested By: Karen Vitiello

Page 7 of 8

ITEMIZED STATEMENT
------------------------

* Please note the accruals on your account are estimates.
  Make sure to promptly submit your actual gross room revenue and rooms sold.

******* END OF REPORT *******

WYNDHAM HOSPITALITY

Page 8 of 8

@008/008

**E-FILED**
Thursday, 30 August, 2007  03:28:02 PM
Clerk, U.S. District Court, ILCD

# EXHIBIT E

N

Location: **GALESBURG, IL**
Entity No: 82054
Unit No.: 797

**DAYS INNS WORLDWIDE, INC.**
**LICENSE AGREEMENT**

THIS LICENSE AGREEMENT ("Agreement"), dated ~~23~~ 30th June, 2004, is between DAYS INNS WORLDWIDE, INC., a Delaware corporation ("we", "our", or "us"), and **GROWTH PROPERTY INVESTMENT GROUP, INC., a** California **corporation** ("you"). The definitions of capitalized terms are found in Appendix A. In consideration of the following mutual promises, the parties agree as follows:

**1. License.** We have the exclusive right to license and franchise to you the distinctive "Days Inn" System for providing transient guest lodging services. We grant to you and you accept the License, effective and commencing on the Opening Date and ending on the earliest to occur of the Term's expiration or a Termination. You will call the Facility a "Days Inn." You may adopt additional or secondary designations for the Facility with our prior written consent, which we may withhold, condition, or withdraw on written notice in our sole discretion. You shall not affiliate or identify the Facility with another franchise system, reservation system, brand, cooperative or registered mark during the Term.

**2. Days Inns Licensee Advisory Association.** You will be eligible to participate in the Days Inn Licensee Advisory Association, a Delaware corporation that is the organization of Days Inn System licensees, in accordance with the Bylaws and Certificate of Incorporation of the Association, as amended, so long as you are not in default under this Agreement.

**3. Your Improvement and Operating Obligations.** Your obligations to improve, operate and maintain the Facility are:

3.1 **Improvements.** You must select and acquire the Location and acquire, equip and supply the Facility in accordance with System Standards. You must provide us with proof that you own or lease the Facility before or within 30 days after the Effective Date. You must begin renovation of the Facility no later than thirty (30) days after the Effective Date. The deadline for completing the pre-opening phase of conversion and renovation, when the Facility must score at least 400 points under our quality assurance inspection system (or equivalent score under a successor quality assurance scoring system we employ), and be ready to open for business under the System, is ninety (90) days after the Effective Date. All renovations will comply with System Standards, any Approved Plans and any Punch List attached to this Agreement. Your general contractor or you must carry the insurance required under this Agreement during renovation. You must complete the pre-opening renovation specified on the Punch List and the Facility must pass its pre-opening quality assurance inspection with a score of at least 400 points (or equivalent score under a successor quality assurance scoring system we employ), before we consider the Facility to be ready to open under the System. You must continue renovation and improvement of the Facility after the Opening Date as the Punch List requires so that the Facility scores at least 425 points (or equivalent score under a successor quality assurance scoring system we employ),

on a quality assurance inspection within nine (9) months after the Opening Date. We may, in our sole discretion, terminate this Agreement by giving written notice to you (subject to applicable law) if (1) you do not commence or complete the pre-opening or post-opening improvements of the Facility by the dates specified in this Section, or (2) you prematurely identify the Facility as a Chain Facility or begin operation under the System name described in Schedule B in violation of Section 3.3 and you fail to either complete the pre-opening Improvement Obligation or cease operating and/or identifying the Facility under the Marks and System within five days after we send you written notice of default. Time is of the essence for the Improvement Obligation. We may, however, in our sole discretion, grant one or more extensions of time to perform any phase of the Improvement Obligation. You will pay us a non-refundable extension fee of $2.00 per room for each day of any extension of the deadline for completing pre-opening improvements. This fee will be payable to us after each 30 days of the extension. You will pay us the balance of the extension fee outstanding when the Facility opens under the System 10 days after the Opening Date. The grant of an extension will not waive any other default existing at the time the extension is granted.

3.2 **Improvement Plans.** You will create plans and specifications for the work described in Section 3.1 (based upon the System Standards and this Agreement) if we so request and submit them for our approval before starting improvement of the Location. We will not unreasonably withhold or delay our approval, which is intended only to test compliance with System Standards, and not to detect errors or omissions in the work of your architects, engineers, contractors or the like. Our review does not cover technical, architectural or engineering factors, or compliance with federal, state or local laws, regulations or code requirements. We will not be liable to your lenders, contractors, employees, guests, others, or you on account of our review or approval of your plans, drawings or specifications, or our inspection of the Facility before, during or after renovation or construction. Any material variation from the Approved Plans requires our prior written approval. You will promptly provide us with copies of permits, job progress reports, and other information as we may reasonably request. We may inspect the work while in progress without prior notice.

3.3 **Pre-Opening.** You may identify the Facility as a Chain Facility prior to the Opening Date, or commence operation of the Facility under a Mark and using the System, only after first obtaining our approval or as permitted under and strictly in accordance with the System Standards Manual. If you identify the Facility as a Chain Facility or operate the Facility under a Mark before the Opening Date without our express written consent, then in addition to our remedies under Sections 3.1 and 11.2, you will begin paying the Royalty to us, as specified in Section 7.1, from the date you identify or operate the Facility using the Mark. We may delay the Opening Date until you pay the Royalty accruing under this Section.

3.4 **Operation.** You will operate and maintain the Facility continuously after the Opening Date on a year-round basis as required by System Standards and offer transient guest lodging and other related services of the Facility (including those specified on Schedule B) to the public in compliance with the law and System Standards. You will keep the Facility in a clean, neat, and sanitary condition. You will clean, repair, replace, renovate, refurbish, paint, and redecorate the Facility and its FF&E as and when needed to comply with System Standards. The Facility will accept payment from guests by all credit and debit cards we designate in the System Standards

2

Manual.  You may add to or discontinue the amenities, services and facilities described in Schedule B, or lease or subcontract any service or portion of the Facility, only with our prior written consent which we will not unreasonably withhold or delay.  Your front desk operation, telephone system, parking lot, swimming pool and other guest service facilities may not be shared with or used by guests of another lodging or housing facility.

3.5 **Training.**  You, or a person with executive authority if you are an entity, and the Facility's general manager (or other representative who exercises day to day operational authority) will attend the training programs described in Section 4.1 we designate as mandatory for licensees or general managers, respectively.  You will train or cause the training of all Facility personnel as and when required by System Standards and this Agreement.  You will pay for all travel, lodging, meals and compensation expenses of the people you send for training programs, the cost of training materials and other reasonable charges we may impose for training under Section 4.1. You will direct the Facility staff to attend on-site opening training in connection with the opening of the Facility and reimburse us for our expenses for the training as discussed in Section 4.1.3.

3.6 **Marketing.**  You will participate in System marketing programs, including the Directory and the Reservation System.  You will obtain and maintain the computer and communications service and equipment we specify to participate in the Reservation System.  You will comply with our rules and standards for participation, and will honor reservations and commitments to guests and travel industry participants.  You authorize us to offer and sell reservations for rooms and services at the Facility according to the rules of participation and System Standards.  You may implement, at your option and expense, your own local advertising.  Your advertising materials must use the Marks correctly, and must comply with System Standards or be approved in writing by us prior to publication.  You will stop using any non-conforming, out-dated or misleading advertising materials if we so request.

3.6.1  You may participate in any regional marketing, training or management alliance or cooperative of Chain licensees formed to serve the Chain Facilities in your area.  We may assist the cooperative collect contributions.  You may be excluded from cooperative programs and benefits if you don't participate in all cooperative programs according to their terms, including making payments and contributions when due.

3.6.2  The Facility must participate in our Chain-wide Internet marketing activities like other marketing programs.  You will discontinue any Internet marketing that conflicts, in our reasonable discretion, with Chain-wide Internet marketing activities.  You must honor the terms of any participation agreement you sign for Internet marketing.  You shall pay when due any fees, commissions, charges and reimbursements relating to Internet marketing activities (i) in which you agree to participate, or (ii) that we designate as mandatory on a Chain-wide basis, provided that the activities carry aggregate fees per transaction of not more than the sum of the full agent commission specified on Schedule C for sales agents, plus 10% of the Chain's reported average daily rate for the preceding calendar year.  We may suspend the Facility's participation in Internet marketing activity if you default under this Agreement.

3.7 **Governmental Matters.**  You will obtain as and when needed all governmental permits, licenses and consents required by law to construct, acquire, renovate, operate and maintain the

3

Facility and to offer all services you advertise or promote. You will pay when due or properly contest all federal, state and local payroll, withholding, unemployment, beverage, permit, license, property, ad valorem and other taxes, assessments, fees, charges, penalties and interest, and will file when due all governmental returns, notices and other filings. You will comply with all applicable federal, state and local laws, regulations and orders applicable to you and/or the Facility, including those combating terrorism such as the USA Patriot Act and Executive Order 13224.

## 3.8 **Financial Books & Records; Audits.**

3.8.1 The Facility's transactions must be timely and accurately recorded in accounting books and records prepared on an accrual basis compliant with generally accepted accounting principles of the United States ("GAAP") and consistent with the most recent edition of the Uniform System of Accounts for the Lodging Industry published by the American Hotel & Motel Association, as modified by this Agreement and System Standards. You acknowledge that your accurate accounting for and reporting of Gross Room Revenues is a material obligation you accept under this Agreement.

3.8.2 We may notify you of a date on which we propose to audit the Facility's books and records. You will be deemed to confirm our proposed date unless you follow the instructions with the audit notice for changing the date. You need to inform us where the books and records will be produced. You need to produce for our auditors at the confirmed time and place for the audit the books, records, tax returns and financial statements relating to the Facility for the applicable accounting periods we require under this Agreement and System Standards. If our auditors must return to your location after the first date we confirm for the audit because you violate this Section 3.8.2 or refuse to cooperate with the reasonable requests of our auditors, you must pay us the Audit Fee under Section 4.8 when invoiced. We may also perform an audit of the Facility's books and records without advance notice. Your staff must cooperate with and assist our auditors to perform any audit we conduct.

3.8.3 We will notify you in writing if you default under this Agreement because (i) you do not cure a violation of Section 3.8.2 within 30 days after the date of the initial audit, (ii) you cancel 2 or more previously scheduled audits, (iii) you refuse to admit our auditors for an audit during normal business hours at the place where you maintain the Facility's books and records, or refuse to produce the books and records required under this Agreement and System Standards for the applicable accounting periods, (iv) our audit determines that the books and records you produced are incomplete or show evidence of tampering or violation of generally accepted internal control procedures, or (v) our audit determines that that you have reported to us less than 97% of the Facility's Gross Room Revenues for any fiscal year preceding the audit. Our notice of default may include, in our sole discretion and as part of your performance needed to cure the default under this Section 3.8, an "Accounting Procedure Notice." You must also pay any deficiency in Recurring Fees or other charges we identify and invoice as a result of the audit. The Accounting Procedure Notice requires that you obtain and deliver to us, within 90 days after the end of each of your next three fiscal years ending after the Accounting Procedure Notice, an audit opinion signed by an independent certified public accountant who is a member of the American Institute of Certified Public Accountants addressed to us that the Facility's Gross Room Revenues you

4

reported to us during the fiscal year fairly present the Gross Room Revenues of the Facility computed in accordance with this Agreement for the fiscal year.

3.9 **Inspections.** You acknowledge that the Facility's participation in our quality assurance inspection program (including unannounced inspections) is a material obligation you accept under this Agreement. You will permit our representatives to perform quality assurance inspections of the Facility at any time with or without advance notice. The inspections will commence during normal business hours although we may observe Facility operation at any time. You and the Facility staff will cooperate with the inspector performing the inspection. If the Facility fails an inspection, you refuse to cooperate with our inspector, or you refuse to comply with our published inspection System Standards, then you will pay us when invoiced for any reinspection fee specified in System Standards Manuals (which will not exceed $750) plus the reasonable travel, lodging and meal costs our inspector incurs for a reinspection. We may also conduct paper and electronic customer satisfaction surveys of your guests and include the results in your final quality assurance score. We may publish and disclose the results of quality assurance inspections and guest surveys.

3.10 **Insurance.** You will obtain and maintain during the Term of this Agreement the insurance coverage required under the System Standards Manual from insurers meeting the standards established in the Manual. Unless we instruct you otherwise, your liability insurance policies will name Days Inns Worldwide, Inc., Cendant Hotel Group, Inc. and Cendant Corporation, their successors and assigns as additional insureds.

3.11 **Conferences.** You (or your representative with executive authority if you are an entity) will attend each annual Chain conference and pay the Conference Fee we set for the Chain licensees, if and when we determine to hold an annual Chain conference. Mandatory recurrent training for licensees and managers described in Section 4.1.3 may be held at a conference. The Fee will be the same for all Chain Facilities that we license in the United States. You will receive reasonable notice of a Chain conference.

3.12 **Purchasing.** You will purchase or obtain certain items we designate as proprietary or that bear Marks, such as signage, only from suppliers we approve. You may purchase any other items for the Facility from any competent source you select, so long as the items meet or exceed System Standards.

3.13 **Good Will.** You will use reasonable efforts to protect, maintain and promote the name "Days Inn" and its distinguishing characteristics, and the other Marks. You will not permit or allow your officers, directors, principals, employees, representatives, or guests of the Facility to engage in conduct which is unlawful or damaging to the good will or public image of the Chain or System. You will participate in Chain-wide guest service and satisfaction guaranty programs we require in good faith for all Chain Facilities. You will follow System Standards for identification of the Facility and for you to avoid confusion on the part of guests, creditors, lenders, investors and the public as to your ownership and operation of the Facility, and the identity of your owners.

3.14 **Facility Modifications.** You may materially modify, diminish or expand the Facility (or change its interior design, layout, FF&E, or facilities) only after you receive our prior written

5

consent, which we will not unreasonably withhold or delay. You will pay our Rooms Addition Fee then in effect for each guest room you add to the Facility. If we so request, you will obtain our prior written approval of the plans and specifications for any material modification, which we will not unreasonably withhold or delay. You will not open to the public any material modification until we inspect it for compliance with the Approved Plans and System Standards.

3.15 **Courtesy Lodging.** You will provide lodging at the "Employee Rate" established in the System Standards Manual from time to time (but only to the extent that adequate room vacancies exist) to our representatives traveling on business, but not more than three standard guest rooms at the same time.

3.16 **Minor Renovations.** Beginning three years after the Opening Date, we may issue a "Minor Renovation Notice" to you that will specify reasonable Facility upgrading and renovation requirements (a "Minor Renovation") to be commenced no sooner than 60 days after the notice is issued, having an aggregate cost for labor, FF&E and materials estimated by us to be not more than the Minor Renovation Ceiling Amount. You will perform the Minor Renovations as and when the Minor Renovation Notice requires. We will not issue a Minor Renovation Notice within three years after the date of a prior Minor Renovation Notice, or if the three most recent quality assurance inspection scores of the Facility averaged at least 425 points and the most recent quality assurance inspection score for the Facility was at least 400 points (or equivalent scores under a successor quality assurance scoring system we employ), when the Facility is otherwise eligible for a Minor Renovation.

**4. Our Operating and Service Obligations.** We will provide you with the following services and assistance:

4.1 **Training.** We will offer (directly or indirectly by subcontracting with an affiliate or a third party) general manager and owner orientation training, on-site opening training, remedial training and supplemental training.

4.1.1 **General Manager Orientation Training.** We will offer at a location in the United States we designate a general manager orientation training program. The program will not exceed two weeks in duration and will cover such topics as System Standards, services available from us, and operating a Chain Facility. Your initial general manager (or other representative who exercises day to day operational authority) for the Facility must complete this program to our satisfaction no later than 90 days after he/she assumes the position or 90 days after the Opening Date, whichever occurs first. If we do not offer a place in general manager orientation within that time frame, your general manager must attend the next program held at which we offer a place. Any replacement general manager must complete general manager orientation within 90 days after he/she assumes the position or the next program available, whichever comes later. Your general manager for the Facility must complete general manager orientation even if you employ managers at other Chain Facilities who have already received this training. We charge you tuition of $995 for your first general manager if you open the Facility with our approval and your general manager completes general manager orientation within the time period established under this Agreement. You must pay the tuition then in effect as disclosed in our latest Uniform Franchise Offering Circular ("UFOC"), but not more than $3,000, if you do not meet these deadlines. For any supplemental

6

or replacement general manager, you must pay the tuition in effect for the program when your manager attends the program. You must also pay for your manager's travel, lodging, meals, incidental expenses, compensation and benefits.

4.1.2 **Owner Orientation Training.**     We will offer an owner orientation training program to familiarize you with the System, the Chain, and our services.     If this is your first System license, you (or a person with executive authority if you are an entity) must attend owner orientation preferably before, but not later than 60 days prior to the Opening Date. If we do not offer owner orientation training within this time period, you must attend the next program offered. Financial institutions and real estate mortgage investment conduits are exempt from the obligation to attend owner orientation, but may choose to do so at their option. Owner orientation will be no longer than five days. We charge you tuition of $825 if you open the Facility with our approval and attend owner orientation within the time periods established under this Agreement. If you do not open the Facility and attend orientation by such deadlines, you must pay the tuition then in effect for this program as disclosed in our latest UFOC, but not more than $3,000. You must also pay your travel, lodging, meal and incidental expenses.

4.1.3 **On-Site Opening Training.** We will provide at the Facility or another agreed location, and your staff must attend, on-site opening training (at our discretion as to length and scheduling) to assist you in opening the Facility. There is currently no charge for the initial training program. You will pay the cost of any site used if the Facility is not available and the rent for any equipment we need. You must provide lodging for our trainers at your expense. You must also pay, at our request, the reasonable travel, meal and out-of-pocket expenses incurred by our trainers for on-site opening training.

4.1.4 **DaySkills Certification.** Each general manager must successfully complete the DaySkills (or successor) certification program on an annual basis. This program is accessible on-line via the System Intranet. Licensees also must complete DaySkills before the Opening Date.

4.1.5 **Remedial Training.** We may require you, your general manager and/or your staff to participate in on-site remedial training if the Facility fails multiple quality assurance inspections and/or experiences significant complaints to our guest services department, as a condition to avoiding termination or to resumption of reservation service. You must pay the tuition in effect for this program when it is offered to you, and you must provide lodging for our trainers. As of March 31, 2003, tuition for remedial on-site training is $450 per day, which must be paid before the training commences. We may increase the tuition charge in the future. The length of the remedial training could be up to five days, depending on the severity of the quality assurance and/or customer service issues.

4.1.6 **Supplemental Training.** We may offer other mandatory or optional training programs for reasonable tuition or without charge. This training could be held in our U.S. training center or other locations. You will pay for your representative's travel, lodging, meals, incidental expenses, compensation and benefits and any tuition charge we establish for this training. This training may be held in conjunction with a Chain Lodging conference. We may offer, rent or sell to you video tapes, computer discs or other on-site training aids and materials, or require you to buy them at reasonable prices. We may also offer Internet-based training via the Chain's intranet website.

7

4.1.7 **Cancellation Fees.** We will charge you a cancellation fee of 50% of the tuition for a program if you cancel your participation less than 15 days before it is scheduled to be held. If you fail to attend a training program as scheduled without notifying us in advance, your cancellation fee will be 100% of the tuition for the program. These fees are non-refundable and you will also be charged the full tuition in effect for the program when you reschedule your training.

4.2    **Reservation System.** We will operate and maintain (directly or by subcontracting with an affiliate or one or more third parties) a computerized Reservation System or such technological substitute(s) as we determine, in our discretion. We will use the Basic Service Charge for the acquisition, development, support, equipping, maintenance, improvement and operation of the Reservation System. We will provide software maintenance for the software we license to you to connect to the Reservation System if your Recurring Fee payments are up to date. The Facility will participate in the Reservation System, commencing with the Opening Date for the balance of the Term. We have the right to provide reservation services to lodging facilities other than Chain Facilities or to other parties. We will not offer callers to our general consumer toll free reservation telephone number in the United States the opportunity to make reservations for other lodging chains.

4.3  **Marketing.**

4.3.1    We will promote public awareness and usage of Chain Facilities by implementing advertising, promotion, publicity, market research and other marketing programs, training programs and related activities, and the production and distribution of Chain publications and directories of hotels. We will determine in our discretion: (i) The nature and type of media placement; (ii) The allocation (if any) among international, national, regional and local markets; and (iii) The nature and type of advertising copy, other materials and programs. We or an affiliate may be reimbursed for the reasonable direct and indirect costs, overhead or other expenses of providing marketing services. We are not obligated to supplement or advance funds available from System licensees to pay for marketing activities. We do not promise that the Facility or you will benefit directly or proportionately from marketing activities.

4.3.2  We may, at our discretion, implement special international, national, regional or local promotional programs (which may or may not include the Facility) and may make available to you (to use at your option) media advertising copy and other marketing materials for prices which reasonably cover the materials' direct and indirect costs.

4.3.3  We will publish the Chain Directory. We will include the Facility in the Chain Directory after it opens if you submit the information we request on time, and you are not in default under this Agreement at the time we must arrange for publication. We will supply Directories to you for display at locations specified in the System Standards Manual or policy statements. We may assess you a reasonable charge for the direct and indirect expenses (including overhead) of producing and delivering the Directories.

4.4  **Purchasing.** We may offer optional assistance to you with purchasing items used at or in the Facility. Our affiliates may offer this service on our behalf. We may restrict the vendors authorized

8

to sell proprietary or Mark-bearing items in order to control quality, provide for consistent service or obtain volume discounts. We will maintain and provide to you lists of suppliers approved to furnish Mark-bearing items, or whose products conform to System Standards.

4.5 **The System.** We will control and establish requirements for all aspects of the System. We may, in our discretion, change, delete from or add to the System, including any of the Marks or System Standards, in response to changing market conditions. We may, in our discretion, permit deviations from System Standards, based on local conditions and our assessment of the circumstances.

4.6    **Consultations and Standards Compliance.** We will assist you to understand your obligations under System Standards by telephone, mail, during quality assurance inspections, through the System Standards Manual, at training sessions and during conferences and meetings we conduct. We will provide telephone and mail consultation on Facility operation and marketing through our representatives. We will offer you access to any Internet website we may maintain to provide Chain licensees with information and services, subject to any rules, policies and procedures we establish for its use and access and to this Agreement. We may limit or deny access to any such website while you are in default under this Agreement.

4.7 **System Standards Manual and Other Publications.** We will specify System Standards in the System Standards Manual, policy statements or other publications. We will lend you one copy of the System Standards Manual promptly after we sign this Agreement. We will send you any System Standards Manual revisions and/or supplements as and when issued. We will send you all other publications for Chain licensees and all separate policy statements in effect from time to time.

4.8    **Inspections and Audits.** We have the unlimited right to conduct unannounced quality assurance inspections of the Facility and its operations, records and Mark usage to test the Facility's compliance with System Standards and this Agreement, and the audits described in Section 3.8. We have the unlimited right to reinspect if the Facility does not achieve the score required on an inspection. We may impose a reinspection fee and will charge you for our costs as provided in Section 3.9. You will pay us an "Audit Fee" of $300.00 when we invoice you for an Audit Fee under Section 3.8. We may increase the Audit Fee on a Chain-wide basis to cover any increases in our audit costs to not more than $500.00, effective any time after December 31, 2005. Our inspections are solely for the purposes of checking compliance with System Standards.

5. **Term.** The Term begins on the Effective Date and expires at the end of the fifteenth License Year. Some of your duties and obligations will survive termination or expiration of this Agreement. You will execute and deliver to us with this Agreement a notarized Declaration of License Agreement in recordable form. We will countersign and return one copy of the Declaration to you. We may, at our option, record the Declaration in the real property records of the county where the Facility is located. The Declaration will be released at your request and expense when this Agreement terminates or expires and you perform your post-termination obligations. NEITHER PARTY HAS RENEWAL RIGHTS OR OPTIONS.

6. **Initial Fees.**

6.1 **Application and Initial Fees.** We should receive from you a non-refundable Application Fee

9

of $1,000.00.  You will pay us a non-refundable Initial Fee in the amount of **$17,500.00**, when you sign this Agreement, which is fully earned when we sign this Agreement.

6.2 **Initial Entry Charge.**  We should receive from you a non-refundable Initial Entry Charge to gain access to the Reservation System.  The Initial Entry Charge is **waived** for the Facility.

### 7. Recurring Fees, Taxes and Interest.

7.1  You will pay us certain "Recurring Fees" in U.S. dollars (or such other currency as we may direct if the Facility is outside the United States) ten days after the month in which they accrue, without billing or demand.  Recurring Fees include the following:

7.1.1  A "Royalty" equal to five percent (5.0%) of Gross Room Revenues of the Facility accruing during the calendar month, accrues from the earlier of the Opening Date or the date you identify the Facility as a Chain Facility or operate it under a Mark until the end of the Term.

7.1.2  "System Assessment Fees," including a "Basic Service Charge" as set forth in Schedule C for advertising, marketing, training, the Reservation System and other related services and programs, and the specific additional charges and fees referred to in Schedule C or Section 4.2 of this Agreement as "Additional Charges," accrues from the Opening Date until the end of the Term, including during reservation suspension periods.  We will allocate at least 39% of the Basic Service Charge to advertising, marketing and related services and programs.  We reserve the right to increase or modify the System Assessment Fees for all Chain Facilities, and to add other fees and charges for new services, at our sole discretion as to amount or formula, from time to time, but with at least 30 days prior written notice and after consultation with the Days Inns Franchisee Advisory Association Board of Directors, by substituting a new Schedule C or otherwise, to reflect changes in the fully allocated costs of providing marketing and reservation services, and to add, drop or modify the types of services we offer.  You will also pay or reimburse us for travel and other agent commissions paid for certain reservations at the Facility and a "GDS Fee" levied to pay for reservations for the Facility originated or processed through the Global Distribution System, the Internet and other reservation systems and networks.  We may charge a reasonable service fee for this service.  We, or our affiliates, may charge Facilities using the System outside the United States using a different formula.

7.2  You will pay to us "Taxes" equal to any federal, state or local sales, gross receipts, use, value added, excise or similar taxes assessed against us on the Recurring Fees by the jurisdictions where the Facility is located, but not including any income tax, franchise or other tax for the privilege of doing business by us in your State.  You will pay Taxes to us when due.

7.3  "Interest" is payable when you receive our invoice on any past due amount payable to us under this Agreement at the rate of 1.5% per month or the maximum rate permitted by applicable law, whichever is less, accruing from the due date until the amount is paid.

7.4  If a transfer occurs, your transferee or you will pay us our then current Application Fee and a "Relicense Fee" equal to the Initial Fee we would then charge a new licensee for the Facility.

10

## 8. Indemnifications.

8.1 Independent of your obligation to procure and maintain insurance, you will indemnify, defend and hold the Indemnitees harmless, to the fullest extent permitted by law, from and against all Losses and Expenses, incurred by any Indemnitee for any investigation, claim, action, suit, demand, administrative or alternative dispute resolution proceeding, relating to or arising out of any transaction, occurrence or service at, or involving the operation of, the Facility, any payment you make or fail to make to us, any breach or violation of any contract or any law, regulation or ruling by, or any act, error or omission (active or passive) of, you, any party associated or affiliated with you or any of the owners, officers, directors, employees, agents or contractors of you or your affiliates, including when you are alleged or held to be the actual, apparent or ostensible agent of the Indemnitee, or the active or passive negligence of any Indemnitee is alleged or proven. You have no obligation to indemnify an Indemnitee for damages to compensate for property damage or personal injury if a court of competent jurisdiction makes a final decision not subject to further appeal that the Indemnitee engaged in willful misconduct or intentionally caused such property damage or bodily injury. This exclusion from the obligation to indemnify shall not, however, apply if the property damage or bodily injury resulted from the use of reasonable force by the Indemnitee to protect persons or property.

8.2 You will respond promptly to any matter described in the preceding paragraph, and defend the Indemnitee. You will reimburse the Indemnitee for all costs of defending the matter, including reasonable attorneys' fees, incurred by the Indemnitee if your insurer or you do not assume defense of the Indemnitee promptly when requested, or separate counsel is appropriate, in our discretion, because of actual or potential conflicts of interest. We must approve any resolution or course of action in a matter that could directly or indirectly have any adverse effect on us or the Chain, or could serve as a precedent for other matters.

8.3 We will indemnify, defend and hold you harmless, to the fullest extent permitted by law, from and against all Losses and Expenses incurred by you in any action or claim arising from your proper use of the System alleging that your use of the System and any property we license to you is an infringement of a third party's rights to any trade secret, patent, copyright, trademark, service mark or trade name. You will promptly notify us in writing when you become aware of any alleged infringement or an action is filed against you. You will cooperate with our defense and resolution of the claim. We may resolve the matter by obtaining a license of the property for you at our expense, or by requiring that you discontinue using the infringing property or modify your use to avoid infringing the rights of others.

## 9. Your Assignments, Transfers and Conveyances.

9.1 **Transfer of the Facility.** This Agreement is personal to you (and your owners if you are an entity). We are relying on your experience, skill and financial resources (and that of your owners and the guarantors, if any) to sign this Agreement with you. You may finance the Facility and grant a lien, security interest or encumbrance on it without notice to us or our consent. If a Transfer is to occur, the transferee or you must comply with Section 9.3. Your License is subject to termination when the Transfer occurs. The License is not transferable to your transferee, who has no right or authorization to use the System and the Marks when you transfer ownership or possession of the

11

Facility. The transferee may not operate the Facility under the System, and you are responsible for performing the post-termination obligations in Section 13. You and your owners may, only with our prior written consent and after you comply with Sections 9.3 and 9.6, assign, pledge, transfer, delegate or grant a security interest in all or any of your rights, benefits and obligations under this Agreement, as security or otherwise. Transactions involving Equity Interests that are not Equity Transfers do not require our consent and are not Transfers.

9.2 **Public Offerings and Registered Securities.** You may engage in the first registered public offering of your Equity Interests only after you pay us a public offering fee equal to **$5,000.** Your Equity Interests (or those of a person, parent, subsidiary, sibling or affiliate entity, directly or indirectly effectively controlling you), are freely transferable without the application of this Section if they are, on the Effective Date, or after the public offering fee is paid, they become, registered under the federal Securities Act of 1933, as amended, or a class of securities registered under the Securities Exchange Act of 1934, as amended, or listed for trading on a national securities exchange or the automated quotation system of the National Association of Securities Dealers, Inc. (or any successor system), provided that any tender offer for at least a majority of your Equity Interests will be an Equity Transfer subject to Section 9.1.

9.3 **Conditions.** We may, to the extent permitted by applicable law, condition and withhold our consent to a Transfer when required under this Section 9 until the transferee and you meet certain conditions. If a Transfer is to occur, the transferee (or you, if an Equity Transfer is involved) must first complete and submit our Application, qualify to be a licensee in our sole discretion, given the circumstances of the proposed Transfer, provide the same supporting documents as a new license applicant, pay the Application and Relicense Fees then in effect, sign the form of License Agreement we then offer in conversion transactions and agree to renovate the Facility as if it were an existing facility of similar age and condition converting to the System, as we reasonably determine. We will provide a Punch List of improvements we will require after the transferee's Application is submitted to us. We must also receive general releases from you and each of your owners, and payment of all amounts then owed to us and our affiliates by you, your owners, your affiliates, the transferee, its owners and affiliates, under this Agreement or otherwise. Our consent to the transaction will not be effective until these conditions are satisfied.

9.4 **Permitted Transferee Transactions.** You may transfer an Equity Interest or effect an Equity Transfer to a Permitted Transferee without obtaining our consent, renovating the Facility or paying a Relicense Fee or Application Fee. No Transfer will be deemed to occur. You also must not be in default and you must comply with the application and notice procedures specified in Sections 9.3 and 9.6. Each Permitted Transferee must first agree in writing to be bound by this Agreement, or at our option, execute the License Agreement form then offered prospective licensees. No transfer to a Permitted Transferee shall release a living transferor from liability under this Agreement or any guarantor under any Guaranty of this Agreement. You must comply with this Section if you transfer the Facility to a Permitted Transferee. A transfer resulting from a death may occur even if you are in default under this Agreement.

9.5 **Attempted Transfers.** Any transaction requiring our consent under this Section 9 in which our consent is not first obtained shall be void, as between you and us. You will continue to be liable for payment and performance of your obligations under this Agreement until we terminate

12

this Agreement, all your financial obligations to us are paid and all System identification is removed from the Facility.

9.6 **Notice of Transfers.** You will give us at least 30 days prior written notice of any proposed Transfer or Permitted Transferee transaction. You will notify us when you sign a contract to Transfer the Facility and 10 days before you intend to close on the transfer of the Facility. We will respond to all requests for our consent and notices of Permitted Transferee transactions within a reasonable time not to exceed 30 days. You will notify us in writing within 30 days after a change in ownership of 25% or more of your Equity Interests that are not publicly held or that is not an Equity Transfer, or a change in the ownership of the Facility if you are not its owner. You will provide us with lists of the names, addresses, and ownership percentages of your owner(s) at our request.

**10. Our Assignments.** We may assign, delegate or subcontract all or any part of our rights and duties under this Agreement, including by operation of law, without notice and without your consent. We will have no obligations to you after you are notified that our transferee has assumed our obligations under this Agreement except those that arose before we assign this Agreement.

**11. Default and Termination.**

11.1 **Default.** In addition to the matters identified in Sections 3.1 and 3.8, you will be in default under this Agreement if (a) you do not pay us when a payment is due, (b) you do not perform any of your other obligations when this Agreement and the System Standards Manual require, or (c) if you otherwise breach this Agreement. If your default is not cured within ten days after you receive written notice from us that you have not filed your monthly report, paid us any amount that is due or breached your obligations regarding Confidential Information, or within 30 days after you receive written notice from us of any other default (except as noted below), then we may terminate this Agreement by written notice to you under Section 11.2. We will not exercise our right to terminate if you have completely cured your default, or until any waiting period required by law has elapsed. In the case of quality assurance default, if you have acted diligently to cure the default but cannot do so and have entered into a written improvement agreement with us within 30 days after the failing inspection, you may cure the default within 90 days after the failing inspection. We may terminate the License if you do not perform that improvement agreement.

11.2 **Termination.** We may terminate the License, or this Agreement if the Opening Date has not occurred, effective when we send written notice to you or such later date as required by law or as stated in the default notice, when (1) you do not cure a default as provided in Section 11.1 or we are authorized to terminate under Section 3.1, (2) you discontinue operating the Facility as a "Days Inn", (3) you do or perform, directly or indirectly, any act or failure to act that in our reasonable judgment is or could be injurious or prejudicial to the goodwill associated with the Marks or the System, (4) you lose possession or the right to possession of the Facility, (5) you (or any guarantor) suffer the termination of another license or License Agreement with us or one of our affiliates, (6) you intentionally maintain false books and records or submit a materially false report to us, (7) you (or any guarantor) generally fail to pay debts as they come due in the ordinary course of business, (8) you, any guarantor or any of your owners or agents misstated to us or omitted to tell us a material fact to obtain or maintain this Agreement with us, (9) you receive two or more notices of

13

default from us in any one year period (whether or not you cure the defaults), (10) a violation of Section 9 occurs, or a Transfer occurs before the relicensing process is completed, (11) you or any of your Equity Interest owners contest in court the ownership or right to franchise or license all or any part of the System or the validity of any of the Marks, (12) you, any guarantor or the Facility is subject to any voluntary or involuntary bankruptcy, liquidation, dissolution, receivership, assignment, reorganization, moratorium, composition or a similar action or proceeding that is not dismissed within 60 days after its filing, or (13) you maintain or operate the Facility in a manner that endangers the health or safety of the Facility's guests.

## 11.3 Casualty and Condemnation.

11.3.1 You will notify us promptly after the Facility suffers a Casualty that prevents you from operating in the normal course of business, with less than 75% of guest rooms available. You will give us information on the availability of guest rooms and the Facility's ability to honor advance reservations. You will tell us in writing within 60 days after the Casualty whether or not you will restore, rebuild and refurbish the Facility to conform to System Standards and its condition prior to the Casualty. This restoration will be completed within 180 days after the Casualty. You may decide within the 60 days after the Casualty, and if we do not hear from you, we will assume that you have decided, to terminate this Agreement, effective as of the date of your notice or 60 days after the Casualty, whichever comes first. If this Agreement so terminates, you will pay all amounts accrued prior to termination and follow the post-termination requirements in Section 13. You will not be obligated to pay Liquidated Damages if the Facility will no longer be used as an extended stay or transient lodging facility after the Casualty.

11.3.2 You will notify us in writing within 10 days after you receive notice of any proposed Condemnation of the Facility, and within 10 days after receiving notice of the Condemnation date. This Agreement will terminate on the date the Facility or a substantial portion is conveyed to or taken over by the condemning authority.

11.4 **Our Other Remedies.** We may suspend the Facility from the Reservation System for any default or failure to pay or perform under this Agreement or any other written agreement with us relating to the Facility, discontinue Reservation System referrals to the Facility for the duration of such suspension, and may divert previously made reservations to other Chain Facilities after giving notice of non-performance, non-payment or default. All Basic Service Charges accrue during the suspension period. We may deduct points under our quality assurance inspection program for your failure to comply with this Agreement or System Standards. Reservation service will be restored after you have fully cured any and all defaults and failures to pay and perform. We may omit the Facility from the Directory if you are in default on the date we must determine which Chain Facilities are included in the Directory. You recognize that any use of the System not in accord with this Agreement will cause us irreparable harm for which there is no adequate remedy at law, entitling us to injunctive and other relief. We may litigate to collect amounts due under this Agreement without first issuing a default or termination notice. Our consent or approval may be withheld if needed while you are in default under this Agreement or may be conditioned on the cure of all your defaults.

11.5 **Your Remedies.** If we fail to issue our approval or consent as and when required under this

14

Agreement within a reasonable time of not less than 30 days after we receive all of the information we request, and you believe our refusal to approve or consent is wrongful, you may bring a legal action against us to compel us to issue our approval or consent to the obligation. To the extent permitted by applicable law, this action shall be your exclusive remedy. We shall not be responsible for direct, indirect, special, consequential or exemplary damages, including, but not limited to, lost profits or revenues.

## 12. Liquidated Damages.

12.1 Generally. If we terminate the License under Section 11.2, or you terminate this Agreement (except under Section 11.3 or as a result of our default which we do not cure within a reasonable time after written notice), you will pay us Liquidated Damages within 30 days following the date of Termination. If Termination occurs during the last two License Years of the Term, Liquidated Damages will be the lesser of (i) the amount specified in Section 18.5, or (ii) the average daily fees based on a percentage of Gross Room Revenues accruing under Section 7.1 during the 12 full calendar months preceding the month in which Termination occurs multiplied by the number of days remaining in the unexpired Term (the "Ending Period") at the date of Termination. You will also pay any applicable Taxes assessed on such payment. Before the last two License Years, Liquidated Damages will be as set forth in Section 18.5. If we terminate this Agreement under Section 3 before the Opening Date, you will pay us within 10 days after you receive our notice of termination Liquidated Damages equal to one-half the amount payable under the preceding sentence. Liquidated Damages are paid in place of our claims for lost future Recurring Fees under this Agreement. Our right to receive other amounts due under this Agreement is not affected.

12.2 Condemnation Payments. In the event a Condemnation is to occur, you will pay us the fees set forth in Section 7 for a period of nine months after we receive the initial notice of condemnation described in Section 11.3.2, or until the Condemnation occurs, whichever is longer. You will pay us Liquidated Damages equal to the average daily Royalties and Basic Service Charges for the nine months period preceding the date of your condemnation notice to us multiplied by the number of days remaining in the nine months notice period if the Condemnation is completed before the nine months notice period expires. This payment will be made within 30 days after Condemnation is completed (when you close the Facility or you deliver it to the condemning authority). You will pay no Liquidated Damages if the Condemnation is completed after the nine months notice period expires, but you must pay the fees set forth in Section 7 when due until Condemnation is completed.

13. **Your Duties At and After Termination.** When the License or this Agreement terminates for any reason whatsoever:

13.1 System Usage Ceases. You will immediately stop using the System to operate and identify the Facility. You will remove all signage and other items bearing any Marks and follow the other steps detailed in the System Standards Manual for changing the identification of the Facility. You will promptly paint over or remove the Facility's distinctive System trade dress, color schemes and architectural features. You shall not identify the Facility with a confusingly similar mark or name, or use the same colors as the System trade dress for signage, printed materials and painted surfaces.

15

You will cease all Internet marketing using any Marks to identify the Facility.

13.2 **Other Duties.** You will pay all amounts owed to us under this Agreement within 10 days after termination. You will owe us Recurring Fees on Gross Room Revenues accruing while the Facility is identified as a "Days Inn", including Basic Service Charges for so long as the Facility receives service from the Reservation System. We may immediately remove the Facility from the Reservation System and divert reservations as authorized in Section 11.4. We may notify third parties that the Facility is no longer associated with the Chain. We may also, to the extent permitted by applicable law, and without prior notice enter the Facility and any other parcels, remove software (including archive and back-up copies) for accessing the Reservation System, all copies of the System Standards Manual, Confidential Information, equipment and all other personal property of ours, and paint over or remove and purchase for $10.00, all or part of any interior or exterior Mark-bearing signage (or signage face plates), including billboards, whether or not located at the Facility, that you have not removed or obliterated within five days after termination. You will promptly pay or reimburse us for our cost of removing such items, net of the $10.00 purchase price for signage. We will exercise reasonable care in removing or painting over signage. We will have no obligation or liability to restore the Facility to its condition prior to removing the signage. We shall have the right, but not the obligation, to purchase some or all of the Facility's Mark-bearing FF&E and supplies at the lower of their cost or net book value, with the right to set off their aggregate purchase price against any sums then owed us by you.

13.3 **Advance Reservations.** The Facility will honor any advance reservations, including group bookings, made for the Facility prior to termination at the rates and on the terms established when the reservations are made and pay when due all related travel agent commissions.

13.4 **Survival of Certain Provisions.** Sections 3.8 (as to audits, for 2 years after termination), 3.13, 7 (as to amounts accruing through termination), 8, 11.4, 12, 13, 15, 16 and 17 survive termination of the License and this Agreement, whether termination is initiated by you or us, even if termination is wrongful.

**14. Your Representations and Warranties.** You expressly represent and warrant to us as follows:

14.1    **Quiet Enjoyment and Financing.** You own, or will own prior to commencing improvement, or lease, the Location and the Facility. You will be entitled to possession of the Location and the Facility during the entire Term without restrictions that would interfere with your performance under this Agreement, subject to the reasonable requirements of any financing secured by the Facility. You have, when you sign this Agreement, and will maintain during the Term, adequate financial liquidity and financial resources to perform your obligations under this Agreement.

14.2 **This Transaction.** You and the persons signing this Agreement for you have full power and authority and have been duly authorized, to enter into and perform or cause performance of your obligations under this Agreement. You have obtained all necessary approvals of your owners, Board of Directors and lenders. No executory franchise, license or affiliation agreement for the Facility exists other than this Agreement. Your execution, delivery and performance of this Agreement will not violate, create a default under or breach of any charter, bylaws, agreement or

16

other contract, license, permit, indebtedness, certificate, order, decree or security instrument to which you or any of your principal owners is a party or is subject or to which the Facility is subject. Neither you nor the Facility is the subject of any current or pending merger, sale, dissolution, receivership, bankruptcy, foreclosure, reorganization, insolvency, or similar action or proceeding on the date you execute this Agreement and was not within the three years preceding such date, except as disclosed in the Application. You will submit to us the documents about the Facility, you, your owners and your finances that we request in the License Application (or after our review of your initial submissions) before or within 30 days after you sign this Agreement. To the best of your knowledge, neither you, your owners (if you are an entity), your officers, directors or employees or anyone else affiliated or associated with you, whether by common ownership, by contract, or otherwise, has been designated as, or is, a terrorist, a "Specially Designated National" or a "Blocked Person" under U.S. Executive Order 13224, in lists published by the U.S. Department of the Treasury's Office of Foreign Assets Control, or otherwise.

14.3 **No Misrepresentations or Implied Covenants.** All written information you submit to us about the Facility, you, your owners, any guarantor, or the finances of any such person or entity, was or will be at the time delivered and when you sign this Agreement, true, accurate and complete, and such information contains no misrepresentation of a material fact, and does not omit any material fact necessary to make the information disclosed not misleading under the circumstances. There are no express or implied covenants or warranties, oral or written, between we and you except as expressly stated in this Agreement.

## 15. Proprietary Rights.

15.1 **Marks and System.** You will not acquire any interest in or right to use the System or Marks except under this Agreement. You will not apply for governmental registration of the Marks, or use the Marks or our corporate name in your legal name, but you may use a Mark for an assumed business or trade name filing.

15.2 **Inurements.** All present and future distinguishing characteristics, improvements and additions to or associated with the System by us, you or others, and all present and future service marks, trademarks, copyrights, service mark and trademark registrations used and to be used as part of the System, and the associated good will, shall be our property and will inure to our benefit. No good will shall attach to any secondary designator that you use.

15.3 **Other Locations and Systems.** We and our affiliates each reserve the right to own, in whole or in part, and manage, operate, use, lease, finance, sublease, franchise, license (as licensor or licensee), provide services to or joint venture (i) distinctive separate lodging or food and beverage marks and other intellectual property which are not part of the System, and to enter into separate agreements with you or others (for separate charges) for use of any such other marks or proprietary rights, (ii) other lodging, food and beverage facilities, or businesses, under the System utilizing modified System Standards, and (iii) a Chain Facility at or for any location outside the Protected Territory described in Section 17.8. Except as provided in Section 17.8, there are no territorial rights or agreements between the parties. You acknowledge that we are affiliated with or in the future may become affiliated with other lodging providers or franchise systems that operate under names or marks other than the Marks. We and our affiliates may use or benefit from common

17

hardware, software, communications equipment and services and administrative systems for reservations, franchise application procedures or committees, marketing and advertising programs, personnel, central purchasing, approved supplier lists, franchise sales personnel (or independent franchise sales representatives), etc.

15.4   **Confidential Information.**   You will take all appropriate actions to preserve the confidentiality of all Confidential Information. Access to Confidential Information should be limited to persons who need the Confidential Information to perform their jobs and are subject to your general policy on maintaining confidentiality as a condition of employment or who have first signed a confidentiality agreement. You will not permit copying of Confidential Information (including, as to computer software, any translation, decompiling, decoding, modification or other alteration of the source code of such software). You will use Confidential Information only for the Facility and to perform under this Agreement. Upon termination (or earlier, as we may request), you shall return to us all originals and copies of the System Standards Manual, policy statements and Confidential Information "fixed in any tangible medium of expression," within the meaning of the U.S. Copyright Act, as amended. Your obligations under this subsection commence when you sign this Agreement and continue for trade secrets (including computer software we license to you) as long as they remain secret and for other Confidential Information, for as long as we continue to use the information in confidence, even if edited or revised, plus three years. We will respond promptly and in good faith to your inquiry about continued protection of any Confidential Information.

15.5 **Litigation.** You will promptly notify us of (i) any adverse or infringing uses of the Marks (or names or symbols confusingly similar), Confidential Information or other System intellectual property, and (ii) or any threatened or pending litigation related to the System against (or naming as a party) you or us of which you become aware. We alone handle disputes with third parties concerning use of all or any part of the System. You will cooperate with our efforts to resolve these disputes. We need not initiate suit against imitators or infringers who do not have a material adverse impact on the Facility, or any other suit or proceeding to enforce or protect the System in a matter we do not believe to be material.

15.6 **The Internet.** You may use the Internet to market the Facility subject to this Agreement and System Standards. You shall not use, license or register any domain name, universal resource locator, or other means of identifying you or the Facility that uses a mark or any image or language confusingly similar to a Mark without our consent. You will assign to us any such identification at our request without compensation or consideration. You must make available through the Reservation System and the Chain website all rates you offer to the general public via Internet marketing arrangements with third parties. You must participate in the Chain's best available rate on the Internet guarantee or successor program. The content you provide us or use yourself for any Internet marketing must be true, correct and accurate, and you will notify us in writing promptly when any correction to the content becomes necessary. You shall promptly modify at our request the content of any Internet marketing material for the Facility you use, authorize, display or provide to conform to System Standards. Any use of the Marks and other elements of the System on the Internet inures to our benefit under Section 15.2.

## 16. Relationship of Parties.

18

16.1 **Independence.** You are an independent contractor. You are not our legal representative or agent, and you have no power to obligate us for any purpose whatsoever. We and you have a business relationship based entirely on and circumscribed by this Agreement. No partnership, joint venture, agency, fiduciary or employment relationship is intended or created by reason of this Agreement. You will exercise full and complete control over and have full responsibility for your contracts, daily operations, labor relations, employment practices and policies, including, but not limited to, the recruitment, selection, hiring, disciplining, firing, compensation, work rules and schedules of your employees.

16.2 **Joint Status.** If you comprise two or more persons or entities (notwithstanding any agreement, arrangement or understanding between or among such persons or entities) the rights, privileges and benefits of this Agreement may only be exercised and enjoyed jointly. The liabilities and responsibilities under this Agreement will be the joint and several obligations of all such persons or entities.

## 17. Legal Matters.

17.1 **Partial Invalidity.** If all or any part of a provision of this Agreement violates the law of your state (if it applies), such provision or part will not be given effect. If all or any part of a provision of this Agreement is declared invalid or unenforceable, for any reason, or is not given effect by reason of the prior sentence, the remainder of the Agreement shall not be affected. However, if in our judgment the invalidity or ineffectiveness of such provision or part substantially impairs the value of this Agreement to us, then we may at any time terminate this Agreement by written notice to you without penalty or compensation owed by either party.

17.2 **Waivers, Modifications and Approvals.** If we allow you to deviate from this Agreement, we may insist on strict compliance at any time after written notice. Our silence or inaction will not be or establish a waiver, consent, course of dealing, implied modification or estoppel. All modifications, waivers, approvals and consents of or under this Agreement by us must be in writing and signed by our authorized representative to be effective. We may unilaterally revise Schedule C when this Agreement so permits.

17.3 **Notices.** Notices will be effective if in writing and delivered (i) by facsimile transmission with confirmation original sent by first class mail, postage prepaid, (ii) by delivery service, with proof of delivery, or (iii) by first class, prepaid certified or registered mail, return receipt requested, to the appropriate party (x) at its address stated below or as it may otherwise designate by notice, or (y) by such other means as to result in actual or constructive receipt by the person or office holder designated below. The parties may also communicate via electronic mail between addresses to be established by notice. You consent to receive electronic mail from us. Notices shall be deemed given on the date delivered or date of attempted delivery, if refused.

Days Inns Worldwide, Inc.:
Our address: 1 Sylvan Way, P.O. Box 278, Parsippany, New Jersey 07054-0278
Attention: Vice President-Franchise Administration;

19

Fax No. (973) 496-5359

Your name: **GROWTH PROPERTY INVESTMENT GROUP, INC.**,
Your address: **11752 Garden Grove Boulevard #115, Garden Grove, CA 92843**,
Attention: **Carlos E. Cardona**;
Your fax No.: **714-467-4308**.

17.4  **Remedies.**  Remedies specified in this Agreement are cumulative and do not exclude any remedies available at law or in equity.  The non-prevailing party will pay all costs and expenses, including reasonable attorneys' fees, incurred by the prevailing party to enforce this Agreement or collect amounts owed under this Agreement.

17.5  **Miscellaneous.**  This Agreement is exclusively for the benefit of the parties.  There are no third party beneficiaries.  No agreement between us and anyone else is for your benefit.  The section headings in this Agreement are for convenience of reference only.

**17.6  Choice of Law; Venue; Dispute Resolution.**

17.6.1  This Agreement will be governed by and construed under the laws of the State of New Jersey, except for its conflicts of law principles.  The New Jersey Franchise Practices Act will not apply to any Facility located outside the State of New Jersey.

17.6.2  The parties shall attempt in good faith to resolve any dispute concerning this Agreement or the parties' relationship promptly through negotiation between authorized representatives.  If these efforts are not successful, either party may attempt to resolve the dispute through non-binding mediation.  Either party may request mediation through the National Franchise Mediation Program, using the procedures employed by the CPR Institute for Dispute Resolution, Inc.  We will provide you with the contact address for that organization.  The mediation will be conducted by a mutually acceptable and neutral third party.  If the parties cannot resolve the dispute through negotiation or mediation, or choose not to negotiate or mediate, either party may pursue litigation.

17.6.3  You consent and waive your objection to the non-exclusive personal jurisdiction of and venue in the New Jersey state courts situated in Morris County, New Jersey and the United States District Court for the District of New Jersey for all cases and controversies under this Agreement or between we and you.

**17.6.4  WAIVER OF JURY TRIAL.  THE PARTIES WAIVE THE RIGHT TO A JURY TRIAL IN ANY ACTION RELATED TO THIS AGREEMENT OR THE RELATIONSHIP BETWEEN THE LICENSOR, THE LICENSEE, ANY GUARANTOR, AND THEIR RESPECTIVE SUCCESSORS AND ASSIGNS.**

**17.7  Special Acknowledgments.  You acknowledge the following statements to be true and correct as of the date you sign this Agreement, and to be binding on you.**

**17.7.1  You received our Uniform Franchise Offering Circular ("UFOC") for prospective**

20

DAYEXC1
150518 3/04

licensees at least 10 business days before, and a copy of this Agreement and all other agreements we are asking you to sign at least 5 business days before, signing this Agreement and paying the Initial Fee to us. You have received our UFOC at least 10 business days before you paid any fee to us or signed any contract with us.

17.7.2 Neither we nor any person acting on our behalf has made any oral or written representation or promise to you on which you are relying to enter into this Agreement that is not written in this Agreement. You release any claim against us or our agents based on any oral or written representation or promise not stated in this Agreement.

17.7.3 This Agreement, together with the exhibits and schedules attached, is the entire agreement superseding all previous oral and written representations, agreements and understandings of the parties about the Facility and the License.

17.7.4 You acknowledge that no salesperson has made any promise or provided any information to you about projected sales, revenues, income, profits or expenses from the Facility except as stated in Item 19 of the UFOC or in a writing that is attached to this Agreement.

17.7.5 You understand that the franchise relationship is an arms' length, commercial business relationship in which each party acts in its own interest.

17.8 Protected Territory. We will not own, operate, lease, manage, or license any party but you to operate a Chain Facility in the "Protected Territory", defined below, while this Agreement is in effect. We may own, operate, lease, manage, franchise or license anyone to operate any Chain Facility located anywhere outside the Protected Territory without any restriction or obligation to you. We may grant Protected Territories for other Chain Facilities that overlap your Protected Territory. While this Agreement is in effect, neither you nor your officers, directors, general partners or owners of 25% or more of your Equity Interests, may own, operate, lease, manage or franchise any guest lodging facility other than the Facility in the Protected Territory unless we or our affiliate licenses the facility. You will use any information obtained through the Reservation System to refer guests, directly or indirectly, only to Chain Facilities. This Section does not apply to any Chain Facility located in the Protected Territory on the Effective Date, which we may renew, relicense, allow to expand, or replace with a replacement Facility located within the same trading area having not more than 120% of the guest rooms of the replaced Chain Facility if its license with us terminates or is not renewed. The Protected Territory fairly represents the Facility's trading area, and you acknowledge that. There are no express or implied territorial rights or agreements between the parties except as stated in this Section. By electing to include this section in your Agreement, you irrevocably waive any right to seek or obtain the benefits of any policy we now follow or may in the future follow to notify you about proposed Chain Facilities in the general area of the Facility, solicit information about the effect of the proposed Chain Facility on the revenue or occupancy of the Facility or decide whether to add the proposed Chain Facility to the Chain based on the potential effect of the proposed Chain Facility on the Facility or its performance. The covenants in this Section are mutually dependent; if you breach this Section, your Protected Territory will be the Location only. The Protected Territory means a ten mile radius from the front door of the Facility.

21

**18. Special Stipulations.** The following special stipulations apply to this Agreement and supersede any inconsistent or conflicting provisions. These are personal to you and are not transferable or assignable except to a Permitted Transferee.

**18.1 Your Additional Termination Right.** You may terminate the License without cause or penalty effective only on the fifth or tenth anniversaries of the Opening Date provided you give us at least six (6) months prior written notice of termination and you are not in default under this Agreement at the time notice must be given or at the effective date of termination. You will pay no Liquidated Damages if you satisfy the conditions of the preceding sentence and you perform the post termination obligations specified in this Agreement within 10 days after the effective date of termination. Your rights under this Section will automatically terminate without notice if and as of the date (i) a Termination occurs, (ii) you fail to cure any default under this Agreement within the time permitted, if any, in the notice of default we send you, or (iii) after the Facility satisfies the Improvement Obligation, the Facility scores less than 425 (or its then equivalent) on a quality assurance inspection and then fails to achieve a score of at least 425 (or its then equivalent) in a reinspection to be performed no sooner than 30 days after the initial inspection. You will not exercise this right if the Facility is then financed under a program in which the United States Small Business Administration ("SBA") guarantees the financing or its repayment unless you first obtain SBA's consent.

**18.2 Our Additional Termination Right.** We may terminate the License without cause or penalty effective only on the fifth or tenth anniversaries of the Opening Date provided we give you at least six (6) months prior written notice of termination. You will perform the post termination obligations specified in this Agreement within 10 days after the effective date of termination. You will pay no Liquidated Damages if we terminate the License under this Section and you perform the post termination obligations specified in this Agreement within 10 days after the effective date of termination. We will not exercise this right if you notify us that the Facility is then financed under a program in which the United States Small Business Administration ("SBA") guarantees the financing or its repayment unless we first obtain SBA's consent.

**18.3. Special Combined Fees.** Notwithstanding Section 7.1, you will pay the "Combined Fee," consisting of the Royalty and the System Accessment Fee (excluding agent and property to property commissions, Internet fees, guest reward and affinity program fees, service fees and charges, guest complaint assessments, and GDS Fees), to us at the rates set forth in this Section, **provided that the Facility opens by December 1, 2004:**

**18.3.1** The Combined Fee shall be seven and eight tenths percent (7.8%) of Gross Room Revenues accruing during the first License Year; and

**18.3.2** The Combined Fee shall be eight and three tenths percent (8.3%) of Gross Room Revenues accruing during the second License Year; and

**18.3.3** The Royalty and System Assessment Fee shall be computed and paid at the rates specified in Section 7.1 on Gross Room Revenues accruing after the second License Year.

DAYEXCl
150518 3/04

18.3.4  The rate changes set forth in this Section automatically terminate without notice or opportunity to cure, and the Combined Fee shall reset to the rates specified in Section 7, if and as of the date (i) a Termination occurs, or we send you a notice of default and you fail to cure the default within the time specified, if any, in the notice of default, or (ii) after you satisfy the Improvement Obligation, the Facility receives a quality assurance inspection score of less than 425 (or its then equivalent) and the Facility fails to achieve a quality assurance inspection score of at least 425 in a reinspection to be performed not less than 30 days after the initial inspection.

18.4 **Reduced Relicense Fee.** If you are not then in default under this Agreement, the Relicense Fee for a Transfer will be $11,000.00 if we receive the written Transfer request before the third anniversary of the Opening Date, and $15,000.00 if we receive the written Transfer request after the third anniversary and before the sixth anniversary of the Opening Date. After the sixth anniversary, the Relicense Fee will be as specified in Section 7.4.

18.5 **Liquidated Damages.** Liquidated Damages payable under Section 12.1 for a Termination that occurs before the last two License Years will be One Thousand Dollars ($1,000.00) for each guest room of the Facility you are authorized to operate at the time of Termination.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first stated above.

**WE:**
DAYS INNS WORLDWIDE, INC.:

By: _____
        Vice President

Attest: _____
              Assistant Secretary

**YOU**, as licensee:
**GROWTH PROPERTY INVESTMENT GROUP, INC.**

By: _____
        (Vice) President

Attest: _____

24

## APPENDIX A

### DEFINITIONS

Agreement means this License Agreement.

Application Fee means the fee you pay when you submit your Application under Section 6.

Approved Plans means your plans and specifications for constructing or improving the Facility initially or after opening, as approved by us under Section 3.

Casualty means destruction or significant damage to the Facility by act of God or other event beyond your reasonable anticipation and control.

Chain means the network of Chain Facilities.

Chain Facility means a lodging facility we own, lease, manage, operate or authorize another party to operate using the System and identified by the Marks.

Condemnation means the taking of the Facility for public use by a government or public agency legally authorized to do so, permanently or temporarily, or the taking of such a substantial portion of the Facility that continued operation in accordance with the System Standards, or with adequate parking facilities, is commercially impractical, or if the Facility or a substantial portion is sold to the condemning authority in lieu of condemnation.

Conference Fee means the fee we charge for your attendance at a conference for Chain Facilities and their licensees when and if held.

Confidential Information means any trade secrets we own or protect and other proprietary information not generally known to the lodging industry including confidential portions of the System Standards Manual or information we otherwise impart to you and your representatives in confidence. Confidential Information includes the "Rules of Operation Manual" and all other System Standards manuals and documentation, including those on the subjects of employee relations, finance and administration, field operation, purchasing and marketing, the Reservation System software and applications software.

Design Standards mean standards specified in the System Standards Manual from time to time for design, construction, renovation, modification and improvement of new or existing Chain Facilities, including all aspects of facility design, number of rooms, rooms mix and configuration, construction materials, workmanship, finishes, electrical, mechanical, structural, plumbing, HVAC, utilities, access, life safety, parking, systems, landscaping, amenities, interior design and decor and the like for a Chain Facility.

Directory means the general purpose directory we publish listing the names and addresses of Chain Facilities, and at our discretion, other Days Inn facilities located outside the United States, Canada and Mexico.

25

Effective Date means the date we insert in the Preamble of this Agreement after we sign it.

Equity Interests shall include, without limitation, all forms of equity ownership of you, including voting stock interests, partnership interests, limited liability company membership or ownership interests, joint and tenancy interests, the proprietorship interest, trust beneficiary interests and all options, warrants, and instruments convertible into such other equity interests.

Equity Transfer means any transaction in which your owners or you sell, assign, transfer, convey, pledge, or suffer or permit the transfer or assignment of, any percentage of your Equity Interests that will result in a change in control of you to persons other than those disclosed on Schedule B, as in effect prior to the transaction. Unless there are contractual modifications to your owners' rights, an Equity Transfer of a corporation or limited liability company occurs when either majority voting rights or beneficial ownership of more than 50% of the Equity Interests changes. An Equity Transfer of a partnership occurs when a newly admitted partner will be the managing, sole or controlling general partner, directly or indirectly through a change in control of the Equity Interests of an entity general partner. An Equity Transfer of a trust occurs when either a new trustee with sole investment power is substituted for an existing trustee, or a majority of the beneficiaries convey their beneficial interests to persons other than the beneficiaries existing on the Effective Date. An Equity Transfer does not occur when the Equity Interest ownership among the owners of Equity Interests on the Effective Date changes without the admission of new Equity Interest owners. An Equity Transfer occurs when you merge, consolidate or issue additional Equity Interests in a transaction which would have the effect of diluting the voting rights or beneficial ownership of your owners' combined Equity Interests in the surviving entity to less than a majority.

Facility means the Location, together with all improvements, buildings, common areas, structures, appurtenances, facilities, entry/exit rights, parking, amenities, FF&E and related rights, privileges and properties existing at the Location on the Effective Date or afterwards.

FF&E means furniture, fixtures and equipment.

FF&E Standards means standards specified in the System Standards Manual for FF&E and supplies to be utilized in a Chain Facility.

Food and Beverage means any restaurant, catering, bar/lounge, entertainment, room service, retail food or beverage operation, continental breakfast, food or beverage concessions and similar services offered at the Facility.

Gross Room Revenues means gross revenues attributable to or payable for rentals of guest rooms at the Facility, including all credit transactions, whether or not collected, but excluding separate charges to guests for Food and Beverage, room service, telephone charges, key forfeitures and entertainment; vending machine receipts; and federal, state and local sales, occupancy and use taxes.

Improvement Obligation means your obligation to either (i) renovate and upgrade the Facility, or (ii) construct and complete the Facility, in accordance with the Approved Plans and System Standards, as described in Section 3.

26

Indemnitees means us, our direct and indirect parent, subsidiary and sister corporations, and the respective officers, directors, shareholders, employees, agents and contractors, and the successors, assigns, personal representatives, heirs and legatees of all such persons or entities.

Initial Entry Charge means the fee you are to pay for gaining access to the Reservation System when you sign this Agreement and on the first and second anniversaries of the Effective Date under Section 6.2.

Initial Fee means the fee you are to pay for signing this Agreement as stated in Section 6.1.

License means the non-exclusive license to operate the type of Chain Facility described in Schedule B only at the Location, using the System and the Mark we designate in Section 1.

License Year means:

(i) *If the Opening Date occurs on the first day of a month*: the period beginning on the Opening Date and ending on the day immediately preceding the first anniversary of the Opening Date, and each subsequent one year period; or

(ii) *If the Opening Date does not occur on the first day of a month:* the period beginning on the Opening Date and ending on the first anniversary of the last day of the month in which the Opening Date occurs, and each subsequent one year period.

Liquidated Damages means the amounts payable under Section 12, set by the parties because actual damages will be difficult or impossible to ascertain on the Effective Date and the amount is a reasonable pre-estimate of the damages that will be incurred and is not a penalty.

Location means the parcel of land situated at **3282 North Henderson Street, Galesburg, IL 61401**, as more fully described in Schedule A.

Losses and Expenses means (x) all payments or obligations to make payments either (i) to or for third party claimants by any and all Indemnitees, including guest refunds, or (ii) incurred by any and all Indemnitees to investigate, respond to or defend a matter, including without limitation investigation and trial charges, costs and expenses, attorneys' fees, experts' fees, court costs, settlement amounts, judgments and costs of collection; and (y) the "Returned Check Fee" we then specify in the System Standards Manual ($20.00 on the Effective Date) if the drawee dishonors any check that you submit to us.

Maintenance Standards means the standards specified from time to time in the System Standards Manual for repair, refurbishment and replacement of FF&E, finishes, decor, and other capital items and design materials in Chain Facilities.

Marks means, collectively (i) the service marks associated with the System published in the System Standards Manual from time to time including, but not limited to, the name, design and logo for "Days Inn" and other marks (U.S. Reg. Nos.: 1,160,430; 1,160,431; 1,420,612; 1,469,518; and

27

1,003,834) and (ii) trademarks, trade names, trade dress, logos and derivations, and associated good will and related intellectual property interests.

Marks Standards means standards specified in the System Standards Manual for interior and exterior Mark-bearing signage, advertising materials, china, linens, utensils, glassware, uniforms, stationery, supplies, and other items, and the use of such items at the Facility or elsewhere.

Minor Renovation means the repairs, refurbishing, repainting, and other redecorating of the interior, exterior, guest rooms, public areas and grounds of the Facility and replacements of FF&E we may require you to perform under Section 3.16.

Minor Renovation Ceiling Amount means $3,000.00 per guest room.

Minor Renovation Notice means the written notice from us to you specifying the Minor Renovation to be performed and the dates for commencement and completion given under Section 3.16.

Opening Date means the date on which we authorize you to open the Facility for business identified by the Marks and using the System.

Operations Standards means standards specified in the System Standards Manual for cleanliness, housekeeping, general maintenance, repairs, concession types, food and beverage service, vending machines, uniforms, staffing, employee training, guest services, guest comfort and other aspects of lodging operations.

Permitted Transferee means (i) any entity, natural person(s) or trust receiving from the personal representative of an owner any or all of the owner's Equity Interests upon the death of the owner, if no consideration is paid by the transferee  or (ii) the spouse or adult issue of the transferor, if the Equity Interest transfer is accomplished without consideration or payment, or (iii) any natural person or trust receiving an Equity Interest if the transfer is from a guardian or conservator appointed for an incapacitated or incompetent transferor.

Punch List means the list of upgrades and improvements attached as part of Schedule B, which you are required to complete under Section 3.

Recurring Fees means fees paid to us on a periodic basis, including without limitation, Royalties, System Assessment Fees, Basic Service Charges, and other reservation fees and charges as stated in Section 7.

Relicense Fee means the fee your transferee or you pay to us under Section 7 when a Transfer occurs.

System Assessment Fees means the fees you pay to us under Section 7 and Schedule C for reservation services, including the Basic Service Charge and any other fees we charge for services provided by or through the Reservation System.

Reservation System or "Central Reservation System" means the system for offering to interested parties, booking and communicating guest room reservations for Chain Facilities described in

E-FILED
Thursday, 30 August, 2007  03:28:46 PM
Clerk, U.S. District Court, ILCD

Section 4.2.

Rooms Addition Fee means the fee we charge you for adding guest rooms to the Facility.

Royalty means the monthly fee you pay to us for use of the System under Section 7(a). "Royalties" means the aggregate of all amounts owed as a Royalty.

System means the comprehensive system for providing guest lodging facility services under the Marks as we specify which at present includes only the following:  (a) the Marks; (b) other intellectual property, including Confidential Information, System Standards Manual and know-how; (c) marketing, advertising, publicity and other promotional materials and programs; (d) System Standards; (e) training programs and materials; (f) quality assurance inspection and scoring programs; and (g) the Reservation System.

System Standards means the standards for the participating in the System published in the System Standards Manual, including but not limited to Design Standards, FF&E Standards, Marks Standards, Operations Standards, Technology Standards and Maintenance Standards and any other standards, policies, rules and procedures we promulgate about System operation and usage.

System Standards Manual means the Operating Policies Manual, the Planning and Design Standards Manual and any other manual we publish or distribute specifying the System Standards.

Taxes means the amounts payable under Section 7.2 of this Agreement.

Technology Standards means standards specified in the System Standards Manual for local and long distance telephone communications services, telephone, telecopy and other communications systems, point of sale terminals and computer hardware and software for various applications, including, but not limited to, front desk, rooms management, records maintenance, marketing data, accounting, budgeting and interfaces with the Reservation System to be maintained at the Chain Facilities.

Term means the period of time during which this Agreement shall be in effect, as stated in Section 5.

Termination means a termination of the License under Sections 11.1 or 11.2 or your termination of the License or this Agreement.

Transfer means (1) an Equity Transfer, (2) you assign, pledge, transfer, delegate or grant a security interest in all or any of your rights, benefits and obligations under this Agreement, as security or otherwise without our consent as specified in Section 9, (3) you assign (other than as collateral security for financing the Facility) your leasehold interest in (if any), lease or sublease all or any part of the Facility to any third party, (4) you engage in the sale, conveyance, transfer, or donation of your right, title and interest in and to the Facility, (5) your lender or secured party forecloses on or takes possession of your interest in the Facility, directly or indirectly, or (6) a receiver or trustee is appointed for the Facility or your assets, including the Facility.  A Transfer does not occur when you pledge or encumber the Facility to finance its acquisition or improvement, you refinance it, or you engage in a Permitted Transferee transaction.

DAYEXC1
150518 3/04

"You" and "Your" means and refers to the party named as licensee identified in the first paragraph of this Agreement and its Permitted Transferees.

"We", "Our" and "Us" means and refers to Days Inns Worldwide, Inc., a Delaware corporation, its successors and assigns.

30

# <u>SCHEDULE A</u>

(Legal Description of Facility)

DAYEXC1
150518 3/04

**0919638**

NANCY McCLURE
KNOX COUNTY RECORDER

04 MAY 24  PM 1: 15

GALESBURG, ILL

25

**CORPORATE**
**WARRANTY DEED**
STATE OF ILLINOIS,
KNOX COUNTY, ss.

BOOK **3125** PAGE **007**

THIS INDENTURE WITNESSETH That the Grantor:

**AMIGO REAL ESTATE, INC.**

a corporation organized and existing under the laws of California,

for and in consideration of the sum of Ten Dollars and other good and valuable
consideration in hand paid, CONVEYS and WARRANTS to

**GROWTH PROPERTY INVESTMENT GROUP, INC.**

a corporation organized and existing under the laws of California, having its principal
office at the following address: 2700 N. Main ST. #1050, Santa Ana, CA 92705,

the real estate described as follows, to-wit:

Lot 2 Twin Falls Motel Subdivision, a Subdivision of part of the Northeast Quarter of
Section 33, Township 12 North, Range 1 East of the Fourth Principal Meridian, Knox
County, Illinois per 28 of Plats, page 83 ("Knox County Real Estate" being located at
3282 N. Henderson Street, Galesburg, Knox County, Illinois).

situated in the County of Knox and State of Illinois , hereby releasing and waiving all
rights under and by virtue of the Homestead Exemption Laws of the State of Illinois.
This deed is exempt pursuant to 35 ILCS 200/31-45(e).   Consideration is less than
Subject to covenants, conditions and easements of record.   $100.00.

Dated this 22nd day of _____ May _____, 2004

By: JORGE NEWBERY
Its:  PRESIDENT

BOOK 3125 PAGE 008

## NOTARY ACKNOWLEDGMENT

STATE OF _Ohio_ )
) SS
COUNTY OF _Franklin_ )

On this 22nd day of _May_, 2004, before me, a notary public in and for said county and state, personally appeared Jorge Newbery, to me personally known, who being by me duly sworn (or affirmed) did say that the person is President of Amigo Real Estate, Inc., the said corporation, acknowledged that he signed the foregoing document in the capacity therein set forth and declared that the statements therein contained are true and acknowledged the execution of said instrument to be the voluntary act and deed of said corporation by it voluntarily executed.

In Witness Whereof, I have hereunto set my hand and seal the day and year before written.

_Laura Ser_
Notary Public

LAURA FULLER
Notary Public, State of Ohio
My Commission Expires
Nov. 11, 2007

Mail tax bill to:
Growth Property Investment Group, Inc.
2700 N. Main ST. #1050
Santa Ana, CA 92705

Grantee's Address:
Growth Property Investment Group, Inc.
2700 N. Main ST. #1050,
Santa Ana, CA 92705

This Instrument was prepared by and return to:
ALLAN N. LOWY & ASSOCIATES
424 S. Beverly Drive
Beverly Hills, CA 90212
(310) 553-8533
Fax : (310) 557-1505

09196J5

N xoy McCuE
KNOX       xr

2004 MAY 24  PM 1: 11

GALESBURG, ILI

25 e

**BOOK 3125 PAGE 001**

**JUDICIAL DEED**
**STATE OF ILLINOIS,**
**KNOX COUNTY, ss.**

This Indenture made this 21st day of April, 2004, by and between the **Honorable Stephen C. Mathers, Judg** of the **Ninth Circuit, Knox County, Illinois,** party of the first part, and **Amigo Real Estate, Inc., a Californi corporation,** party of the second part, WITNESSETH:

WHEREAS, in pursuance of a decree made and entered of record in said Circuit Court of the Ninth Judicial Circuit, Knox County, Illinois, in a certain cause then pending in said Court, wherein Northwest Bank & Trust Company, a federal savings bank, was Plaintiff, and Windsor Hotel, L.L.C., an Illinois Limited Liability Company; William Stieron; City of Galesburg; Moore Electric, Inc., an Illinois Corporation; William 3. Potter; State of Illinois Department of Unemployment; Lowe's Home Centers, Inc., a North Carolina Corporation; John VanWassechovo d/b/a A & J Sales & Service; East Moline Glass Company, An Illinois corporation; Merchants Bonding Company (Mutual); American Industrial Door Company, an Iowa corporation; Imperial Marble Corp., an Illinois corporation; Hillebrand Construction, Inc., An Iowa corporation Mechanical Service of Galesburg, Inc.; Society Insurance Company, and Unknown Owners and Non-Record Claimants and Interested Persons, Defendants, Case No. 02-CH-145, Sheldon Good & Company Auctions, .L.C. ("Auctioneer"), as the then assigned auctioneers pursuant to the Decree entered on December 24, 2003, July advertised the real estate and premises hereinafter described for sale at public venue to the highest and best bidder for cash on the 7th day of April, 2004, at 2:00 P.M., at the Windsor Hotel, 3282 N. Henderson, Galesburg, Illinois and;

WHEREAS, Auctioneer, then and there attended in person to make such sale, and then and there offered said property for sale at public venue to the highest and best bidder for cash; whereupon **Amigo Real Estate nc., a California corporation,** then and there offered and bid the sum of Seven Hundred Fifty-Three Thousand Five Hundred Dollars ($753,500.00), and said bid being the highest and best bid, said Auctioneer hereupon struck off and sold said property to **Amigo Real Estate, Inc., a California corporation,** for said sum f money, and;

WHEREAS, the time for redemption has expired and no redemption of said real estate and premises has been made as provided by Decree and by Statute; and

WHEREAS, a Certificate of Sale has been issued in writing and delivered to said second party for a ood and valuable consideration.

\TPostrnak\\Hank Matters\NWB\Windsor\Judicial Deed.doc-111.51

## BOOK 3125 PAGE 002

NOW, THEREFORE, in consideration of the premises, said party of the first part hereby conveys unt the party of the second part the real estate described as follows:

Lot 2 Twin Falls Motel Subdivision, a Subdivision of part of the Northeast Quarter of Section 33, Township 12 North, Range 1 East of the Fourth Principal Meridian, Knox County, Illinois ("Illinois Real Estate");

to have and to hold the same, with all the tenements, hereditaments and appurtenances thereunto belonging or any way appertaining to said party of the second part, and its heirs and assigns forever.

WITNESS the hand and seal of the said party of the first part, the day and year first above written.

Address of the premises:
3282 N. Henderson
Galesburg, IL

                    (SEAL)

Judge Stephen C. Mathers
Ninth Judicial Circuit,
Knox County, Illinois

STATE OF ILLINOIS        )
                         ) SS.
COUNTY OF KNOX           )

On this 21st day of April, 2004, before me, the undersigned, Deputy Clerk of Circuit Court, in and f the State of Illinois, personally appeared Judge Stephen C. Mathers, to me known to be the identical pers named in and who executed the within and foregoing instrument, and acknowledged that he executed the san as his voluntary act and deed.

Deputy Clerk

Prepared by
and Return to:
THOMAS J. PASTRNAK
Pastrnak Law Firm, P.C.
313 West Third Street
Davenport, Iowa 52801
(563) 323-7737

This Deed is Exempted from Illinois Real Estate Transfer Tax Act pursuant to Illinois Revised Statute 1004, paragraph 4(m), since this Deed is issued to a holder of a mortgage pursuant to mortgage foreclosure proceeding 02 CH 145 in the Ninth Judicial Circuit, Knox County, Illinois.

Dated:

G:\TPastrnak\Bank Matters\NWB\Windsor\Judicial Deed.doc-JJl.51

WK7658

# DEED OF CONVEYANCE

THIS DEED OF CONVEYANCE made and entered into on this the 1st day of _June_, 2004, by and between *Sayona, LLC, a Kentucky limited liability company, by and through its President, Bhikhu Patel, and its Secretary, Ashvin Patel,* pursuant to Resolution duly passed by its Board of Directors, of 2960 Husbands Road Paducah, KY 42003, hereinafter referred to as "Grantor"; and *KY Motel, Inc., an Illinois Corporation, by and through its President, Popatlal Patel, and its Secretary, Haragovindbhai Patel,* pursuant to Resolution duly passed by its Board of Directors of 203 South Oakland Ave. Carbondale, IL 62901, hereinafter referred to as "Grantee";

## Witnesseth:

THAT FOR AND IN CONSIDERATION of the sum of ($1,800,000.00), *One Million Eight Hundred Thousand 00/100 dollars* cash in hand paid, receipt of which is hereby acknowledged, the Grantor has this day and does by these presents hereby grant, bargain, sell, alien, and convey unto Grantee, its right, title, and interest in that certain tract or parcel of land lying and being in McCracken County, Kentucky, and more particularly described as follows:

See Exhibit "A" attached

TO HAVE AND TO HOLD the same unto the Grantee, its successors and assigns forever, together with all improvements, appurtenances, and rights thereunto belonging forever, with COVENANT OF GENERAL WARRANTY, subject to the restrictions, easements, and agreements of record.

IN WITNESS WHEREOF, witness the hand of the Grantor on this the day and year first above written.

JUN-28-2004   09:54   CENDANT HOTEL GROUP                8472973843      P.08

WK7658

## EXHIBIT "A"

*Beginning at a 1/2 inch diameter rebar with cap No. 1955(set) on the north right of way of Ramp 4 of Interstate 24 and being located north 03 degrees 52 minutes 26 seconds west for a distance of 62.08 feet from a point 108.69 feet north at right angles from the centerline of U.S. Highway 60 (a/k/a Hinkleville Road), said centerline point being south 67 degrees 16 minutes 28 seconds west for a distance of 452.07 feet with said centerline from the centerline intersection of U. S. Highway 60 and Interstate 24.*

*Thence north 03 degrees 52 minutes 26 seconds west for a distance of 502.71 feet with the west right of way of Ramp 4 of Interstate 24 to a 1/2 inch diameter rebar with cap no. 1955 (set) at the southeast corner of the property described in Deed Book 655, page 346.*

*Thence south 86 degrees 20 minutes 13 seconds west for a distance of 134.28 feet with the south line of said property to a 1/2 inch diameter rebar with cap no. 1955 (set):*

*Thence south 79 degrees 06 minutes 59 seconds west for a distance of 166.73 feet with the south line of said property to PK nail (set):*

*Thence south 10 degrees 53 minutes 01 seconds east for a distance of 64.94 feet to a PK nail (set):*

*Thence south 67 degrees 29 minutes 22 seconds west for a distance of 58.40 feet to a PK nail(set) at the northeast corner of the property described in Deed Book 728, page 545;*

*Thence along a curve to the right having a radius of 20.00 feet and an arc length of 37.35 feet, being subtended by a chord of south 59 degrees 00 minutes 38 seconds east for a distance of 32.15 feet with the east line of said property to a 1/2 inch diameter rebar with camp no 1955 (set);*

*Thence south 05 degrees 30 minutes 38 seconds east for a distance of 115.51 feet with the east line of said property to a punch mark in concrete (set);*

*Thence along a curve to the right having a radius of 80.00 feet an arc length of 83.76 feet being subtended by a chord of south 24 degrees 29 minutes 03 seconds west for a distance of 79.99 feet with the east line of said property to a 1/2 inch diameter rebar with cap no. 1955 (set);*

*Thence south 67 degrees 03 minutes 25 seconds west for a distance of 183.02 feet with the south line of said property to a 1/2 inch diameter rebar with cap no. 1955(set);*

*Thence along a curve to the right having a radius of 20.00 feet and arc length of 10.69 feet being subtended by a chord of south 82 degrees 21 minutes 47 seconds west for a distance of 10.56 feet with the south line of said property to a 1/2 inch diameter rebar with cap no. 1955 (set) in the east line of Kentucky Oaks Mall East access entrance described in Deed Book 646, page 256 ( Declaration of Easements):*

*Thence south 10 degrees 39 minutes 43 seconds east for a distance 33.12 feet with the east line of said access entrance to a punch mark in concrete (found) at the northwest corner of the property described in Deed book 824, page 691;*

*Thence north 67 degrees 16 minutes 28 seconds east for a distance of 201.39 feet with the north line of said property to a punch mark in concrete (found) at the northwest corner of the property described in Deed Book 758, page 668.*

JUN-28-2004 09:54    CENDANT HOTEL GROUP                    8472973843    P.09
06/04/2004 10:55    2705750347          BANTERRA BANK PADUCAH         PAGE 02/05

WK7658

THE PARTIES HERETO state the consideration reflected in this deed is the full consideration paid for the property. The Grantee joins in this deed for the sole purpose of certifying the consideration pursuant to KRS 382.

Sayona, LLC                                       KY Motel, Inc.

BY: _Bhikhu Patel._                               BY: _Patel Papatlal_
Bhikhu Patel, as its President                    Popatlal Patel, as its President

BY: _Ashvin M Patel_                              BY: _Haragovind Patel_
Ashvin Patel, as its Secretary                    Haragovindbhai Patel, as its Secretary


State of _Kentucky_ )
                    ) SS
County of _McCracken_ )

The foregoing Deed and Consideration Certificate was signed, sworn to and acknowledged before me by *Sayona, LLC.* a Kentucky limited liability company, by and through its President, Bhikhu Patel, and its Secretary, Ashvin Patel, on this the _1st_ day of _June_, 2004.

My Commission expires: _2-23-08_

_John S. Hamlin_
Notary Public


State of _Kentucky_ )
                    ) SS
County of _McCracken_ )

The foregoing Consideration Certificate was signed, sworn to and acknowledged before me by *KY Motel, Inc.*, an Illinois Corporation, by and through its President, Popatlal Patel, and its Secretary, Haragovindbhai Patel on this the _1st_ day of _June_, 2004.

My Commission expires: _2-23-08_

_John S. Hamlin_
Notary Public

## Exhibit "A" Cont.

Thence along a curve to the right having a radius of 91.40 feet and an arc length of 71.51 feet being subtended by a chord of north 89 degrees 41 minutes 28 seconds east for a distance of 69.70 feet with the east line of said property to a punch mark in concrete;

Thence south 67 degrees 53 minutes 32 seconds east for distance 92.23 feet with the east line of said property to a PK nail (set);

Thence south 21 degrees 51 minutes 51 seconds east for a distance of 152.89 feet with the east line of said property to a 1/2 inch diameter rebar with cap no 1645 (found);

Thence north 71 degrees 15 minutes 07 seconds east for a distance of 70.00 feet with the north line of said property to a 1/2 inch diameter rebar with cap no 1645 (found);

Thence south 18 degrees 44 minutes 53 seconds east for a distance of 15.00 feet with the east line of said property to a 1/2 inch diameter rebar with cap no. 1955 (set):

Thence north 71 degrees 15 minutes 07 seconds east for a distance of 75.83 feet to the point of beginning.

Together with access to U.S. Highway 60 for ingress/egress easement described in Deed Book 646, Page 256 (Declaration of Easement).

See Plat filed in Plat Section "K", Page 2003, McCracken County Court Clerk's Office.

Being the same property conveyed to KY Motel, Inc. by deed dated _____, 2004, and filed _____, 2004 of record in Deed Book _____, Page_____], in the McCracken County Court Clerk's Office.

## SCHEDULE B

PART I:        YOUR OWNERS:

| Name | Ownership Percentage | Type of Equity Interest |
|------|---------------------|------------------------|
| Carlos E. Cardona | 50% | Common Stock |
| Frank Ticas | 50% | Common Stock |

PART II:       THE FACILITY:

Primary designation of Facility:  **Days Inn and Suites**

Number of approved guest rooms:  **118**.

Parking facilities (number of spaces, description):  **118**.

Other amenities, services and facilities:  **Restaurant, Lounge, Indoor Pool and Whirlpool**.

PART III:      DESCRIPTION AND SCHEDULE OF RENOVATIONS TO BE
               COMPLETED AS THE IMPROVEMENT OBLIGATION:

**[Punch List to be attached.]**

32

Page 1   of 7

Days Inns Worldwide, Inc.
Punchlist for Conversion
"Schedule B Part III"
03/24/2004
Revised on June 30, 2004

IL Galesburg Regency Inn CV lip Di&S

Tier: Inn & Suites

**DATE OF APPLICATION**

| | |
|---|---|
| Property Name: | Regency Inn |
| Property Address: | 1262 N. Henderson Street |
| City: | Galesburg     St.: IL  Zip: 61401 |
| Conversion Consultant: | Audrey Brand |
| Owner/Applicant: | Doug Johnson |
| Phone: | (309) 344-1111 |
| Salesperson: | Nick DePinto |
| Phone: | (312) 559-4455 |

**ROOM DIMENSIONS - EXISTING**

| | # of Rms | (width) x | (length) = | sq. ft. | TOTAL ROOMS: | 118 |
|---|---|---|---|---|---|---|
| | 50 | 12 | 24.5 | 294.00 sq. ft. | RENTABLE: | 71 |
| | 40 | 12 | 22 | 264.00 sq. ft. | Non-Rentable | 47 |
| | 21 | 24 | 24.5 | 588.00 sq. ft. | | |
| | 2 | 12 | 36 | 432.00 sq. ft. | | |
| | 2 | 30 | 24.5 | 735.00 sq. ft. | Closed | |
| | | | | sq. ft. | | |

ROOM DIMENSION STANDARD: 288 SF

**BRIEF PROPERTY SUMMARY**

Property is located in C market. This 54 year old former Days Inn (#6236) facility left the system in August /2003 and consists of a 2-story, double loaded building of concrete block construction with a stucco exterior and a parapet roofline on 3 sides. Property is due to be auctioned within 1 month. The restaurant and lounge were closed in August/2003 with no plans to reopen. The Banquet Center is open and offers catering services. The property must completely de-Identify (i.e. logo'd supplies) as a Days Inn. There are 47, unrentable units on site that are closed and in different stages of renovation. Total renovation of all FF&E to meet Company standards prior to opening will be required. 52 units on site have Vinguard punchcard locks on the guestroom entry doors. All units contain central air conditioning; 29 units contain a gas boiler heat system and 89 units contain 210 electrical baseboard heat units that is slated to be powered by a 110 electrical supply. Renovations will be required in all areas of the property to comply with system standards. Clientele derives from the two universities within 30 miles, transients, Corporate Lodging, workers from the local Burlington Railroad industry and turners tourism.

**PUBLIC SPACE DIMENSIONS - EXISTING**

| | (width) x | (length) = | sq. ft. | | (width) x | (length) = | sq. ft. |
|---|---|---|---|---|---|---|---|
| Lobby | 22.5 | 45 | 1012.5 sq. ft. | Meeting Room | 32 | 34 | 1088 sq. ft. N/A |
| Restaurant | 35 | 70 | 2450 sq. ft. N/A | Meeting Room | 42 | 72 | 3024 sq. ft. N/A |
| Lounge | 48 | 56 | 2688 sq. ft. N/A | | | | sq. ft. |

**BRAND EXAMPLES**

See Attached Addendum

ONLY THE FRANCHISOR MAY REVISE THIS PUNCHLIST.  PUNCHLIST VOID 180 DAYS AFTER INSPECTION DATE UNLESS FRANCHISE OR LICENSE AGREEMENT BECOMES EFFECTIVE.

This Punchlist identifies actions needed to cause the Facility to meet the Franchisor's standards. You are solely responsible for compliance of the Facility with applicable federal, state and local laws, codes, ordinances and regulations.

Your have been provided a Punchlist Reference Guide to assist in compliance with permitted completion of Brand Standards.

This Punchlist was based on a random sample inspection of the Facility on the date specified. You may need to take additional actions to meet our Standards, or comply with laws, or at our discretion if we modify our Standards or the condition of the Facility changes materially after the inspection date.

The Franchise Review Committee may in its discretion revise this Punchlist as a condition of approving your application.

You should not consider this Punchlist to be final until we sign the License or Franchise Agreement.

| | | |
|---|---|---|
| | 6/14/04 | AMS |
| | 6/28/04 | Flip |

Signed: _____

Print Name: _____

Quality Assurance

Date: _____

Initial: ___

## ADDENDUM

File No. _____

**Brand variances comments**

The existing gas boiler heating system in 29 units appears to be working property based upon the inspection; however, the system should be replaced when condition grades a "C/Moderate" on any future Quality Assurance evaluation or when the system becomes inoperable, whichever occurs first. The electrical baseboard heating system in 89 units will require a safety certification from a licensed electrician to ensure safe. Upon replacement, installation of an approved heating system will be required.

*Existing operational bin style ice machine will be acceptable until condition grades a "C/Moderate" on any Quality Assurance evaluation.

*The existing 1" ceramic tile floors and walls in the Banquet center public restrooms will be acceptable until grading a "C/Moderate" on any future Quality Assurance evaluation.

*Existing wooden pool area fencing will be acceptable until grading a "C/Moderate" on any future Quality Assurance evaluation.

*The current usage of matching wood encased refrigerators as a second nightstand in some single bedded rooms will be acceptable.

*The existing 19" Magnavox televisions are acceptable until condition grades a "C/Moderate" on any future Quality Assurance evaluation.

*The existing wood chairs in two room suites are acceptable until condition grades a "C/Moderate" on any future Quality Assurance evaluation.

IL GALESBURG R

Page: 2  of: 7

| | EXTERIOR | |
|---|---|---|
| COMPLETION DATE | SCOPE OF WORK | For Office Use Only |
| Prior to opening | Provide Company approved signage. Deep clean reader board to eliminate discoloration. If discoloration remains, replacement will be required. Eliminate remnants from former banner/ banner from pylon stanchion. | |
| Prior to opening | Exterior renovation plans must be approved prior to commencement of work thru written approval by the Design/Development Department reached at (973) 496-2525. At a minimum, plans should include Company design features, etc. Renovate per the Brand Level B upgrade to include: | |
| Prior to opening | Complete parapet roofline around perimeter of building. | |
| Prior to opening | Incorporate a Company design feature into the existing porte cochere, banquet entrance and all exterior entries as per the Days Inn rendering. | |
| Prior to opening | Repair/paint building exteriors (stucco facade, porte cochere ceiling, banquet center entrance and gutter, drainspout areas) where damaged and discolored. | |
| Prior to opening | Hot patch, reseal and stripe parking lot. Resurface badly cracked and damaged areas. Eliminate appearance of former landscaping beds. Installation of new landscaped beds is an acceptable option. | |
| Prior to opening | Repour concrete section of parking lot to eliminate cracks and damage. | |
| Prior to opening | Eliminate weeds from concrete section of parking lot. | |
| Prior to opening | Rework existing beds, to include planters and pots at all building entrances and building perimeters. Install additional ground cover (mulch, rock, bark) and colorful seasonal flowers as in samples FP-3, FP-4, FP-5 and FP-6. | |
| Prior to opening | Replace rusted and damaged Dumpster enclosure. | |
| Prior to opening | It is strongly recommended to install a perimeter fence to conceal closed and abandoned gas station from guests' view to improve curb appeal. | |
| | | |
| | | |
| | | |
| | | |

Produced using AIQ software, 800-254-8771 www.powerit.com

Quality Assurance

Initial: [signature]

PAGE.04

JUN 30 2004 09:53

IL GALESBURG R

## PUBLIC AREAS

| COMPLETION DATE | SCOPE OF WORK | For Office Use Only |
|---|---|---|
| Prior to opening | Facilities to assist the handicapped in accordance with local, state and federal codes, regulations and ordinances are required. | |
| Prior to opening | Ensure current property management system (MSI) from previous affiliation as a Days Inn is per Company specifications. | |
| Prior to opening | Provide USA Today Newspapers. | |
| Prior to opening | Refinish worn wood portions of lobby furniture restoring to a "like new" condition. If a "like new" condition cannot be obtained, replacement will be required. | |
| Prior to opening | Replace lobby ceiling tiles to eliminate any that are worn, stained, damaged or discolored. Ensure all replacements match existing tiles in style, color and texture. If replacements do not match total replacement will be required. | |
| Prior to opening | Professionally clean lobby carpet. If carpet grades a "CMModerate" on the opening evaluation, carpet must be replaced. | |
| Prior to opening | Currently the restaurant is closed with no immediate plans to reopen. Therefore, service of the Daybreak Continental Breakfast is required. Renovate former dining room to accommodate the required continental breakfast. Usage of the banquet table located in the lobby is unacceptable. | |
| Prior to opening | Replace window pane and horizontal style railings in stairwells. Existing enclosed atrium railings will be acceptable. | |
| | Repour/repaint concrete stairwell steps where peeling, chipped and worn. | |
| Prior to opening | Repair/paint guestroom corridor walls, ceilings, entrance and service area doors, to include trim work. Install corridor light covers where missing as in the south wing. Ensure new covers coordinate with existing decor and are uniform in design and style. | |
| Prior to opening | Renovate guest laundry facility to Company specifications (i.e. flooring, wallcovering and light package). Renovation of former guest laundry for an alternate usage (i. e. vending, game room , etc.) is an acceptable alternative. | |
| Prior to opening | Replace inoperable bin type ice machine located near the commercial laundry. Install/replace vending flooring in vending area near the commercial laundry. Deep clean, regrout and seal vending area flooring near room #123. | |
| Prior to opening | Replace existing vending area wallcovering. | |
| Prior to opening | Replace/repair inoperable and damaged whirlpool. | |
| Prior to opening | Paint atrium pool and wooden pool area fencing. | |
| | Refinish pool deck to eliminate discoloration. | |

Produced by AZ Definition 800-234-0777 www.azweb.com
Initials
FLOEPA
Quality Assurance

IL GALESBURG R

Page 4 of 7

## PUBLIC AREAS

| COMPLETION DATE | SCOPE OF WORK | For Office Use Only |
|---|---|---|
| Prior to opening | Replace pool furniture. | |
| | Provide a safety equipment and signage package to meet Company specifications. | |
| | | |
| | | |

Quality Assurance

Produced using AQ software, 800 234 8722 www.aqhub.com

Initials:

PLOPA

IL GALESBURG R

Page: 5  of 7

## FOOD AND BEVERAGE

| COMPLETION DATE | SCOPE OF WORK | For Office Use Only |
|---|---|---|
| Prior to opening | Facilities to assist the handicapped in accordance with local, state and federal codes, regulations and ordinances are required. | |
| Prior to opening | Currently the restaurant and lounge are closed. Service of the required Daybreak Continental Breakfast is required. Should the food and beverage facilities re-open in the future, ensure facilities are in compliance with all state, city and local codes. | |
| Prior to opening | The former restaurant and lounge areas must be renovated for an alternate usage (i.e. Continental Breakfast room, banquet room) so as not to appear a closed and vacant facility. | |
| Prior to opening | Refinish base of hostess stand in former dining room. | |
| Prior to opening | Replace/repair and refinish damaged service entry doors in former dining room. | |
| Prior to opening | Professionally clean cloth accordion dividers in main banquet room to eliminate discoloration. | |
| Prior to opening | Replace worn VCT section of flooring in "buffet" room. Paint all doors and frames. Replace tarnished "kick" plates on entry and service doors. | |
| Prior to opening | Install a cove/base/base board to conceal raw textured edges at base of walls. Install thermostat covers where missing in all meeting/banquet rooms. | |
| Prior to opening | Replace chipped and worn banquet tables. Refinish wooden entry doors to banquet center public restrooms. | |
| | | |
| | | |
| | | |
| | | |

Produced solely by KI software, 1.800.424.4777 www.kisystl.com

Quality Assurance

Initials [signature]

RLOPS

Page 6 of 7

**IL GALESBURG R**

## GUESTROOMS

**ROOMS INSPECTED** 129, 123, 122, 120, 112, 108, 107, 104, 131, 133, 135, 137, 139, 216, 210, 208, 205, 213, 224, 260, 257

| COMPLETION DATE | SCOPE OF WORK | For Office Use Only |
|---|---|---|
| Prior to opening | Facilities to assist the handicapped in accordance with local, state and federal codes, regulations and ordinances are required. | |
| Prior to opening | Immediate removal of all Days Inn logo'd supplies and amenities is required. | |
| Prior to opening | There are a number of rooms on site that are closed. Total renovation of all FF&E to meet Company standards prior to opening will be required. | |
| Prior to opening | Provide hairdryers, AM/FM alarm clock radios and all required supplies. A minimum of 50% of guestrooms must be designated as "non-smoking". All major network channels are required. | |
| Prior to opening | Replace unapproved Vingcard punchcard locks. Existing Securlfox electronic locks are acceptable. | |
| Prior to opening | Install secondary locks. | |
| Prior to opening | Install self-closures. | |
| Prior to opening | Replace existing connecting door locks per Company specifications. | |
| Prior to opening | Currently 89 units contain 210 electrical baseboard heat units that is stated to be powered by a 110 electrical supply. This system must be certified by a licensed engineer to ensure within Company specifications and in compliance with all local, city and state ordinances. | |
| Prior to opening | Provide professionally printed entrance door plaques where missing as on room #108. Ensure replacements match existing plaques exactly or entire replacement will be required. | |
| Prior to opening | Provide matching furniture pieces where missing (i.e. headboards and nightstands). If matching pieces cannot be found, total furniture replacement is required. Refinish casegoods (i.e. tables, chairs, etc.) to eliminate worn and scratched surfaces. | |
| Prior to opening | Provide artwork per Company specifications where missing as in room #122. | |
| Prior to opening | Professionally clean chairs to eliminate stained upholstery. | |
| Prior to opening | Provide a credenza wall light source where missing as in room #120 and #257. Replace lamps where tarnished and/or dented as in room #257. Ensure additional/replacement light fixtures coordinate with existing package. | |
| Prior to opening | Replace older, worn televisions with the faux wood cases. | |
| Prior to opening | Provide draperies where missing. Horizontal and vertical blinds are not acceptable. Installation of drapes in addition to the existing horizontal blinds is acceptable. | |

Quality Assurance

Initials: [signature]

Page: 7   of: 7

## IL GALESBURG R

### GUESTROOMS

**ROOMS INSPECTED** 129, 123, 122, 120, 112, 108, 107, 104, 131, 133, 135, 137, 139, 216, 210, 208, 205, 213, 224, 260, 257

| COMPLETION DATE | SCOPE OF WORK | For Office Use Only |
|---|---|---|
| Prior to opening | Replace the white bedspreads or where mismatched with balance of room finishes as in room #257. | |
| | Replace bedsets (mattresses and boxsprings) to eliminate all that are stained, sagging or have loss of support. | |
| Prior to opening | Eliminate brass plate with Florida minibar law on encased refrigerator/nightstand units. Refinish units to a like new condition. | |
| Prior to opening | Provide facial tissue dispenser covers for wall mounted dispensers where missing as in room #257. | |
| | Replace sink drain and drain rings where tarnished or corroded as in #129. | |
| Prior to opening | Refinish tubs to eliminate cigarette burns and peeling finish as in room #123. | |
| | Deep clean, reseal and grout ceramic flooring tiles as in room #123. | |

Initials: _____

Produced using HC software. 800-244-9121 www.pdesk.com

Quality Assurance

**DAYS INNS WORLDWIDE, INC.**
<u>**SCHEDULE C**</u>
**April 2004**

A.    <u>System Assessment Fees</u>

The System Assessment Fee includes the Basic Service Charge equal to 3.8% of Gross Room Revenues. We reserve the right to increase or modify the Basic Service Charge and any Additional Charges for all Chain Facilities in the United States and to add other fees and charges for new services, at our sole discretion as to amount or formula from time to time but with at least 30 days prior written notice and after consultation with the Board of Directors of the Days Inns Franchisee Advisory Association, and to add, drop or modify the types of services offered.

B.    <u>Mandatory Marketing Program Charge</u>

We charge a Mandatory Marketing Program Charge for your participation in the TripRewards® or successor guest loyalty program. Under TripRewards, program members staying at qualifying rates at Chain Facilities earn their choice of TripRewards points, airline miles or other program currency. TripRewards points are redeemable for free stays at Chain Facilities and for travel, merchandise, entertainment and other awards. The Mandatory Marketing Program Charge is up to 5% of the Gross Room Revenues accruing from each qualifying stay at the Facility. You will be billed monthly in arrears for qualifying stays by program members during the preceding month.

C.    <u>GDS and Internet Booking Fees</u>

We will charge you under our Central Commission Payment Program either a GDS Fee or an Internet Booking Fee for reservations processed through the global distribution systems ("GDS"), including any operated by an affiliate, or the Internet for your Facility. The GDS Fee described in Section 7 is $4.50 per reservation processed through any GDS or through any Internet website powered by a GDS. Internet-originated reservations carry fees of $3.50 per reservation booked through sources other than GDS powered websites or our Chain website. GDS and Internet-originated reservations may also carry a commission if the originator qualifies. If a guest cancels a GDS or Internet-originated reservation using the same source as was used to originate the reservation, you will not be charged the applicable fee.

D.    <u>Additional Reservation System Charges</u>

Agency and other commissions are typically 10% of the Gross Room Revenues generated by each reservation booked by an agency or other qualifying originator. We may raise the agency commission to up to 15% of Gross Room Revenues from time to time for certain Chain-wide promotions upon 20 days advance written notice. Such increases will apply only to reservations booked after we announce the increased commission unless we specify otherwise. The general sales agent commission (also known as the international sales office commission) is 15% of the Gross Room Revenues generated by each reservation originated in an area served by a general sales agent/international sales office and includes the agency commission.

33

We may assess you for additional fees or commissions charged us by distribution channels, travel intermediaries and retailers or for performing other services. By accepting reservations from the GDS, Internet, travel agencies and other intermediaries, you agree to participate in our Central Commission Payment Program and to reimburse us for any fees or commissions we pay to them on your behalf.

You must (i) make available through the Central Reservation System and the Chain website room rates equivalent to those offered to the general public by third parties that you authorize to offer and sell reservations for the Facility's guest rooms and (ii) participate in the Chain's Best Available Rate Guarantee Program according to its published requirements. Beginning May 1, 2004 if a guest finds a lower publicly available rate on the Internet than the "Best Available Rate" you offer through the Chain website or the Central Reservation System for the same date and accommodations and the guest meets all Program requirements, you must provide the first room night to the guest without a room charge. You may collect standard incidental fees, charges and taxes. We will also charge you a Processing Fee of $25 to reimburse us for our administrative charges of handling the complaint.

We will offer you the opportunity to participate in certain Internet distribution channel marketing and reservation activity with third parties including our affiliates. Under one type of arrangement, you will offer rooms for sale through an electronic distribution channel on which you will be paid a net, non-commissionable rate if and when the rooms are sold by the distribution channel at its marked-up rate. For providing and managing this activity we may receive commissions from the Internet distribution channels based upon the mark-up or room rates that they receive for renting your rooms. The net rate you receive, not the mark-up retained by the channel, should be included in Gross Room Revenues. We will allocate these commissions to Royalties and Basic Service Charges in equal proportions. Under another type of arrangement, you will offer rooms for sale through an electronic distribution channel at your best commissionable rate. The distribution channel will not mark-up these rates but will charge you a commission of up to 15% on consumed room nights.

The "property to property" incentive sales commission is 5% of the Gross Room Revenues generated from each reservation originated by another Chain Facility through the Central Reservation System. You will receive an incentive commission equal to 5% of the Gross Room Revenues generated by a reservation originated through the Facility's Reservation System terminal. We may establish rules and procedures for this program in the Manuals. Your incentive commissions are payable monthly in arrears. We may use your incentive commission payments to offset amounts you owe us for Recurring Fees and other charges, or owe our Affiliates for other fees and charges.

We or an affiliate may charge you a commission of up to 10% of the Gross Room Revenues generated from consumed reservations booked by members of affinity groups and organizations participating in our Member Benefits sales program. We or our affiliate usually pays a portion of this commission to the affinity group or organization in exchange for promoting the Member Benefits program to its members.

DAYEXCI
150518 3/04

E.    <u>Guest Services Assessment</u>

We will contact you if we receive any guest complaint about you or the Facility, and you will be responsible for resolving the complaint to the satisfaction of the guest.  If you do not respond to any complaint within 7 business days after we refer it to you and the guest contacts us again to seek resolution, we will charge you a "Guest Services Assessment" of $75.00, plus the costs we incur to settle the matter with the guest.  In addition, if the number of guest complaints per 1,000 occupied roomnights about you or the Facility in a calendar year exceed the "Annual Facility Allotment" we establish with the approval of the Board of Directors of the Days Inn Franchise Advisory Association, Inc., we will charge you a "Processing Fee" of $25.00 for each additional complaint we receive during that year, regardless of whether you are able to resolve it to the guest's satisfaction.  We may change or eliminate the Guest Services Assessment, the Processing Fee, the Annual Facility Allotment and/or the time for responding to or resolving a guest complaint on a Chain-wide basis at any time upon 30 days advance notice, with the approval of the Board.  The Guest Services Assessment and the Processing Fee are intended only to reimburse us for the costs of complaint handling and are not intended as penalties or liquidated damages.  All guest complaints remain subject to indemnification under this Agreement.

DAYEXC1
150518 3/04

Location: **GALSBURG, IL**
Site: ___797___

## SATELLITE CONNECTIVITY SERVICES ADDENDUM

This Satellite Connectivity Services Addendum (the "Addendum") by and between DAYS INNS WORLDWIDE, INC. ("we," "our," "us") and **GROWTH PROPERTY INVESTMENT GROUP, INC.** ("you," "your") is dated ___June 30___, 2004 (the "Addendum Effective Date"). This Addendum is part of the License Agreement (the "Agreement") between you and us.

Notwithstanding anything to the contrary set forth in the Agreement, the following provisions shall supercede and apply:

1. Services. Our affiliate has entered into an agreement with Hughes Network Systems, Inc. ("HNS") under which we are authorized to provide our licensees with satellite-based Internet connectivity services. The specific satellite communications services ("Services") and related equipment necessary for the proper functioning of the Services ("Equipment") are listed in Schedule 1 of this Addendum. We will furnish to you the Services and Equipment (collectively, the "VSAT System") for the Facility. Once installed, you will access the Central Reservation System, the Central Data Warehouse, the Email Network and the Brand Information Source (as those terms are defined in the Software and Services Agreement) using only the VSAT System, except in emergencies, while this Addendum remains in effect.

2. Site Inspection. You will reasonably cooperate with us and HNS to determine how the Equipment will be installed. You will furnish us or HNS with any information requested in order to complete the installation. We or HNS, in our sole discretion, will determine the placement of the Equipment at the Facility, which is intended to ensure the optimal performance of the Services.

3. Installation. HNS will install the Equipment at the Facility during regular business hours, when possible. HNS may install, at its sole discretion, anti-icing equipment to protect the Equipment at the Facility at no additional cost to you. If anti-icing equipment is installed, you must provide, at your expense and prior to the installation date, a source of 110V GFCI 20-amp non-dedicated circuit AC power that is readily available at the antenna site. If your installation involves more than two access devices, or additional Equipment, cabling or costs beyond the standard installation package, we may charge you for the charges we incur with HNS to complete installation of the VSAT System, plus an administrative charge of nor more than $50.00. You will allow installation personnel reasonable access to all areas of the Facility necessary to perform the installation. You will obtain in advance, if necessary, any required permits, approvals or consents from any governmental authority, your landlord or mortgagee to install the Equipment at the Facility, including access to the premises of a third-party, if necessary, to complete the installation. You will permit the installation of certain Equipment on the roof or attached to the exterior walls of the Facility. You will furnish to the installation personnel, free of charge, adequate electrical power, local telephone service, water and other utilities necessary to perform the installation. If (a) you postpone a scheduled installation with less than seven (7)

1

days prior written notice to us, or (b) an installation is delayed or aborted because you did not comply with this Section 3 (collectively, a "Cancellation"), you will pay us an Installation Cancellation Charge of $1,000.00 within five (5) days after our written notice to you. If a second Cancellation occurs, you will be in default under this Addendum. You must then cure this default within thirty (30) days after you receive written notice from us. Toll-free access to the Central Reservation System will be unavailable to you while you are in default under this Addendum. We will provide and will reprogram your property management system or property terminal unit to dial a working telephone number for Central Reservation System access, which may cause you to incur toll charges.

4. Operations; Authorizations. (a) Once installed, you will not move the Equipment without our prior written consent. You will maintain the Equipment according to the environmental conditions we specify. Upon reasonable prior notice, you will give us or HNS reasonable access to inspect the Equipment.

(b) You will maintain, at your expense, any necessary permits and licenses required for your use of the VSAT System.

(c) After the Start Date, we will provide through HNS the Services during the Term so long as you are not in default under this Addendum or the Agreement.

5. Support and Maintenance. After the Equipment is installed and Service commences, we will provide you a toll-free number for reporting VSAT System problems. You will contact the number promptly when and if you experience any problems with the VSAT System, or if any casualty affects the VSAT System. We or HNS will work with you to determine if the problem requires support or maintenance services. The support and maintenance services we or HNS will provide you are listed in Schedule 2 to this Addendum. You will allow maintenance personnel reasonable access to all areas of the Facility necessary to perform these services.

6. Monthly Charges. You will pay to us for the VSAT System a Monthly Service Charge of $150.00 for the period (the "Install Period") beginning on the Start Date and ending at the end of 60 full months after the Start Date, or such lesser amount as we determine to charge all similarly situated licensees in our sole discretion for any subsequent period of time and so notify you in writing. The "Start Date" is the date the Equipment has been installed at the Facility and the VSAT System begins operating. Charges will begin to accrue on the Start Date. We will invoice you for the Monthly Service Charge in advance each month. We will charge you a pro-rated amount of the Monthly Service Charge for the portion of a calendar month in which the Start Date occurs if it is not the first day of the month. You will pay the invoice amount to us upon receipt. You will also pay any excise, sales, use or other taxes assessed in connection with the VSAT System. We may apply any amounts received to any outstanding invoices in any order. We may, after we give you at least 30 days advance written notice, increase the Monthly Service Charge during the term of this Addendum by an amount that reflects the actual price increase to us in the rates HNS charges us for the VSAT System and the cost of providing any related support or maintenance services. If we increase your Monthly Service Charge, we will also apply these increases to all other similarly situated Chain Licensees.

2

7. Term. This Addendum will be effective from the date of execution by you and us and shall continue in full force and effect for a period (the "Initial Term") ending on the last day of the sixtieth (60th) month, starting on the first day of the month following the Start Date (the Term Start Date"), unless earlier terminated in accordance with the terms of this Addendum or the Agreement. At the end of the Initial Term, this Addendum shall renew (a "Renewal Term") on a quarterly basis until either you or we give written notice of termination to the other party at least ninety (90) days before the end of the Initial Term or any subsequent Renewal Term.

8. Software. (a) We assign to you HNS' non-exclusive licenses to use the operating systems in connection with the VSAT System (the "Software"), subject to the conditions and limitations in this Addendum. The Software licenses are found on the packaging of the Equipment. The Software may be used only in conjunction with the VSAT System at the Facility, at no other location, and for the sole purpose of obtaining the Services in connection with the operation of your franchise with us. You may not disclose, reverse engineer, alter, add to, modify or copy the Software for any reason. You may not, directly or indirectly, distribute, sell, assign, transfer, offer, disclose, lease or license the Software to a third party.

(b) Title to and ownership of the Software shall remain with us or those entities that have authorized us to sublicense and use them, free of any claim or right of yours or the holder of any security interest, lien or encumbrance on the Facility or any of your other property. If any person attempts to establish any legal right in the Software, you will promptly notify us in writing.

9. Title to Equipment; Risk of Loss; Insurance. HNS or its designee retains title to the Equipment. You have no right, title, or interest in the Equipment other than as specified in this Addendum. The Equipment is not intended to be a fixture or permanently attached to any real property. You will not allow any security interest, landlord's lien, or any other lien or encumbrance to be placed on or attach to the Equipment. If any person attempts to establish any legal right in or to the Equipment, you will promptly notify us in writing. We or HNS may, at our option, mark, label or otherwise identify the Equipment. You will not remove or deface such identification. You bear the entire risk of loss, theft, damage or destruction of any installed Equipment from any cause whatsoever, unless we or HNS directly caused the loss, damage or destruction. You will promptly notify us if the Equipment is damaged for any reason. You will maintain "all-risk" fire and extended casualty (including any acts of nature such as lightning, wind, rain, snow, flood, fire and hail) insurance for the Equipment during the Initial Term and any Renewal Term of at least $25,000, and you name us, Cendant Corporation, Cendant Finance Holding Corporation, their successors and assigns as additional insureds. You will furnish us, prior to installation of the VSAT System, with a certificate of insurance showing the insurance coverage is in effect, the named insured and additional insureds. You must furnish us with an updated certificate of insurance each year when renewed and every time a change is made in your insurance policy or insurance carrier.

10. Force Majeure. If performance by you, HNS or us is delayed or prevented because of strikes, inability to procure labor or materials, defaults of suppliers or subcontractors, delays or shortages of transportation, failure of power or telephone transmissions, restrictive governmental

3

laws or regulations, weather conditions, or other reasons beyond the reasonable control of the party, then performance of such acts will be excused and the period for performance will be extended for a period equivalent to the period of such delay. Delays or failures to pay resulting from lack of funds will not be deemed delays beyond your reasonable control.

11. No Warranties; Security; Indemnity. (a) WE MAKE NO WARRANTY WHATSOEVER, EXPRESS OR IMPLIED, INCLUDING, WITHOUT LIMITATION, ANY WARRANTY ABOUT THE VSAT SYSTEM, ITS MERCHANTABILITY, ITS FITNESS FOR ANY PARTICULAR PURPOSE, OR ITS CONFORMANCE TO SPECIFICATIONS OF ANY ORDER OR DOCUMENTATION.

(b) We do not warrant any connection to or transmission over the VSAT System, other than as specified in this Addendum. Your use of any information obtained through the Services is at your own risk. We deny any responsibility for the accuracy or quality of the information obtained through the Services. We do not warrant that the VSAT System will be operate uninterrupted or error-free.

(c) You may not use the VSAT System to take any actions or make any statements that (i) infringe on another party's copyright, patent, trademark, trade secret or other proprietary rights or rights of publicity or privacy; (ii) violate any applicable law, statute, ordinance or regulation; (iii) are defamatory, trade libelous or threatening; (iv) are pornographic or obscene; (v) violate any laws regarding unfair competition, discrimination or false advertising; (vi) result in the distribution of viruses, Trojan horses, worms, time bombs, cancelbots, chain letters or other similar harmful or deleterious programming routines; or (vii) result in the unauthorized entry to any other network, machine or device accessible through the Services. You are responsible for all content transmitted from the VSAT System using the Services.

(d) You are responsible for user access security for the VSAT System, and any unauthorized use of the VSAT System. You must authorize and supervise the users of the VSAT System. We may not provide user access security. However, we and HNS will use reasonable efforts to assist you with detecting and identifying a possible security breach.

(e) We or HNS may, at our sole discretion, institute security controls on the Services to protect the confidentiality, privacy, integrity and availability of your information and our information. These controls include (i) requiring users to utilize unique identification and authorization; (ii) limiting certain levels of access to persons you authorize; (iii) implementing access controls on all data, software or other file-system objects to limit access to only authorized users; (iv) ensuring the integrity of all data stored or processed; and (v) preventing the loss of data processed or transferred.

(f) You acknowledge that the VSAT System is specifically authorized for the Facility's commercial use only, and is not intended for personal Internet use by your personnel or Chain guests. We or HNS may, at our sole discretion, institute filters, screens, traps or other devices on the Services and block certain Internet content from being received at or transmitted from the Facility.

4

DAYEXCI
150518 3/04

(g)  You will indemnify and hold harmless us, our affiliates, successors and assigns and each of the respective directors, officers and employees associated with them against all claims of employees, agents, guests, and all other persons and entities, arising out of your operation, use or non-use of the VSAT System, including any content disseminated from the VSAT System at the Facility.  We will not be liable to you or any other person or entity for personal injury, personal loss or property loss, including but not limited to, damage to the Facility, as a result of your operation, use or non-use of the Services and Equipment.

12.  Temporary Internet Service.  If installation of the VSAT System at the Facility is delayed when your Facility opens as a Chain Facility, you must subscribe, on a temporary basis, to the Internet access service we designate if it offers a local point of presence where the Facility is located.  However, in certain locations you may be obligated to pay additional Internet access charges if your usage exceeds certain specified limits.  If our designated supplier does not offer service in your area, you must subscribe to another Internet service provider, at your cost, until local Internet access service is available from our designated supplier so you can access our information sources available to licensees over the Internet.  You will be responsible for all charges for local access and long distance telecommunications, except the direct charges of any toll-free service we offer.

13.  Default; Termination; Attorney's Fees.  (a) If you are in default under Section 11.1 of the Agreement, or any one of the events described in Section 11.2 of the Agreement that gives us the right to terminate occurs, or you violate Section 11(c) of this Addendum, or you violate Section 8 of the Addendum, or you are in default under either Sections 2 or 3 of the Addendum, or the Equipment becomes inoperable by your act or omission, or you assign or transfer, or attempt to assign or transfer the Services or Equipment without our consent, except as permitted under the Agreement, then to the extent permitted by applicable law, we shall have the right to suspend the Service and use of the Equipment, while the default remains uncured.  Additionally, if you default under this Addendum and do not cure the default within the time permitted, we may, at our option, terminate only this Addendum and not the Agreement, upon written notice to you.

(b)  Upon the termination of this Addendum for any reason, you will permit us or HNS reasonable access to Facility to remove the Equipment. YOU EXPRESSLY WAIVE ANY RIGHT TO NOTICE OF OR A HEARING WITH RESPECT TO REPOSSESSION AND CONSENT TO ENTRY INTO THE FACILITY BY US, HNS OUR OR THEIR AGENTS OR REPRESENTATIVES TO REMOVE THE EQUIPMENT WITHOUT JUDICIAL PROCESS.  If you fail or refuse to permit the peaceable entry to take possession of any Equipment, you will be liable for rental of the Equipment at the rate of Five Hundred Dollars ($500.00) per week from the date that we first attempt to retake it.

(c)  If we terminate this Addendum under Section 13(a), you will pay us "Addendum Liquidated Damages" of One Thousand Dollars ($1,000.00) within 10 days following the date of termination.  Addendum Liquidated Damages are paid in place of our claims for lost future Monthly Service Charges under this Addendum and the costs to de-install the Equipment.  You and we acknowledge that actual damages are difficult or impossible to ascertain on the

5

Addendum Effective Date, and the amount of the Addendum Liquidated Damages is a reasonable pre-estimate of the damages that will be incurred and is not a penalty. Our right to receive other amounts due under the Agreement and this Addendum is not affected.

(d)   The non-prevailing party will pay the costs and expenses, including reasonable attorneys' fees and the expenses, incurred by the prevailing party to enforce this Addendum.

remainder of page intentionally left blank

6

IN WITNESS WHEREOF, the undersigned have executed this Addendum as of the date set forth above.

**WE:**
**DAYS INNS WORLDWIDE, INC.**

By:_____

(Vice) President

**YOU**, as licensee:
**GROWTH PROPERTY INVESTMENT GROUP, INC.**

By:_____

**(Vice) President**

7

**SCHEDULE 1**
**SERVICES AND EQUIPMENT**

The Services are full duplex point-to-multipoint satellite communications between an HNS shared hub (the "Hub") and the Facility. The Services include the following:

1) Provision and operation of the Hub by HNS on a 24 hour per day, 365 day per year basis.

2) Built-in redundancy to ensure a higher level of Service availability in the event of HNS equipment failure.

3) Installation of the Equipment at the Facility.

4) Provision and operation of the space segment of HNS's satellite, including its satellite transponder capacity.

5) Equipment maintenance services specified in Schedule 2 of this Addendum.

The Equipment consists of :

1) DW4010 outdoor satellite antenna, indoor equipment with two ethernet ports, two serial (RS-232) ports, and integrated 40 gigabyte hard drive and caching software license.

2) Ethernet Hub (8 port), including up to 25' of ethernet cabling and connections per device for up to 2 separate devices

3) Anti-icing equipment, where required.

8

## SCHEDULE 2
## SUPPORT AND MAINTENANCE

You will receive the following maintenance and support services:

1) Telephone Support.  You may contact HNS' satellite control center 24 hours per day, 365 days per year by calling a toll free telephone access to receive Service support.

2) Corrective Maintenance.  If HNS determines that the Equipment is not operating properly, HNS will restore the Equipment to good working condition by performing the following corrective maintenance as required:

a) Diagnostic testing to determine the existence and cause of the malfunction;
b) Removal and replacement of any malfunctioning field replaceable Equipment ;
c) Reorientation (repointing) of the antenna subsystem;
d) Repair or replacement of Equipment interconnecting cables;
e) Reloading initializing instructions and recommissioning;
f) Verification of proper operation and completion of service report; and
g) Notification to the you, us and the control center that the Equipment has been restored to operational status.

3) Limitations.  Maintenance services do not include any of the following services:

a)  Maintenance, repair, or replacement of parts damaged or lost through catastrophe, accident, lightning, theft, misuse, fault, or negligence of the you or causes external to the Equipment, including failure of, or faulty, electrical power or air conditioning, operator error, failure, or malfunction of data communication we or HNS did not provide you, or from any cause other than intended and ordinary use.

b)  Changes, modifications, or alterations in or to the Equipment by anyone other than HNS or us other than HNS-approved upgrades and configuration changes

c)  Deinstallation, relocation, or removal of the Equipment or any accessories, attachments, or other devices

4) Software Maintenance.  HNS will correct reported defects in the Software that cause it not to substantially perform in accordance with its applicable specifications as promptly as commercially reasonable at no cost to Customer.

5) Software Maintenance Service Limitations.  We and HNS have no responsibility to correct any defects in any Software that are caused by (i) modification of the Software by any person other than us or HNS; (ii) failure to install an update provided by us or HNS within 60 days after we or HNS provide it to you; (iii) misuse or improper installation by you; or (iv) problems in third-party hardware, software, or networking equipment which is manipulated by, interoperates with, or operates in conjunction with the Software.

9

## ADDENDUM TO THE LICENSE AGREEMENT PURSUANT TO THE CALIFORNIA FRANCHISE INVESTMENT LAW

This Addendum to the License Agreement by and between DAYS INNS WORLDWIDE, INC. ("we", "our" or "us") and **GROWTH PROPERTY INVESTMENT GROUP, INC.** ("you") is dated _June 30_, 200_4_.

Notwithstanding anything to the contrary set forth in the License Agreement, the following provisions shall supersede and apply:

    1.  Our right to terminate the License under Section 11.2 if you commence a bankruptcy proceeding may not be enforceable under federal bankruptcy law.

    2.  Under Section 1671 of the California Civil Code, certain liquidated damages clauses are unenforceable.

    3.  California law may not enforce the choice of New Jersey law in Section 17.6.1 to govern the License Agreement.

    4.  California Corporations Code, Section 31125, requires us to give you a disclosure document, approved by the Department of Corporations, prior to solicitation of a proposed material modification of an existing franchise or license.

    5.  California Business and Professions Code, Sections 2000 through 20043 provide rights to the licensee concerning termination and non-renewal of the franchise or license.  If the License Agreement is inconsistent with the law, the law will control.

    6.  If the License Agreement requires you to execute a general release of claims upon renewal or transfer of the License Agreement, California Corporations Code Section 31512 provides that any condition, stipulation or provision purporting to bind any person acquiring any franchise to waive compliance with any provision of that law or any rule or order thereunder is void.  Section 31512 voids a waiver of your rights under the Franchise Investment Law (California Corporations Code Section 31000-31516).  California Business and Professions Code Section 20010 voids a waiver of your rights under the Franchise Relations Act (Business and Professions Code Sections 2000-20043).

    7.  All other rights, obligations, and provisions of the License Agreement shall remain in full force and effect.  Only the Sections specifically added to or amended by this Addendum shall be affected.  This Addendum is incorporated in and made a part of the License Agreement for the State of California.

<div align="center">1</div>

DAYEXCI
150518 3/04

IN WITNESS WHEREOF, the undersigned have executed this Addendum as of the date set forth above.

**WE:**
DAYS INNS WORLDWIDE, INC.

Attest: _____
      (Assistant) Secretary

By: _____
     Vice President

**YOU,** as licensee:
**GROWTH PROPERTY INVESTMENT**

**GROUP, INC.**

Attest: _____

By: _____
     (Vice) President

2

DAYEXCI
150518  3/04

**ADDENDUM TO THE LICENSE AGREEMENT PURSUANT TO THE
ILLINOIS FRANCHISE DISCLOSURE ACT**

This Addendum to the License Agreement by and between DAYS INNS WORLDWIDE, INC. ("we", "our" or "us") and **GROWTH PROPERTY INVESTMENT GROUP, INC.** ("you") is dated _____, 2004.

These provisions supersede anything to the contrary in the License Agreement:

1.    The Illinois Franchise Disclosure of 1987, as amended, applies to this Agreement and supersedes any conflicting provision of the License Agreement or New Jersey law.

2.  The first and third sentences of Section 14.2 are deleted.

3.  Section 17.6.3 of the License Agreement is amended by providing that all litigation by or between you and us, arising directly or indirectly from the franchise relationship, shall be commenced and maintained, at our election, in the state courts of Illinois or the United States District Court for Illinois with the specific venue, in either court system, determined by appropriate jurisdiction and venue requirements; a License Agreement may, however, provide for arbitration in a forum outside of the state of Illinois.

4.  If any of the provisions of the License Agreement are inconsistent with applicable state law, then the state law shall apply to the extent such law is constitutional and valid as applied.

5.  The acknowledgment of receipt of a copy of the UFOC at least 10 business days before paying any fee or signing any contract with us is deleted from Section 17.7.1 of the License Agreement. Section 17.7.4 of the License Agreement is deleted.

6.  Sections 17.7.2 and 17.7.3 are amended to read as follows:

"17.7.2   Neither we nor any person acting on our behalf has made any oral or written representation or promise to you on which you are relying to enter into this Agreement that is not written in this Agreement or included in the UFOC. You release any claim against us or our agents based on any oral or written representation or promise not stated in this Agreement or included in the UFOC.

17.7.3   This Agreement, together with the exhibits and schedules attached, is the entire agreement superseding all previous oral and written representations, agreements and understandings of the parties about the Facility and the License except those contained in the UFOC."

7.  All other rights, obligations, and provisions of the License Agreement shall remain in full force and effect. Only the Sections specifically added to or amended by this Addendum shall be affected. This Addendum is incorporated in and made a part of the License Agreement for the State of Illinois.

1

DAYEXCI
150518 3/04

IN WITNESS WHEREOF, the undersigned have executed this Addendum as of the date set forth above.

**WE:**
DAYS INNS WORLDWIDE, INC.

By: _____
                Vice President

Attest: _____
                Assistant Secretary

**YOU, as licensee:**
**GROWTH PROPERTY INVESTMENT GROUP, INC.**

By: _____
                (Vice) President

Attest: _____

2

DAYEXCI
150518  3/04